

## SECOND AMENDMENT OF LEASE

**THIS SECOND AMENDMENT OF LEASE** (this "**Amendment**") is made as of the 23rd day of February 2017 by and between **40 WALL STREET LLC**, a New York limited liability company, having an office at 725 Fifth Avenue, New York, New York 10022 ("**Landlord**"), and **DEAN & DELUCA, INC.**, a Delaware corporation, having an office at 2402 East 37th Street North, Wichita, Kansas 67219 ("**Tenant**").

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant entered into that certain Lease, dated as of July 16, 2015, as amended by that certain First Amendment of Lease, dated as of October 20, 2015 (as further amended, modified and/or supplemented from time to time, the "**Lease**"), with respect to that certain premises located on a portion of the main floor and lower level (the "**Demised Premises**") in the building known as 40 Wall Street, New York, New York, as more particularly described in the Lease; and

**WHEREAS**, Landlord and Tenant desire to modify and amend the Lease upon such terms and conditions as are more particularly set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

1.    <u>Capitalized Terms</u>. Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Lease.

2.    <u>Permitted Use</u>. Section 2.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"2.01    Subject to, and in accordance with, all rules, regulations, laws, ordinances, statutes and requirements of all governmental authorities, and any Fire Insurance Rating Organization, Board of Fire Insurance Underwriters and/or other similar bodies having jurisdiction thereof, Tenant covenants and agrees that it shall use the Demised Premises solely as (a) a high end café and/or restaurant providing food and beverages for on premises and off premises consumption and for service and outdoor dining in the Outdoor Dining Area, including, at Tenant's election and without limitation, sandwiches prepared on site, on site cooking and preparation of food and beverages, coffee, espresso and espresso based drinks, and beverages containing alcohol, and for any other ancillary lawful purpose, and (b) a kitchen commissary including the on-site cooking preparation, and sale (both wholesale and retail) of food and beverages (including corporate and private catering and private dining services and at Tenant's election, alcoholic beverages) ((a) and (b) collectively are the "**Permitted Use**"). The Demised Premises shall be used for no other purpose, without Landlord's prior consent which consent shall not be unreasonably withheld, delayed, conditioned or denied. Landlord represents and warrants to Tenant that applicable zoning statutes allows the

Demised Premises to be used for the Permitted Use (excluding the Outside Dining Area, which, for sake of clarity and emphasis and notwithstanding anything to the contrary contained in this Lease, Landlord makes no representation to as to any kind or nature). Subject to the terms and conditions described in Section 8.02 as to the Lobby Entrance and vestibule area surrounding same on Exhibit A-1, Landlord represents and warrants that the Permitted Use is not precluded by any third party rights granted to any other tenants (or their predecessors) in the Building. A copy of the waiver by Duane Reade as to Tenant's Permitted Use and to permitted product mix is attached hereto as Exhibit J. Notwithstanding anything to the contrary contained in this Lease, Tenant shall at its own sole cost and expense, comply with all rules, regulations, order and violations of any and all departments, whether City, State or Municipality, having jurisdiction thereof relating to and applicable to the Demised Premises."

3.  Miscellaneous.

(a)  Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed. Tenant hereby confirms that Landlord is not in default under any provision of the Lease, and Tenant has no existing claim, counterclaim or defense with respect to the Lease.

(b)  This Amendment (i) may not be changed, modified, terminated or discharged, in whole or in part, except by a writing, executed by the party against whom enforcement of the change, modification, termination or discharge is sought, (ii) shall be construed, governed and enforced in accordance with the laws of the State of New York, (iii) shall be interpreted and enforced in accordance with its provisions and without the aid of any custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provisions in question, (iv) shall not be binding upon or enforceable against Landlord unless and until Landlord delivers an executed counterpart hereof to Tenant, (v) may be executed in one or more counterparts (and by facsimile or .PDF), each of which so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument, and (vi) shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(c)  If any of the provisions of this Amendment, or its application to any situation, shall be invalid or unenforceable to any extent, the remainder of this Amendment, or the application thereof to situations other than that as to which it is invalid or unenforceable, shall not be affected thereby, and every provision of this Amendment shall be valid and enforceable to the fullest extent permitted by law.

(d)  In the event of any inconsistency between the provisions of this Amendment and those contained in the Lease, the provisions of this Amendment shall govern and be binding.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first above written.

LANDLORD:

**40 WALL STREET LLC**

By: 40 Wall Street Member Corp.,

By: _____
Name: Donald J. Trump, Jr
Title: Executive Vice President

TENANT:

**DEAN & DELUCA, INC.**

By: _____
Name: Jonathan Ley
Title: SVP.



## FIRST AMENDMENT OF LEASE

**THIS FIRST AMENDMENT OF LEASE** (this "**Amendment**") is made as of the 20th day of October 2015, between **40 WALL STREET LLC**, a New York limited liability company having an office at 725 Fifth Avenue, New York, New York 10022 ("**Landlord**" or "**Owner**"), and **DEAN & DELUCA, INC.**, a Delaware corporation having an office at 2402 East 37th Street North, Wichita, KS 67219 ("**Tenant**").

## W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant entered into a Lease dated as of July 16th, 2015 (the "**Lease**"), for that certain premises located on a portion of the main floor and lower level (the "**Demised Premises**") in the building commonly known as 40 Wall Street, New York, New York, as more particularly described in the Lease;

**WHEREAS**, the Lease currently specifies that the Term shall commence on the date of delivery of the Demised Premises to Tenant in the condition required under the Lease with all of Landlord's Work (as defined in Exhibit D of the Lease) substantially complete (the "**Commencement Date**");

**WHEREAS**, Tenant is required to deliver Tenant's Plans to Landlord in order for Landlord to commence Landlord's Work, and as of the date hereof, Tenant is not able to ascertain with certainty as to what date it will be able to deliver Tenant's Plans to Landlord; and

**WHEREAS**, the parties desire by this Amendment to, among other things, amend the definition of Commencement Date as hereinafter set forth.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Defined Terms; Recitals**.  All terms used herein and not otherwise defined shall have the meanings ascribed to them in the Lease.  The recitals set forth hereinabove are expressly incorporated into the body of this Amendment by reference.

2.      **Commencement Date**.  Pursuant to the Lease, prior to the commencement of Landlord's Work by Landlord, Tenant shall have delivered Tenant's Plans to Landlord.  As of the date hereof, there is uncertainty as to when Tenant will deliver Tenant's Plans to Landlord. Due to such uncertainty, Landlord will not be able to commence Landlord's Work, thereby causing a delay in the Commencement Date.  Accordingly, the parties hereby acknowledge and agree that notwithstanding anything to the contrary contained in the Lease, the Commencement Date shall be the earlier to occur of (i) January 1, 2016, and (ii) substantial completion of Landlord's Work.  For the sake of clarity and emphasis (A), in the event Landlord's Work is not substantially completed by January 1, 2016, Landlord shall nonetheless remain obligated to substantially complete Landlord's Work within sixty (60) days after (x) Landlord's receipt and approval of Tenant's Plans and (y) Landlord's receipt of building permits from the New York

City Department of Buildings with respect to Landlord's Work (such date that is sixty (60) days after Landlord's receipt of both (x) and (y), "Landlord's Work Substantial Completion Outside Date") and (B) the Commencement Date shall not be affected by the occurrence of a Force Majeure Event.

3.   **Opening Date; Go-Dark Event; Continuous Operation.**

Landlord and Tenant hereby agree that Section 2.09 of the Lease is hereby deleted in its entirety and replaced with the following:

"A.   Subject to the provisions of Article 46, Tenant covenants and agrees to operate a gourmet supermarket at the Demised Premises in accordance with the requirements of this Article 2 on or before September 1, 2016 ("**Opening Date**"), and continue thereafter for the term of the Lease ("**Continuous Operation Period**").   If a Go Dark Event (as defined in Article 46) occurs, the same shall not constitute an Event of Default (as hereinafter defined) but Landlord will have a right of recapture as set forth in Article 46.

B.   In the event Tenant is not continuously operating a gourmet supermarket at the Demised Premises on or before the Opening Date (TIME BEING OF THE ESSENCE), except if due to a Force Majeure Event or Landlord's failure to substantially complete Landlord's Work by Landlord's Work Substantial Completion Outside Date, then in such event Tenant hereby acknowledges and agrees that it shall no longer be entitled to an abatement of Fixed Rent for the twenty fifth (25th) month subsequent to the Commencement Date, as currently provided for in Article 1.05 and Exhibit "C" of the Lease.

C.   In the event Tenant is not continuously operating a gourmet supermarket at the Demised Premises on or before October 16, 2016 (TIME BEING OF THE ESSENCE), except if due to a Force Majeure Event or Landlord's failure to substantially complete Landlord's Work by Landlord's Work Substantial Completion Outside Date, then in such event Tenant hereby acknowledges and agrees that it shall also no longer be entitled to an abatement of Fixed Rent for the thirty seventh (37th) month subsequent to the Commencement Date, as currently provided for in Article 1.05 and Exhibit "C" of the Lease.

D.   In the event Tenant is not continuously operating a gourmet supermarket at the Demised Premises on or before December 1, 2016 (TIME BEING OF THE ESSENCE), except if due to a Force Majeure Event or Landlord's failure to substantially complete Landlord's Work by Landlord's Work Substantial Completion Outside Date, then in such event Tenant hereby acknowledges and agrees that the abatement of Fixed Rent it is entitled to receive as of the Commencement Date (as currently

provided for in Article 1.05 and Exhibit "C" of the Lease) shall be reduced on a day for day basis for each and every day after December 1, 2016 (TIME BEING OF THE ESSENCE) that Tenant is not continuously operating a gourmet supermarket at the Demised Premises.

For sake of clarity and emphasis, the dates referred to in subparagraphs B, C and D hereinabove shall be extended on a day for day basis for each and every day that (a) there is a Force Majeure Event or (b) Landlord fails to substantially complete Landlord's Work by Landlord's Work Substantial Completion Outside Date."

4.     Landlord and Tenant hereby agree that the third (3rd), fourth (4th) and fifth (5th) sentences of Section 3.02 of the Lease are hereby deleted in their entirety.

5.     **Effect of Amendment**.  As modified and amended by this Amendment, all of the terms, covenants and conditions of the Lease are hereby ratified and confirmed and shall continue to be and remain in full force and effect throughout the remainder of the term thereof.

6.     **Miscellaneous**.  The captions and section numbers appearing in this Amendment are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections of this Amendment nor in any way affect this Amendment.  This Amendment may be executed in one or more counterparts (and by facsimile or .PDF), each of which so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

*[The remainder of this page is left intentionally blank.  Signature page to follow.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed as of the day and year first above written.

LANDLORD:

**40 WALL STREET LLC**

By: 40 Wall Street Member Corp.,

By: _____
Name:
Title:

TENANT:

**DEAN & DELUCA, INC.**

By: _____
Name: Dustin Schwind
Title: VP of Finance

**40 WALL STREET LLC**
Landlord

**TO**

**DEAN & DELUCA, INC.**
Tenant

<u>**LEASE**</u>

Premises:  40 WALL STREET, NEW YORK, N.Y.

DEAN & DELUCA – 40 WALL STREET- LEASE (EXECUTION 7-17-15 PM)

## INDEX

Page

ARTICLE 1   Demise, Premises, Term, Rents ................................................................. 1
ARTICLE 2   Use and Operation ................................................................................... 3
ARTICLE 3   Preparation of the Demised Premises ..................................................... 10
ARTICLE 4   Security .................................................................................................... 11
ARTICLE 5   Adjustments Of Rent ............................................................................... 15
ARTICLE 6   Adjacent Excavation-Shoring .................................................................. 17
ARTICLE 7   Subordination, Notice To Lessors And Mortgagees ............................... 17
ARTICLE 8   Quiet Enjoyment ..................................................................................... 19
ARTICLE 9   Assignment and Subletting ...................................................................... 20
ARTICLE 10  Compliance With Laws And Requirements Of Public Authorities ........ 27
ARTICLE 11  Insurance .................................................................................................. 29
ARTICLE 12  Rules And Regulations ............................................................................ 33
ARTICLE 13  Tenant's Changes ..................................................................................... 34
ARTICLE 14  Tenant's Property ..................................................................................... 39
ARTICLE 15  Repairs And Maintenance ....................................................................... 40
ARTICLE 16  Electricity ................................................................................................. 42
ARTICLE 17  Other Utilities .......................................................................................... 44
ARTICLE 18  Other Services .......................................................................................... 45
ARTICLE 19  Sprinklers ................................................................................................. 47
ARTICLE 20  Access, Changes in Building Facilities, Name ....................................... 48
ARTICLE 21  Notice Of Accidents ................................................................................ 49
ARTICLE 22  Non-Liability And Indemnification ......................................................... 50
ARTICLE 23  Destruction Or Damage ........................................................................... 51
ARTICLE 24  Eminent Domain ...................................................................................... 52
ARTICLE 25  Surrender .................................................................................................. 54
ARTICLE 26  Conditions of Limitation ......................................................................... 55
ARTICLE 27  Re-Entry By Landlord .............................................................................. 57
ARTICLE 28  Damages .................................................................................................... 58
ARTICLE 29  Waivers ..................................................................................................... 59
ARTICLE 30  No Other Waivers Or Modifications ........................................................ 60

ARTICLE 31    Curing Tenant's Defaults, Additional Rent ........................................................... 61

ARTICLE 32    Broker........................................................................................................... 62

ARTICLE 33    Notices.......................................................................................................... 62

ARTICLE 34    Estoppel Certificate, Memorandum ............................................................... 63

ARTICLE 35    Arbitration .................................................................................................... 65

ARTICLE 36    No Other Representations, Construction, Governing Law, Consents.................. 65

ARTICLE 37    Parties Bound ................................................................................................ 66

ARTICLE 38    Certain Definitions And Construction ............................................................. 66

ARTICLE 39    ADA and Hazardous Materials ....................................................................... 67

ARTICLE 40    Tenant's Option to Extend Lease Term ........................................................... 68

ARTICLE 41    Maintenance of the Storefront........................................................................ 70

ARTICLE 42    [Intentionally Omitted]................................................................................... 50

ARTICLE 43    Ground Lease Provisions ................................................................................ 71

ARTICLE 44    HVAC System................................................................................................ 51

ARTICLE 45    [Intentionally Omitted]................................................................................... 51

ARTICLE 46    Go Dark Event............................................................................................... 54

ARTICLE 47    Miscellaneous................................................................................................ 55

Exhibit A-1 - Floor Plan
Exhibit A-2 – Description of Outdoor Dining Area
Exhibit B - Description of Land
Exhibit C - Rent
Exhibit D - Landlord's Work and Tenant's Work
Exhibit E - Definitions
Exhibit F - Rules and regulations
Exhibit G – Certificate of Occupancy
Exhibit H – Approved Signage
Exhibit H-1 – Approved Awnings
Exhibit I – Construction Rules and Regulations
Exhibit J – Duane Reade Waiver of Existing Exclusives
Exhibit K – Load Letter
Exhibit L – New Freight Lift Location and Specifications
Exhibit M – Memorandum Confirming Term
Exhibit N- Estoppel

This Index is included only as a matter of convenience of reference and shall not be deemed or construed in any way to define or limit the scope of the following lease or the intent of any provision thereof.

LEASE, dated as of July 16th, 2015 between 40 Wall Street LLC, a New York limited liability company having an office at 725 Fifth Avenue, New York, New York, hereinafter called "Landlord" or "Owner") and Dean & DeLuca, Inc., a Delaware corporation, having an office at 2402 East 37th Street North, Wichita, KS 67219 (hereinafter called "Tenant").

## WITNESSETH:

## ARTICLE 1

### Demise, Premises, Term, Rents

1.01 Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the premises hereinafter described, in the building located at 40 Wall Street, in the Borough of Manhattan, City, County and State of New York (the "**Building**"), on the parcel of land more particularly described in Exhibit B (the "**Land**"), for the term hereinafter stated, for the rents hereinafter reserved and upon and subject to the conditions (including limitations, restrictions and reservations) and covenants hereinafter provided. Each party hereby expressly covenants and agrees to observe and perform all of the conditions and covenants herein contained on its part to be observed and performed.

1.02 The premises hereby leased to Tenant are a portion of the main floor and lower level of the Building, as shown on the floor plans annexed hereto as Exhibit A1. Said premises together with all fixtures and equipment which during the term, of this lease are thereto attached (except items not deemed to be included therein and removable by Tenant as provided in Article 14) constitute and are hereinafter called the "**Demised Premises**". The Demised Premises are bounded by the interior face of exterior walls, the mid-point of all party walls separating the Demised Premises from any parts of the Building, and the surface of the floor slab, and specifically exclude any structural elements of the Building located within the Demised Premises or utility lines and systems located within, but not exclusively serving the Demised Premises. Subject to the terms and conditions of this Lease and all applicable laws, rules and regulations of any governmental or quasi-governmental entity or body (including, without limitation and as applicable, the NYC Department of Consumer Affairs, the Department of Health and Department of Transportation, if required), Landlord herein agrees to provide Tenant with the exclusive right to use that area described on Exhibit A-2 for outdoor dining ("**Outdoor Dining Area**"). Tenant shall obtain any approvals required by governmental agencies in connection with the Outdoor Dining Area but the failure to obtain such approvals shall not affect the validity of this lease.

1.03 The term of this lease (hereinafter the "**Term**") for which the Demised Premises are hereby leased, shall commence on the date of delivery of the Demised Premises to Tenant in the condition required hereunder with all of Landlord's Work (as defined in Exhibit D) substantially complete (the "**Commencement Date**") and shall end (subject to Article 40 hereof) on the last day of the month which is fifteen (15) years after the Rent Commencement Date, which ending date is hereinafter called the "**Expiration Date**", or upon such earlier date upon which said term may expire or be canceled or terminated pursuant to any of the provisions or covenants of this lease or pursuant to law. Promptly following the Rent Commencement Date, the parties hereto (hereinafter sometimes referred to as the "**parties**") shall enter into a

1

recordable supplementary agreement setting out the Commencement Date, Rent Commencement Date and Expiration Date and, if they cannot agree thereon within fifteen (15) days after Landlord's request therefor, such dates shall be determined by arbitration in the manner provided in Article 35. As used herein, the **"Rent Commencement Date"** shall mean fifteen (15) months after the Commencement Date. As used herein, the "initial term" means the period that commences on the Commencement Date and expires on the Expiration Date. As used herein, "the term hereof" or the "term of this Lease" means the initial term and each renewal term that Tenant has validly exercised pursuant to the provisions of Article 40 hereof.

1.04    The **"rents"** reserved under this lease, for the term thereof, shall be and consist of:

(a)    **"fixed rent"** or "Fixed Rent" as specified on Exhibit C annexed hereto which shall be payable in equal monthly installments in advance on the first day of each and every calendar month during the term of this lease, and

(b)    **"additional rent"** or "Additional Rent" consisting of all such other sums of money as shall become due from and payable by Tenant to Landlord hereunder (for default in payment of which Landlord shall have the same remedies as for a default in payment of fixed rent), all to be paid to Landlord at its office, or such other place, or to such agent and at such place, as Landlord may designate by notice to Tenant, in lawful money of the United States of America.

1.05    From and after the Rent Commencement Date (except as otherwise specifically provided in Exhibit C), Tenant shall pay the fixed rent and additional rent herein reserved promptly as and when the same shall become due and payable, without demand therefor and without any abatement, deduction or setoff whatsoever except as expressly provided in this lease.

Anything in this Lease to the contrary notwithstanding, provided Tenant is not in default under the terms, covenants and conditions of this Lease beyond the expiration of any applicable notice and cure periods, Fixed Rent shall be abated (excluding any electric charges and other Additional Rent) and any direct charges, where applicable) beginning with the Commencement Date and ending fifteen (15) months thereafter (i.e., on the day immediately prior to the Rent Commencement Date), after which period the full Fixed Rent payments shall commence in accordance with the terms of this Lease. Furthermore, provided Tenant is not in default under the terms, covenants and conditions of this Lease beyond the expiration of any applicable notice and cure periods, Fixed Rent shall also be abated (excluding any electric charges and other Additional Rent) and any direct charges, where applicable) for the twenty fifth (25th) month and thirty seventh (37th) month subsequent to the Commencement Date.

1.06    If the Rent Commencement Date occurs on a day other than the first day of a calendar month, the fixed rent for the calendar month in which fixed rent is first due and payable shall be prorated and the balance of the first month's fixed rent theretofore paid shall be credited against the next monthly installment of fixed rent.

1.07    Landlord shall use reasonable efforts to cooperate with Tenant in connection with Tenant's application to receive real estate tax abatements currently available under Title 4 of Article 4 of the Real Property Tax Law of the State of New York ("Title 4"). Pursuant to Title 4,

Landlord hereby informs Tenant that: (a) an application for abatement of real property taxes pursuant to Title 4 will be made for the Demised Premises; (b) Tenant's tax payment will be adjusted to accurately reflect any abatement of taxes granted pursuant to Title 4 for the Demised Premises; (c) at least $35.00 per square foot must be spent on improvements to the Demised Premises and common areas, the amount being dependent upon the length of this Lease and whether it is a new or renewal lease; and (d) all abatements granted with respect to a building pursuant to Title 4 will be revoked if, during the benefit period, real estate taxes or water or sewer charges or other lienable charges are unpaid for more than one year, unless such delinquent amounts are paid as provided in Subdivision Four of Section Four Hundred Ninety-Nine of Title 4.

    1.08    Intentionally Deleted.

# ARTICLE 2

## Use and Operation

    2.01    Subject to, and in accordance with, all rules, regulations, laws, ordinances, statutes and requirements of all governmental authorities, and any Fire Insurance Rating Organization, Board of Fire Insurance Underwriters and/or other similar bodies having jurisdiction thereof, Tenant covenants and agrees that it shall use the Demised Premises solely as a full service gourmet food market with a mix of food, food products and merchandise and for any other lawful purpose including, without limitation, for the on-site cooking preparation, and sale (both wholesale and retail) of food and beverages (including corporate and private catering and private dining services and at Tenant's election, alcoholic beverages) for on and off-premises consumption and for service and outdoor dining in the Outdoor Dining Area (the "Permitted Use"). The Demised Premises shall be used for no other purpose, without Landlord's prior consent which consent shall not be unreasonably withheld, delayed, conditioned or denied. Landlord represents and warrants to Tenant that applicable zoning statutes allows the Demised Premises to be used for the Permitted Use (excluding the Outside Dining Area, which, for sake of clarity and emphasis and notwithstanding anything to the contrary contained in this Lease, Landlord makes no representation to as to any kind or nature). Subject to the terms and conditions described in Section 8.02 as to the Lobby Entrance and vestibule area surrounding same on Exhibit A-1, Landlord represents and warrants that the Permitted Use is not precluded by any third party rights granted to any other tenants (or their predecessors) in the Building. A copy of the waiver by Duane Reade as to Tenant's Permitted Use and to permitted product mix is attached hereto as <u>Exhibit J</u>. Notwithstanding anything to the contrary contained in this Lease, Tenant shall at its own sole cost and expense, comply with all rules, regulations, order and violations of any and all departments, whether City, State or Municipality, having jurisdiction thereof relating to and applicable to the Demised Premises.

    2.02    Tenant agrees that, subject to all of the terms, covenants and conditions of this lease (including the balance of this Article 2), it will, during the entire Term, conduct its business in the entire Demised Premises:

(a)     in conformity with standards of practice followed by other gourmet food markets conducting a similar business to that conducted by Tenant in New York City; and

(b)     under the name "Dean & DeLuca" or another name either used in a majority of Tenant's other locations or otherwise reasonably acceptable to Landlord.

Additionally, except for Permitted Closing Days (as hereinafter defined) and except as set forth in this Lease (including but not limited to Article 46), Tenant shall, throughout the Term, keep the market open for business with the public, at a minimum, Mondays through Thursdays from 7 AM to 5 PM and from 7 AM to 3 PM on Fridays, and during such additional hours with respect to all or any portion(s) of the Demised Premises as Tenant, in its sole discretion, shall deem appropriate (including, at Tenant's election, private events on weekends). Permitted Closing Days shall mean and refer to (a) recognized State and Federal holidays; (b)Intentionally Deleted; (c) a reasonable period of time to complete renovations and repairs; (d) Force Majeure Events (hereinafter defined), and (e) days upon which Tenant shall not be able to open due to fire, casualty or condemnation. Subject to the terms and conditions of this Lease (including but not limited to Article 1.08) Tenant and its employees and customers shall have free and unimpeded access to the Demised Premises from the Direct Entrance to the Premises and to the Building Lobby and the Lobby Entrance to the Premises Tenant through the Main Building Entrance (all as defined and identified in Exhibit A-1 attached hereto). During the term, without additional charge, Tenant shall have the non-exclusive use of the Delivery Area (as defined and identified on Exhibit A-1) and the exclusive use of the New Freight Lift (as hereinafter defined) installed by Tenant, at its sole cost and expense, in accordance with such plans and specifications as reasonably approved by Landlord.

2.03     Notwithstanding the designation, if any, of the Building as "40 Wall Street" or any other identifiable name, or any similar or other designation containing the name "Trump" or any other identifiable name, neither Tenant nor any subtenant, concessionaire, licensee, or any of their respective partners, officers, agents, employees, or affiliates shall, at any time during the Term, or after the expiration or sooner termination of the Term, use any name that contains the name "40 Wall Street or "Trump" or such other identifiable name in any form, combination, or manner (including in any advertising), except with the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed; provided that Tenant shall be entitled to indicate and advertise the location of its restaurant as 40 Wall Street, New York, New York (or any variant thereof) for all purposes without further consent from Landlord. After the expiration or sooner termination of the Term, neither Tenant nor any subtenant, concessionaire, licensee, or any of their respective partners, officers, agents, employees, or affiliates shall use any name that contains any word(s) referring to the Building, or state or imply in any advertisement, notice, sign, or otherwise that it or any of them was connected in any manner with same, or use any device or set of words that might so indicate, except with Landlord's prior written consent in each instance or if notifying vendors or customers of a change in Tenant's location or address. Upon at least thirty (30) days' prior written notice to Tenant, Landlord may at any time or times change any such name or designation of the Building. Notwithstanding anything contained herein to the contrary, Landlord agrees that it may not cause or permit the Building to be named after a competitor of Tenant's; provided Landlord has not sold or assigned any of the Landlord's interest in the Ground Lease.

2.04    Tenant agrees that, notwithstanding anything to the contrary contained in this lease, Landlord shall have the right to prohibit the continued use by Tenant of any method of business operation, advertising or interior display if, in Landlord's reasonable opinion, the continued use thereof would impair the reputation of the Building or is otherwise out of harmony with the general character thereof, and, upon notice from Landlord, Tenant shall forthwith refrain from or discontinue such activities.  Landlord agrees that the use of the Demised Premises for the Permitted Use in compliance with the terms of this Lease shall not result in any such prohibition.  Any dispute pursuant to this Section 2.04 shall be submitted to arbitration as provided in Article 35, and the loser in such arbitration shall pay all costs in connection therewith.

2.05    Tenant covenants and agrees to:

(a)    at Tenant's sole cost and expense, keep the interior, non-structural elements of the Demised Premises (including the exterior and interior portions of all windows, doors and all other glass and any and all kitchen exhaust duct(s) and other similar equipment servicing only the Demised Premises) in a neat and clean condition and, diligently keep the Demised Premises free and clear of any rats, mice, insects and other vermin.  In furtherance thereof, Tenant shall employ an exterminator, among others, who will utilize the best prevailing method for the prevention of any infestation, by and extermination of, said animals and insects.  If, in Landlord's sole but reasonable judgment, Tenant shall fail to satisfactorily carry out the provisions of this paragraph following fifteen (15) days written notice and opportunity to cure, Landlord may, but shall not be obligated to, employ an exterminator or other service, and the cost and expense incurred by Landlord for such exterminator or other service shall be repaid to Landlord by Tenant, on demand, and such amounts so repayable shall be considered as Additional Rent;

(b)    use for office, clerical, or other non-revenue producing purposes only such space in the Demised Premises as is reasonably required for Tenant's business therein;

(c)    maintain, at Tenant's sole cost and expense, the interior of the Demised Premises and all of Tenant's personal property therein as an attractive area consistent with an attractive a gourmet market type with respect to each respective portion of the Demised Premises, in accordance with high quality the general reputation and character of the Building;

(d)    require all employees and attendants in the Demised Premises to be properly attired at all times and otherwise to have an appearance consistent with an attractive gourmet market type operation in accordance with the general reputation and character of the Building;

(e)    reasonably cooperate with Landlord in promoting the use of such trade names, slogans or logos as Landlord may adopt for the Building, but nothing contained herein shall be deemed or construed to require Landlord to undertake such promotion or adopt any such trade name, slogan or logo or for Tenant to incur any costs or expenses in connection therewith, provided that nothing herein shall limit or affect Tenant's right to do business under the name 'Dean & Deluca' (or such other name as may be acceptable or approved in accordance with Section 2.02 hereof) and to use such logos, trade names and other indicia of operations as Tenant may desire.

(f)     obey and observe (and compel its officers, employees, contractors, licensees, invitees, subtenants, concessionaires and all others doing business with it, to obey and observe), at Tenant's sole cost and expense, all reasonable rules and regulations established by Landlord from time to time for the conduct of Tenant and/or for the welfare of the Building, so long as the same: (i) are reasonable in nature and not discriminatory with respect to Tenant, (ii) do not result in any expense to Tenant other than a deminimus amount, (iii) do not materially interfere with Tenant's business operations at the Demised Premises and Outdoor Dining Area (subject to Tenant's obligations relating to said Outdoor Dining Area) and (iv) do not impact Tenant's use of the New Freight Lift ; but Landlord shall, except in case of emergency, give Tenant at least fifteen (15) days' notice of the establishment thereof; in the event of any conflict between such rules and regulations and Tenant's rights under this lease, the terms and provisions of this lease shall control;

(g)     Tenant shall, at Tenant's sole cost and expense, routinely cause the windows to be cleaned in a high quality manner and keep the Demised Premises well-lit and well-appointed during the term of this Lease and any renewal term so that Tenant's business in the Demised Premises will not appear to the general public to have ceased operating;

(h)     operate its business in the Demised Premises with adequate equipment and trade fixtures that shall, when initially installed, be new or like-new, functional, sufficient and of good workmanship;

(i)     take all reasonable precautions, at its sole cost and expense, to prevent any unusual or obnoxious odors from emanating from the Demised Premises, including the installation of such reasonable control devices (such as a rotoclone or other similar devices) at all applicable points of cooking and the establishment of reasonable control procedures to eliminate such obnoxious odors;

(j)     install, if required under all applicable codes and laws, and maintain in all cooking areas, at its sole cost and expense, chemical fire extinguishing devices (such as ansul) approved by the Fire Insurance Rating Organization having jurisdiction over the Demised Premises and, if gas is used in the Demised Premises for cooking or other purposes, suitable gas cut-off devices (manual and automatic);

(k)     take all reasonable steps, at its sole cost and expense, to prevent fat, grease, or any other greasy substance from entering the waste lines of the Building;

(l)     perform, at its sole cost and expense, any and all maintenance reasonably necessary or desirable in order to keep the floors of all kitchen areas in watertight condition;

(m)     handle and dispose of all rubbish, garbage and waste from Tenant's operations in areas reasonably designated by Landlord from time to time in accordance with reasonable regulations established by Landlord and the terms of Section 18.02 and not permit the accumulation or burning of any rubbish or garbage in, on, or about any part of the Building;

(n)     Tenant shall install and maintain all equipment and appliances in compliance with all applicable governmental codes and regulates and as required by Landlord's insurance;

(o)     Tenant shall comply with all laws, ordinances, health statutes, rules, regulations and all codes at all times in full force and effect and issued by any Federal, State or local governmental authority having jurisdiction over the Demised Premises, or the conduct of Tenant's business enterprise or use within the Demised Premises;

(p)     Tenant should be prohibited from causing excessive noise or vibration in the Building and must take all necessary steps to comply with all Municipal rules, orders, ordinances and regulations relating thereto;

(q)     the Demised Premises may not be used for residential purposes and that sleeping overnight in the Demised Premises, or other such housekeeping functions are not permitted;

(r)     Tenant shall, at Tenant's sole cost and expense, routinely cause the Outdoor Dining Area to be cleaned in a high quality manner;

(s)     Tenant shall take all steps necessary to monitor the flow of traffic in and out of the Demised Premises and the Building to ensure that the Tenant's business operations do not interfere with the operations and conduct of the Building or of the businesses of other tenants of the Building; and

(t)     maintain an "A" rating with the New York City Department of Health.

Tenant hereby agrees that the agreements, terms, covenants and conditions contained in this Section 2.05 shall, in no event or respect, be taken, deemed, interpreted, or construed to limit the generality of Section 2.04 in any respect or to define or otherwise affect the scope or breadth of the said Section 2.04.

2.06     Tenant agrees that it shall not, at any time, without first obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed:

(a)     utilize any unethical method of business operation in the Demised Premises or any portion thereof;

(b)     change (whether by alteration, replacement, rebuilding, or otherwise) the exterior color and/or exterior architectural treatment of the Demised Premises or of the Building or any part thereof;

(c)     use, or permit to be used or obstructed, any corridor, or any other space outside the Demised Premises (other than the Outdoor Dining Area which shall be located at each side of Tenant's entrance door and four (4) feet away from the glass wall and may be used for sale and dining purposes), for display, sale, storage, or any other similar undertaking or allow the Demised Premises or any portion thereof to be used for housing accommodations or sleeping purposes;

(d)     use, or permit to be used, any advertising medium that may be heard outside the Demised Premises or that does not comply with the written rules and regulations for the Building then in effect;

(e)     use the plumbing facilities for any purpose other than that for which they were constructed, or dispose of any garbage or other foreign substance therein, whether through the utilization of so-called "disposal" or similar units, or otherwise;

(f)     perform any act, or carry on any practice, that damages, mars or defaces the Demised Premises or any other part of the Building;

(g)     other than an ATM which is permitted, operate on the Demised Premises or in any part of the Building any coin or token operated vending machine or similar device for the sale of any merchandise (including pay telephones, pay lockers, pay toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other commodities), without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld, delayed, conditioned or denied;

(h)     install any awnings in or on the Demised Premises other than those approved by Landlord. Landlord shall have the right to review and approve any awning in or on the Demised Premises, such approval not to be unreasonably withheld. All work with reference to this paragraph shall be done in accordance with rules and regulations of the proper municipal authorities and the obtaining of the necessary permits and payment of necessary fees by Tenant;

(i)     place, install, or change any sign (which term, for purposes hereof, shall be deemed to include any placard, light, or other advertising symbol or object, regardless of whether the same is temporary or permanent) on any exterior portion of the Demised Premises (including both the interior and exterior surfaces of windows and doors); however, Tenant shall have the right to install a reasonable number of professionally prepared interior signs and Landlord shall not unreasonably withhold, delay, deny or condition its consent to Tenant's installation and maintenance, at its own cost and expense (including payments for any permits required in connection therewith), of store front sign(s) in any existing sign band space(s) provided by Landlord and (ii) interior identification signs(s) located on entrances to the Demised Premises, provided that (x) in considering whether to give its consent to any such store front or door sign(s), Landlord shall be entitled to consider the number, type, dimensions, content, material, location and design thereof, (y) no sign may be a so-called "flashing", "neon" or "animated" sign, or a sign that otherwise has a variation or variations in the intensity of illumination, and (z) all signs shall be done in accordance with rules and regulations of the proper municipal authorities and shall not be manufactured or installed on the Demised Premises or the Building until all approvals and permits are first obtained and copies thereof delivered to Landlord together with evidence of payment for any fees pertaining to the same; Landlord hereby approves the signage set forth in the conceptual designs attached hereto as Exhibit H, and any replacement thereof of comparable size and configuration, provided that all such signs shall comply with all reasonable design, safety and construction considerations of Landlord and the Board in all respects; and Landlord represents that it has the authority to give such consent without the need to obtain consent from any third party. Notwithstanding anything to the contrary contained herein, Landlord shall have the option, upon ten (10) days prior written notice to Tenant, to compel Tenant to remove any sign in the event such sign shall, in the Landlord's sole discretion, interfere or conflict with the Landlord's overall scheme of decoration or decor of the Building of which the Demised Premises forms a part and which was not previously approved by Landlord; in the event that Tenant fails to remove such sign, Landlord may remove same without any

liability therefor, and at Tenant's sole cost and expense. Any such expense shall be deemed Additional Rent and payable in accordance with the terms of this Lease. The provisions of this Paragraph 2.06(i) shall also apply to any temporary interior window signs which Tenant may install at the Demised Premises. Tenant agrees to indemnify and hold Landlord harmless of and from all cost, loss, liability and expense (including but not limited to reasonable counsel fees) in connection with the installation, maintenance and removal of any sign;

(j)     place a load on any floor in the Demised Premises exceeding the floor load per square foot that such floor was designed to carry and that is allowed by law, or install, operate or maintain therein any heavy item of equipment. Landlord consents to Tenant placing a safe within the Demised Premises in a location acceptable to Tenant provided that such location has sufficient floor load. Subject to Landlord's consent (which shall not be unreasonably withheld) Landlord will review (and if necessary, have its architect and/or engineers review the Load Letter (as defined hereinafter) and pay for the reasonable cost relating thereto) the load letter provided by Tenant's architect, which will be attached hereto as Exhibit K ("**Load Letter**"). Landlord consents to Tenant's reasonable use of equipment in accordance with the floor load(s) to be identified on Exhibit K;

(k)     take any action that would create any work stoppage, picketing, labor disruption, or labor dispute involving Landlord, or (ii) materially interfere with the business of Landlord or any customer or other Person(s) lawfully in and upon the Building.

Tenant hereby agrees that the agreements, terms, covenants and conditions contained in this Section 2.06 shall, in no event or respect, be taken, deemed, interpreted, or construed to limit the generality of Section 2.04 in any respect or to define or otherwise affect the scope or breadth of the said Section 2.04.

2.07     Tenant acknowledges that the provisions of this Article 2 are material inducements to Landlord for the execution of this lease.

2.08     Other than rights previously granted to existing tenants, Tenant shall have the exclusive right to sell retail food products to the general public in the Building ("**Tenant's Exclusive Use**").

Landlord acknowledges that in the event of a breach of Tenant's Exclusive Use by any negligent act or willful omission of Landlord, Tenant's remedies at law would be inadequate. Therefore, in any such event, if such breach is not cured within thirty (30) days after written notice from Tenant to Landlord ("**Tenant's Notice**"), Tenant shall have the right, at its option, to elect any and/or all of the following: (a) to pay, in lieu of fixed rent, an amount equal to ninety percent (90%) of the fixed rent ("**Alternate Rent**"), payment of such Alternate Rent to commence on the expiration of the thirty (30) day cure period and to terminate at such time as Landlord shall have cured such breach of Tenant's Exclusive Use, at which time Tenant shall resume payment of full fixed rent; (b) to relief by temporary or permanent injunction, and (c) suit against Landlord for Tenant's actual lost profits. If within one hundred eighty (180) days after Landlord's receipt of Tenant's Notice Landlord has not cured such breach, Tenant shall have the right (but not the obligation) to terminate this Lease upon sixty (60) days prior written notice to Landlord and, unless such breach is cured within said sixty (60) day period, this Lease shall

terminate. Upon such termination, the Alternate Rent shall be prorated through the date of termination.

2.09     Subject to the provisions of Article 46, Tenant covenants and agrees to operate a gourmet supermarket at the Demised Premises in accordance with the requirements of this Article 2 on or before April 1, 2016 ("**Opening Date**") and continue thereafter for the term of the Lease ("**Continuous Operation Period**"). If a Go Dark Event (as defined in Article 46) occurs, the same shall not constitute an Event of Default (as hereinafter defined) but Landlord will have the right to (a) increase the fixed rent by twenty five percent (25%) or (b) a right of recapture as set forth in Article 46. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not unreasonably withhold or condition its consent to extend the Opening Date requirement by up to forty five (45) additional days (the "**Opening Outside Date**") if so requested of Landlord by Tenant in writing (the "**Opening Date Extension Request**"), provided that (1) Tenant, at the time Landlord receives such Opening Date Extension Request, is diligently performing all of Tenant's Changes and Tenant's Work necessary to open the Premises in a first class manner by the Opening Outside Date and (2) Landlord receives the Opening Date Extension Request no later than fifteen (15) business days prior to the Opening Date.

## ARTICLE 3

### Preparation of the Demised Premises and Remaining Property

3.01     Landlord shall use commercially reasonable speed and diligence in completing Landlord's Work (as defined in Exhibit D). Tenant shall use commercially reasonable speed and diligence in completing Tenant's Work and in preparing the Demised Premises for Tenant's occupancy.

3.02     Except for Landlord's Work and Landlord's Remaining Work (as defined and described in Exhibit D) which shall be undertaken and performed by Landlord at Landlord's sole cost and expense, the Demised Premises shall be completed and prepared for Tenant's occupancy in the manner, and subject to the terms, conditions and covenants set forth in Exhibit D, at Tenant's sole cost and expense. All installations, materials and work which may be undertaken by Tenant to equip, decorate and furnish the Demised Premises for Tenant's occupancy, are hereinafter and in Exhibit D called "**Tenant's Work**" including, without limitation, the installation of a new freight lift in the location and in accordance with the provisions of Exhibit L attached hereto ("**New Freight Lift**") and shall be furnished, installed and performed by Tenant at Tenant's sole cost and expense. Subject to Force Majeure Events and Landlord Delays (as hereinafter defined), Tenant agrees that Tenant's Work shall be substantially completed and the Demised Premises shall be open for business within nine (9) months after the Commencement Date and the completion of Landlord's Work (the "Tenant's Outside Completion Date"). Notwithstanding the foregoing, if Tenant's Work is not substantially completed by the Tenant's Outside Completion Date but Tenant is diligently performing Tenant's Work, then Tenant shall have another three (3) months to substantially complete Tenant's Work (Tenant's Outside Completion Date plus the aforesaid three (3) month period referred to as "Tenant's Second Outside Completion Date"). If Tenant's Work is not substantially completed and the Demised Premises open for business prior to Tenant's Outside Completion Date (or Tenant's Second Outside Completion Date if Tenant is diligently

performing Tenant's Work as of Tenant's Outside Completion Date), the Rent Commencement Date shall be accelerated by one (1) day for each and every day beyond Tenant's Outside Completion Date (or Tenant's Second Outside Completion Date, as the case may be) that Tenant's Work is not substantially completed and the Demised Premises open for business. Prior to Tenant's commencing any Tenant's Work within the Demised Premises or any structural work or work relating to the building's systems, Tenant shall submit to Landlord for Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed, drawings, plans and specifications including, but not limited to, plans for the entranceways, use of window areas, signage and other architectural plans as the case may be, (herein collectively referred to as "Tenant's Plan") together with a CAD of such Tenant's Plan for or in connection with Tenant's Work. Tenant shall also submit to Landlord for its written approval a list of contractors and subcontractors for the major trades, which approval of Landlord shall not be unreasonably withheld, conditioned or delayed ("Tenant's Contractors"). Tenant's Plan shall be fully detailed, shall show complete dimensions, and shall not be in violation of any laws, orders, rules or regulations of any governmental department or bureau having jurisdiction of the Demised Premises. Tenant shall reimburse Landlord for any expense Landlord might incur in reviewing Tenant's Plans and/or Tenant's Contractors in connection with Tenant's Work. Landlord may, at any time and from time to time, at Landlord's expense, in addition to any other right of access given to Landlord pursuant to the terms of this Lease, enter upon the Demised Premises with one or more engineers and/or architects of Landlord's selection (collectively, "Landlord's Architect") to determine the course and degree of completion of Tenant's Work and its compliance with Tenant's Plan and the terms and conditions of this Lease, provided neither interferes with Tenant's Work or Tenant's Contractors.

3.03    Tenant may utilize the two (2) existing HVAC units, furniture, fixtures and equipment to be incorporated into Tenant's Work and which is presently located in the Demised Premises and which Tenant elects to use (the "**Remaining Property**"). Tenant shall accept the Remaining Property in its "as is" condition on the Commencement Date without representation or warranty, express or implied, in fact or by law, by Landlord and without recourse to Landlord as to the nature, condition or usability of the Remaining Property. As part of Landlord's Work, prior to the delivery of the Demised Premises to Tenant, Landlord shall remove from the Demised Premises all debris, HVAC unit(s), equipment, fixtures and other personal property located in the Demised Premises which Tenant desires be removed, such that the Demised Premises shall be delivered to Tenant in broom clean condition with only the Remaining Property located therein.

## ARTICLE 4

### Security

4.01    Tenant has deposited with Landlord the sum of (a) Three Hundred Fifty Thousand Dollars and 00/xx ($350,000.00) (the "**Security Amount**") by Letter of Credit as provided in Section 4.02, and (b) a cash security deposit of Five Hundred Thousand Dollars ($500,000.00) (the "Cash Security Amount"), both the Security Amount and the Cash Security Amount being delivered to Landlord as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease. It is agreed that in the event Tenant defaults after

notice and the expiration of any applicable cure period hereunder, in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of rent and additional rent, Landlord may (in the case of the Security Amount) notify the **"Issuing Bank"** (as such term is defined in Section 4.02) and thereupon receive all of the monies represented by the said Letter of Credit and (in the case of either Security Amount or the Cash Security Amount) draw upon use, apply or retain the whole or any part of such proceeds, as the case may be, to the extent required for the payment of any rent and additional rent or any other sum as to which Tenant is in default, after notice and any cure period provided herein, or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default after notice and the expiration of any applicable cure period hereunder, in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord and the balance, if any, shall be held by Landlord as a cash security in accordance with the terms herein. In the event that Landlord applies or retains any portion or all of such proceeds of such Letter of Credit (or the Cash Security Amount), Tenant shall forthwith restore the amount so applied or retained so that, at all times, the amount deposited shall be the Security Amount. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Letter of Credit (or the Cash Security Amount, if applicable) shall be returned to Tenant within thirty (30) days following the date fixed as the end of the Lease and after delivery of entire possession of the Demised Premises to Landlord.

      4.02    Simultaneous with the execution of this Lease, Tenant shall deliver to Landlord a clean, irrevocable and unconditional letter of credit (hereinafter referred to as the **"Letter of Credit"** or **"Security Amount"**) which shall (a) be issued by and drawn upon any commercial bank (hereinafter referred to as the **"Issuing Bank"**) with offices for banking purposes in the City of New York and which is a member of the New York Clearing House Association and having a net worth of not less than Two Billion and 00/100 ($2,000,000,000.00) Dollars, (b) have an initial term of not less than one year, (c) be in form and content reasonably satisfactory to Landlord, (d) be for the account of Landlord (e) be in the Security Amount, (f) provide that it shall be deemed automatically renewed, without amendment, for consecutive periods of one (1) year each thereafter during the Term of this Lease, and for a ninety (90) day period thereafter (as well as any renewals or extensions thereof), unless Issuing Bank sends written notice (hereinafter referred to as the **"Non-Renewal Notice"**) to Landlord by certified or registered mail, return receipt requested, not less than thirty (30) days next preceding the then expiration date of the Letter of Credit that it elects not to have such Letter of Credit renewed (in which event Landlord shall have the right, by sight draft presented to the bank, to receive the monies represented by the then existing Letter of Credit and to hold and apply such proceeds in accordance with the provisions of this Lease and (g) provide that Landlord, within twenty (20) days of its receipt of the Non-Renewal Notice, shall have the right, exercisable by means of a sight draft, to receive the monies represented by the Letter of Credit and hold such proceeds pursuant to the terms of Section 4.01 as a non-interest bearing cash security unless Tenant provides Landlord with a replacement Letter of Credit within said twenty (20) day period and (h) provide that Landlord shall be entitled to draw upon the Letter of Credit upon presentation of a sight draft stating that an uncured event of default has occurred under the Lease. In the event that Landlord uses, applies or retains any portion of the proceeds of the letter of credit, Tenant shall forthwith restore the amount so applied or retained in cash or by cashiers or bank check so

that, at all times (except as otherwise provided for in this Lease), subject to the provisions herein set forth, the amount of the Letter of Credit shall be the Security Amount.

4.03    In the event of a sale of the Landlord's interest in the Ground Lease or a leasing of the entire Building, Landlord shall transfer the Letter of Credit hereunder to the vendee or lessee, and Landlord shall thereupon be released by Tenant from all liability for the return of such Letter of Credit. In such event, Tenant agrees to look solely to the new Landlord for the return of said Letter of Credit. It is agreed that the provisions hereof shall apply to every transfer or assignment made of said Letter of Credit, to a new Landlord and that any new landlord shall be bound by the terms of this Lease whether or not a formal assignment and assumption agreement has been entered into.

4.04    Tenant covenants that it will not assign or encumber, or attempt to assign or encumber, the Letter of Credit deposited hereunder as security, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.

4.05    Notwithstanding anything to the contrary contained in this Lease, and provided that this Lease is in full force and effect, Tenant shall have fully and timely paid all installments of Fixed Rent and Additional Rent, and Tenant shall not then be in monetary or material nonmonetary default of this Lease, then Tenant may request Owner to apply the sum of $166,666.67 from the Cash Security Amount to the Fixed Rent payment then becoming due and owing for the thirty seventh (37th) month (with the balance of such $166,666.67 being applied to Fixed Rent then becoming due and owing for the thirty eighth (38th) month subsequent to the Commencement Date.

Notwithstanding anything to the contrary contained in this Lease, and provided that this Lease is in full force and effect, Tenant shall have fully and timely paid all installments of Fixed Rent and Additional Rent, Tenant shall not then be in monetary or material nonmonetary default of this Lease and the aforesaid prior reduction in fact occurred, then Tenant may request Owner to apply an $166,666.67 from the Cash Security Amount to the Fixed Rent payment then becoming due and owing for the forty ninth (49th) month (with the balance of such $166,666.67 being applied to Fixed Rent then becoming due and owing for the fiftieth (50th) month subsequent to the Commencement Date.

Notwithstanding anything to the contrary contained in this Lease, and provided that this Lease is in full force and effect, Tenant shall have fully and timely paid all installments of Fixed Rent and Additional Rent, Tenant shall not then be in monetary or material nonmonetary default of this Lease and the aforesaid prior reductions in fact occurred, then Tenant may request Owner to apply the balance of the Cash Security Amount (i.e., $166,666.66) to the Fixed Rent payment then becoming due and owing for the sixty first (61st) month (with the balance of such $166,666.67 being applied to Fixed Rent then becoming due and owing for the sixty second (62nd) month subsequent to the Commencement Date.

BASIC FORM OF LETTER OF CREDIT REQUIRED

**(NOTE: PROVISIONS CONTAINED IN THIS ARTICLE MUST ALSO BE REFLECTED IN THE TEXT OF THIS LETTER OF CREDIT.)**

No._____ Date_____ Irrevocable Letter of Credit

BENEFICIARY:                                         Applicant:
**40 WALL STREET LLC**                    **DEAN & DELUCA, INC.**

Dear Sir(s)/Madam(s):

We hereby authorize you to value on 40 Wall Street, New York, New York.

For account of up to the aggregate amount of $_____. Available by your drafts at sight.

This Letter of Credit may be transferred to any transferee of the interest of the Owner under the lease dated as of July _____, 2015 (the "Lease") between **40 WALL STREET LLC**, as Owner and **DEAN & DELUCA, INC.**, as Tenant.

It is a condition of this Letter of Credit that it shall be deemed to be automatically extended for consecutive periods of one (1) year each from the present and any future expiration date and for any partial year ending December 31, unless we shall notify you and Larry H. Haber, Esq., c/o Abrams Garfinkel Margolis Bergson LLP, 1430 Broadway, 17th Floor, New York, NY 10018, by written notice given by registered mail at least sixty (60) days prior to such expiration date that we elect not to renew it for any such additional period, in which case you shall have the right to draw on us the full amount of this Letter of Credit by your sight draft, accompanied by your signed written statement that you are drawing under Letter of Credit #_____. In no event shall this letter of credit and the original of any subsequent amendments extend beyond the final expiration date of March 31, 2032.

ADDITIONAL DETAILS:

PARTIAL DRAWINGS ARE PERMITTED.

WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS IRREVOCABLE STANDBY LETTER OF CREDIT WILL BE DULY HONORED UPON DELIVERY OF THE DOCUMENTS AS SPECIFIED HEREIN IF PRESENTED AT OUR COUNTERS ON OR BEFORE THE EXPIRY DATE INDICATED HEREIN IN THE CITY OF NEW YORK.

THIS LETTER OF CREDIT IS AVAILABLE WITH _____ AGAINST PRESENTATION OF THE DOCUMENTS INDICATED HEREIN.

1. BENEFICIARY'S DATED STATEMENT REFERENCING _____ LETTER OF CREDIT NO. ------------ INDICATING AMOUNT OF DEMAND/CLAIM AND PURPORTEDLY SIGNED BY AN AUTHORIZED PERSON READING AS FOLLOWS:

"WE HEREBY CLAIM PAYMENT UNDER _____ LETTER OF CREDIT NO. -----------, IN THE AMOUNT OF U.S. DOLLARS _____ AND CERTIFY THAT FUNDS ARE DUE US AS (INSERT NAME OF APPLICANT), THE "TENANT" UNDER THE LEASE DATED _____ BETWEEN (INSERT NAME OF BENEFICIARY), AS "LANDLORD", AND (INSERT NAME OF APPLICANT, AS "TENANT" IS IN DEFAULT OF AN OBLIGATION UNDER THE LEASE AND ALL PERMISSIBLE CURE PERIODS ALLOWED IN THE LEASE (IF ANY) HAVE EXPIRED WITHOUT CURE THEREOF BEING EFFECTIVE. THE GENERAL NATURE OF THE DEFAULT IS AS FOLLOWS (_____)".

THIS LETTER OF CREDIT IS TRANSFERABLE, BUT ONLY IN ITS ENTIRETY, AND MAY BE SUCCESSIVELY TRANSFERRED. TRANSFER OF THIS LETTER OF CREDIT SHALL BE EFFECTED BY US UPON YOUR SUBMISSION OF THIS ORIGINAL LETTER OF CREDIT, INCLUDING ALL AMENDMENTS, IF ANY, ACCOMPANIED BY OUR TRANSFER REQUEST FORM DULY COMPLETED AND SIGNED, WITH THE SIGNATURE THEREON AUTHENTICATED BY YOUR BANK, ALONG WITH PAYMENT OF OUR TRANSFER CHARGES AS INDICATED THEREIN. IF YOU WISH TO TRANSFER THE LETTER OF CREDIT, PLEASE CONTACT US FOR THE FORM WHICH WE SHALL PROVIDE TO YOU UPON YOUR REQUEST. IN ANY EVENT, THIS LETTER OF CREDIT MAY NOT BE TRANSFERRED TO ANY PERSON OR ENTITY LISTED IN OR OTHERWISE SUBJECT TO, ANY SANCTION OR EMBARGO UNDER ANY APPLICABLE RESTRICTIONS.

## ARTICLE 5

### Adjustments Of Rent

5.01. Tax Escalation. For the purpose of Sections 5.01-5.20:

(a) "Taxes" shall mean the real estate taxes and assessments and special assessments imposed upon the Building and the Land (including, but not limited to, business improvement districts fees). If at any time during the term of this lease the methods of taxation prevailing at the commencement of the term hereof shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed or imposed (i) a tax, assessment, levy, imposition or charge wholly or partially as capital levy or otherwise on the rents received therefrom, or (ii) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon the Demised Premises and imposed upon Landlord, or (iii) a license fee measured by the rents payable by Tenant to Landlord, then all such taxes, assessments, levies, impositions or charges, or the part thereof so measured or based, shall be deemed to be included within the term "Taxes" for the purposes hereof. Notwithstanding the foregoing, in no event shall "Taxes" include (i) interest or penalties incurred as a result of the failure to pay Taxes when due, (ii) transfer taxes, (iii) taxes based upon the income or gross revenue of Landlord, (iii) inheritance, estate, succession, gift, franchise, or capital stock taxes; or (iv) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it. Any betterments or special assessments shall be prorated

and divided into the maximum number of installments permitted by law and only the current annual amount shall be included in Taxes for any Tax Year. Taxes shall be charged as if the Land and Building were the only property of Landlord. With respect to any comparison Tax Year, all expenses, including reasonable legal fees, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes (or in attempting to prevent an increase in Taxes) or in obtaining a refund of Taxes or in attempting to prevent an increase in the Taxes, may be considered as part of the Taxes for such Tax Year.

(b)     "**Base Tax Rate**" shall mean the taxes payable for the Tax Year commencing July 1, 2015 and expiring June 30, 2016 (**the "Base Year"**).

(c)     "**Tax Year**" shall mean the fiscal year for which Taxes are levied by the governmental authority.

(d)     "**Tenant's Proportionate Share**" shall mean for purposes of this lease and all calculations in connection herewith 1.601%, which has been computed on the basis of a fraction, the numerator of which is 18,500 (the agreed rentable square foot area of the Demised Premises), and the denominator of which is 1,156,005, which Landlord represents is the agreed rentable square foot area of the Building above grade level.

(e)     "**Tenant's Projected Share of Taxes**" shall mean the Tax Payment, if any, made by Tenant for the prior Tax Year divided by twelve (12) and payable monthly by Tenant to Landlord as additional rent.

5.02     If the Taxes for any Tax Year after the Base Year shall be more than the Base Tax Rate, Tenant shall pay, as additional rent for such Tax Year, an amount equal to Tenant's Proportionate Share of the amount by which the Taxes for such Tax Year are greater than the Base Tax Rate. (The amount payable by Tenant is hereinafter called the "**Tax Payment**"). The Tax Payment shall be prorated, if necessary, to correspond with that portion of any partial Tax Year occurring within the Term of this lease after the Rent Commencement Date or prior to the Expiration Date (or earlier expiration hereof). The Tax Payment shall be payable by Tenant within thirty (30) days after receipt of a written demand from Landlord therefor, which demand shall be accompanied by a copy of the tax bill together with Landlord's computation of the Tax Payment. If the amount of Taxes payable during the Base Year is reduced by final determination of legal proceedings, settlement or otherwise, the reduced amount of such Taxes shall thereafter determine the amount of the increase in the Rent pursuant to this Article 5. The Additional Rent theretofore paid or payable under this Article 5 shall be recomputed (including all prior payments under this Article 5) on the basis of such reduction, and the Tenant shall pay to Owner as Additional Rental within fifteen (15) days after being billed therefore, any deficiency between the amount of the increase in the Rent theretofore computed and the amount thereof due as a result of such recomputation.

5.03     Notwithstanding the fact that the increase in rent is measured by an increase in taxes, such increase is additional rent and shall be paid by Tenant as provided herein regardless of the fact that Tenant may be exempt, in whole or in part, from the payment of any taxes by reason of Tenant's tax exempt status or for any other reason whatsoever.

5.04    Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the Land and Building. Should Landlord be successful in any such reduction proceedings and obtain a rebate for periods during which Tenant has paid its share of increases, or received the benefit of any decreases, Landlord shall, after deducting its actual and documented expenses, including without limitation, attorneys' fees and disbursements in connection therewith, return Tenant's Proportionate Share of such rebate to Tenant.

5.05    Within sixty (60) days after the expiration of any Tax Year, Landlord shall furnish Tenant with a statement setting forth receipted Tax bills (if available) for the Base Year and each later Tax Year and Tenant's Proportionate Share of Taxes. The statement furnished under this Section 5.05 is hereinafter called a "**Tax Statement.**"

5.06    Landlord's failure during the lease term to prepare and deliver any of the tax bills, statements, notice or bills set forth in this Article 5, or Landlord's failure to make a demand, shall not in any way cause Landlord to forfeit or surrender its rights to collect any of the foregoing items of additional rent which may have become due during the term of this lease; provided, however, that any demand for a Tax Payment shall be made within three (3) years after the expiration of the Tax Year applicable thereto or shall be deemed waived. Tenant's liability for the amounts due under this Article 5 shall survive the expiration of the Term.

## ARTICLE 6

### Adjacent Excavation-Shoring

6.01    If an excavation or other substructure work shall be made upon land adjacent to the Demised Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation ("**Excavator**"), license to enter upon the Demised Premises for the purpose of doing such work as shall be necessary to preserve the wall of or the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement or rent. Landlord shall cause Excavator to use commercially reasonable efforts to arrange its activities so as to minimize any interferences with Tenant's or its customers' use of or access to the Demised Premises and the Outdoor Dining Area.

## ARTICLE 7

### Subordination, Notice To Lessors And Mortgagees

7.01    Subject to the provisions of Section 7.04, this lease and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all ground leases, overriding leases and underlying leases of the Land and/or the Building now or hereafter existing and to all mortgages which may now or hereafter affect the Land and/or the Building and/or any of such leases, whether or not such mortgages shall also cover other lands and/or buildings, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements and extensions of such leases and such mortgages and spreaders and consolidations of such mortgages. This Section shall be self-operative and, except as provided in Section 7.04, no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall promptly execute and deliver any instrument that Landlord, the

lessor of any such lease or the holder of any such mortgage or any of their respective successors in interest may reasonably request to evidence such subordination. The leases to which this lease is, at the time referred to, subject and subordinate pursuant to this Article are hereinafter sometimes called **"superior leases"** and the mortgages to which this lease is, at the time referred to, subject and subordinate are hereinafter sometimes called **"superior mortgages"** and the lessor of a superior lease or its successor in interest at the time referred to is sometimes hereinafter called a **"lessor"**.

7.02   In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to the holder of each superior mortgage and the lessor of each superior lease whose name and address shall previously have been furnished to Tenant in writing, and (ii) unless such act or omission shall be one which is not capable of being remedied by Landlord or such mortgage holder or lessor within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such holder or lessor shall have become entitled under such superior mortgage or superior lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this lease or otherwise, after similar notice, to effect such remedy), provided such holder or lessor shall with due diligence give Tenant written notice of its intention to (and in fact, shall) commence and continue to remedy such act or omission.

7.03   If the lessor of a superior lease or the holder of a superior mortgage shall succeed to the rights of Landlord under this lease, whether through possession or foreclosure action or delivery of a new lease or deed, then at the request of such party so succeeding to Landlord's rights (herein sometimes called **"successor landlord"**) and upon successor landlord's written agreement to accept Tenant's attornment, Tenant shall attorn to and recognize such successor landlord as Tenant's landlord under this lease, and shall promptly execute and deliver any instrument that such successor landlord may reasonably request to evidence such attornment. Upon such attornment this lease shall continue in full force and effect as, or as if it were, a direct lease between the successor landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this lease and shall be applicable after such attornment except that the successor landlord shall not:

(a)   be liable for any previous act or omission of Landlord under this lease which is not of a continuing nature,

(b)   be subject to any offset not expressly provided for in this lease which shall have theretofore accrued to Tenant against Landlord, and

(c)   be bound by any previous modification of this lease not expressly provided for in this lease, or by any previous prepayment of more than one month's fixed rent, unless such modification or prepayment shall have been expressly approved in writing by the lessor of the superior lease or the holder of the superior mortgage through or by reason of which the successor landlord shall have succeeded to the rights of Landlord under this lease.

7.04    Within thirty (30) days after the execution and delivery of this lease, Landlord shall cause to be delivered to Tenant a so-called nondisturbance agreement from the holder of a superior mortgage on such superior mortgagee's commercially reasonably form which shall provide, in part, that Tenant's rights under this Lease shall not be disturbed by any such party in the event that it or its assigns succeeds to the interest of Landlord in the Building ("SNDA"). The foregoing requirement shall be applicable to any current as well as to subsequent holder of a superior mortgage affecting the Land and/or the Building.   In the event an SNDA from each existing mortgagee is not provided to Tenant within sixty (60) days after the execution and delivery of this Lease, Tenant shall have the right (but not the obligation) until such SNDA is delivered, to terminate this Lease by written notice to Landlord.

7.05    Notwithstanding anything to the contrary contained in this Lease, for sake of emphasis and clarity: (a) in the event of the termination of the Superior Lease, the Lease shall not terminate or be terminable by the tenant except in the case of an institution of any summary or other proceeding by Superior Lessor (whether for possession of the real property demised under the Superior Lease or the space demised under the Lease), the Lease may be terminated if the Tenant is named by Superior Lessor as a party and served with process sufficient to recover possession of the premises demised under such Lease in such proceeding and a warrant or judgment for possession of the premises demised under such Lease is issued in such proceeding; and; (b) in the event of any action for the foreclosure of any Superior Mortgage, the Lease shall not terminate or be terminable by the subtenant by reason of the termination of the Superior Lease unless the Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against the Tenant; and (c) in the event that the Superior Lease is terminated as aforesaid, if this Lease is not terminated by the service of process on Tenant in any proceeding for recovery of possession of the real property demised under the Superior Lease or the space demised under the Lease in any proceeding seeking the termination of the Superior Lease, the tenant shall attorn to the landlord under the Superior Lease or, if the Lease is not terminated in accordance with clause (b), to the purchaser at the sale of the Property on such foreclosure, as the case may be.

## ARTICLE 8

### Quiet Enjoyment

8.01    So long as Tenant pays all of the fixed rent and additional rent due hereunder and performs all of Tenant's other obligations hereunder, Tenant shall peaceably and quietly have, hold and enjoy the Demised Premises and the Outdoor Dining Area subject, nevertheless, to the obligations of this lease and, to the extent provided in Article 7, to the superior leases and the superior mortgages, without hindrance or ejection by any persons lawfully claiming under Landlord.

8.02    Landlord represents and warrants to Tenant that (i) Landlord is the owner of the Building and owner and holder of the ground lease to the Land, (ii) Landlord has the right, power and authority to execute and deliver this lease and to perform its obligations hereunder, (iii) no consents or approvals are required with respect to the execution or effectiveness of this lease,

(iv) each person executing this Lease on behalf of Landlord is duly authorized to execute and deliver this Lease on behalf of Landlord in accordance with its articles of organization or by-laws of Landlord and pursuant to a duly executed resolution of Landlord; and (v) the execution and delivery of this Lease and the use of the Demised Premises by Tenant for the Permitted Use will not, with or without the passage of time violate any other agreement or lease by which Landlord is bound or by which Landlord's property is encumbered, subject to the terms and conditions of the existing lease between Landlord and Duane Reade solely in regards to Duane Reade's rights in respect to the Lobby Entrance (which for the purposes of Duane Reade's right referred to in this Section 8.02 and for the sake of clarity and emphasis, shall be deemed to include the dotted area indicated on Exhibit A-1 annexed hereto). Landlord shall provide Tenant with an ACP-5 certificate.

## ARTICLE 9

### Assignment and Subletting

9.01     Tenant shall not, at any time during the term demised hereunder, assign, mortgage, or encumber this lease or any of its rights or estates hereunder, or sublet the Demised Premises or any part thereof, or to suffer or permit the Demised Premises or any part thereof to be used or occupied by others without first complying with this Section 9.01; provided, however, that Tenant shall not be required to comply with this Section 9.01 in connection with any assignment of this lease and/or a subletting of all or any portion of the Demised Premises consummated pursuant to Section 9.04 or Section 9.05 below.

(a)     Except as provided in Section 9.04 and 9.05 below, if Tenant shall desire to assign this lease or sublet all or a specific portion of the Demised Premises, Tenant shall send a written notice to Landlord which describes the following: (i) the name of the proposed assignee or subtenant, (ii) the nature of the business in which the proposed assignee or subtenant will engage in the Demised Premises and the date by which the transfer is expected to occur, (iii) if the proposed assignee or subtenant does not publicly file financial statements, a copy of the proposed subtenant's or assignee's two most recent annual financial statements, (iv) any payment to be received on account of any assignment or the sublease rent that the proposed subtenant is willing to pay to Tenant, (v) a copy of the proposed assignment or sublease (with an original version thereof to be delivered to Landlord within three (3) business days of its execution) and (vi) any other information reasonably requested by Landlord (all of the foregoing items in subparagraphs (i) through (v) collectively referred to as a **"Transfer Term Sheet"**).

(b)     Except as provided in Section 9.04 and 9.05 below, Landlord shall have the right, within thirty (30) days after receipt of the Transfer Term Sheet (time being of the essence) by written notice to Tenant (a **"Transfer Acceptance Notice"**), to accept an assignment of this lease or to sublet all or such specified part of the Demised Premises upon the terms stated in the Transfer Term Sheet. If Landlord timely delivers a Transfer Acceptance Notice, then Tenant shall enter into the transaction described in the Transfer Term Sheet with Landlord within the time frames described in the Transfer Term Sheet. Landlord's payment on account of any assignment shall be made by wire transfer of immediately available funds concurrent with the Tenant's delivery of an instrument of assignment in form reasonably satisfactory to Landlord and Tenant. Upon Tenant's delivery of the instrument of assignment with Landlord as assignee,

Tenant shall be released from any further liability under this lease; provided Tenant has delivered satisfactory authoritative proof to Landlord in Landlord's sole but reasonable judgment that such assignee or subtenant has a net worth equal to or greater than $25,000,000.00 net worth (exclusive of goodwill) and the proposed assignee or subtenant is of reputable character, and is an experienced retailer in the same or similar business (operating no less than five (5) stores). If Landlord will sublet the Demised Premises pursuant to a Transfer Acceptance Notice, then Landlord and Tenant shall enter into a sublease agreement in form reasonably satisfactory to Landlord and Tenant.

(c)     If Landlord does not timely deliver a Transfer Acceptance Notice to Tenant, Tenant may within seven (7) business days thereafter (time being of the essence) give Landlord a second notice. If Landlord fails to respond to such second notice from Tenant, within five (5) business days after said second notice, Landlord's right to recapture shall be deemed waived and Tenant shall, subject to the terms and conditions of this Lease, be free to enter into the transaction described in the Transfer Term Sheet on the terms described therein and in all cases the assignment consideration or subrent payable to Tenant shall be no less than the amount described in the Transfer Term Sheet.

(d)     Furthermore, if Landlord shall not exercise its option hereinabove, Landlord shall not unreasonably withhold, condition or delay its consent to the proposed subletting or assignment referred to in Tenant's proposal, but only on the terms set forth therein, provided that the following further conditions shall be fulfilled:

(1)     If comparable retail space remains available for lease in the Building, then the Premises shall not, without Landlord prior consent, be publicly advertised for assignment or subletting at a rental rate lower than the higher of (a) the Fixed Rent and all Additional Rent then payable or (b) the then prevailing rental rate for other comparable space in the Building, but if not publicly advertised, Tenant may offer the Premises for assignment or subletting at any rate Tenant shall determine;

(2)     No subletting or assignment shall be to a person or entity which is of a character, is engaged in a business, or proposes to use the Premises in a manner not in keeping with the reasonable standards of the Building;

(3)     Any subletting shall be expressly subject to all of the non-economic obligations of Tenant under this Lease and, without limiting the generality of the foregoing, the sublease shall impose at least the same restrictions and conditions with respect to use as are contained in this Lease;

(4)     That part, if any, of the term of any such sublease or any renewal or extension thereof which shall extend beyond a date one day prior to the expiration or earlier termination of the term shall be a nullity;

(5)     There shall be no default by Tenant under any of other terms, covenants and conditions of this Lease, after notice and the expiration of any applicable grace periods, at the time that Landlord's consent to any such subletting or assignment is requested

and on the date of the commencement of the term of any such proposed sublease or effective date of the proposed assignment;

(6)     The sublease shall provide by its terms that it may not be further modified in any material manner (including, without limitation, modification of the financial obligations, identity or character of Tenant), without Landlord's consent, it being expressly agreed that any such modification shall, for the purposes of this Lease, be deemed and construed as a subletting for which Tenant must comply with this Article 9 as if such sublease had not been theretofore consented to by Landlord.

(7)     The sublease shall provide that the subtenant shall, at Landlord's option, attorn to Owner upon any termination of this Lease.

(8)     Any portion of the Premises proposed to be sublet shall be of a shape or configuration such that both the area proposed to be sublet and the remainder of the Premises shall, in Landlord's reasonable judgment, constitute commercially marketable space as separate rental units.

(9)     No assignment of this Lease shall be binding upon Owner unless, in addition to compliance with the prior provisions of this Article 47, the assignee shall execute, acknowledge and deliver to Owner (a) a duplicate original instrument of assignment in form and substance reasonably satisfactory to Owner, duly executed by Tenant, and (b) an agreement, in form and substance reasonably satisfactory to Owner, duly executed by the assignee, whereby the assignee shall unconditionally assume observance and performance of, all of the terms, covenants and conditions of this Lease on Tenant's part to be observed or performed from and after the date of the assignment, but the failure or refusal of the assignee to execute or deliver such an agreement shall not release the assignee from its liability for the obligations of Tenant hereunder assumed by acceptance of the assignment of this Lease.

(10)    If this Lease be assigned, whether or not in violation of the terms of this Lease, Owner may collect rent from the assignee. If the Premises or any part thereof be sublet or be used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Owner may, after default by Tenant, required notice and expiration of Tenant's time to cure such default, if any, collect rent from the subtenant or occupant. In either event, Landlord may apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any provisions of this Article 9, or the acceptance of the assignee, subtenant or occupant as a tenant, or a release of Tenant from the further performance by Tenant of Tenant's obligations under this Lease, including the obligation to pay all Rent and Additional Rent. The consent by Landlord to an assignment, transfer, encumbering or subletting pursuant to any provision of this Lease shall not in any way be considered to relieve Tenant from obtaining the express prior consent of Owner to any other or further assignment, transfer, encumbering or subletting. References in this Lease to use or occupancy by anyone other than Tenant shall not be construed as limited to and those claiming under or through but as including also licensees and others claiming under Tenant, immediately or remotely. Tenant agrees to pay to Landlord all reasonable out-of-pocket cost that may be incurred by Landlord in connection

with any proposed assignment of this Lease or any proposed subletting of the Premises or any part thereof including the costs of making investigations as to the acceptability of a proposed subtenant or assignee and reasonable attorneys 'and merchants' fees. Neither any assignment of this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any person other than Tenant, nor any collection of rent by Landlord from any person other than Tenant, nor any application of any such rent as provided in this Article shall, under any circumstances, relieve, impair, release or discharge Tenant of its obligations fully to perform the terms of this Lease on Tenant's part to be performed.

9.02    With respect to each sublease or subletting, other than a sublease or assignment to Landlord as described in subsection 9.01(c) above, it is further agreed that:

(a)    no sublease shall be valid, and no subtenant shall take possession of the Demised Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord and both Tenant and the subtenant has signed Landlord's standard consent form and delivered same to Landlord;

(b)    each sublease shall provide that it is subject and subordinate to this lease, to all of the terms, covenants, conditions, provisions, agreements and conditions contained herein and to the matters to which this lease is or shall be subordinate, and that in the event of termination, re-entry, or dispossess by Landlord under this lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessee, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not: (i) be liable for any previous act or omission of Tenant under such sublease which is not continuing; (ii) be subject to any offset not expressly provided in such sublease which theretofore accrued to such subtenant against Tenant; or (iii) be bound by any previous modification of such sublease not consented to by Landlord or by any previous prepayment of more than one month's fixed rent or any additional rent then due; and

(c)    Tenant shall and will remain fully liable for the payment of the fixed rent and additional rent due, and to become due, hereunder, for the performance of all of the terms, covenants, conditions, provisions, agreements and conditions contained in this lease on the part of Tenant to be performed and for all acts and omissions of any licensee, subtenant, or any other person claiming under or through any subtenant that shall be in violation of any of the obligations of this lease (and any such violation shall be deemed to be a violation by Tenant).

9.03    Except for assignments permitted in Section 9.04, with respect to each and every assignment or other transfer of this lease, it is further agreed that no such assignment or transfer shall be made unless, and shall not be effective until, the assignee or transferee shall execute, acknowledge and deliver to Landlord an agreement whereby the assignee or transferee shall assume the obligations of this lease on the part of Tenant to be performed or observed and whereby the assignee or transferee shall agree that the provisions in this Article 9 shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers. Notwithstanding any such assumption, except as provided in Section 9.01(c) above, Tenant shall not be released from any liability under this lease.

9.04    Provided an Event of Default (as hereinafter defined) does not then exist, Tenant's interest under this lease may, at any time and from time to time, be assigned, or the Demised Premises may be sublet, in whole or in part, from time to time, without complying with Sections 9.01 and 9.03 above and without Landlord's consent (but on not less than ten [10] day's prior notice to Landlord and provided written documentation evidencing same is provided to Landlord) (x) to any entity into or with which Tenant or any Successor (as hereinafter defined) of Tenant may be merged or consolidated, (y) to any entity which is an Affiliate (as hereinafter defined), Parent or Successor affiliate, or (z) any other entity purchasing all or substantially all of the assets or a controlling interest in the stock of Tenant.

(a)    For the purpose of this **Article 9**, an "Affiliate" or a "Successor" or a "Parent" of Tenant shall mean the following:

(i)    An **"Affiliate"** shall mean any entity which, directly or indirectly, controls or is controlled by or is under common Control (as hereinafter defined) with Tenant or any successor of Tenant. For this purpose, **"Control"** shall mean the ownership of fifty-one percent (51%) or more of the interests in such entity and possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity and the distribution of its profits, whether through the ownership of voting securities or by contract or otherwise.

(ii)    A **"Successor"** of Tenant shall mean:

(A)    Any entity in which or with which Tenant or its successors or assigns is merged or consolidated, provided that by operation of law or by effective provisions contained in the instruments of merger or consolidation, the liabilities of the entities participating in such merger or consolidation are assumed by the entities surviving such merger or created by such consolidation, or

(B)    A corporation, limited liability company, partnership or trust acquiring this lease and the term hereby demised and a substantial portion of the property and assets of Tenant, or its successors or assigns, or

(C)    Any successor to a successor entity becoming such by either of the methods described in (A) or (B).

(iii)    A **"Parent"** of Tenant shall mean an entity which has ownership of fifty-one percent (51%) or more of the interests of Tenant and possession of the power to direct the management and policies of Tenant and the distributions of Tenant's profits.

(iv)    An entity in which or with which Tenant is merged or consolidated shall mean an entity subject to the jurisdiction of the courts of the State of New York which succeeds Tenant in accordance with applicable statutory provisions for merger or consolidation of entities and which, by operation of law or by effective provisions contained in the instruments or merger or consolidation fully assumes the liabilities of the entities participating in such merger or consolidation and which has, on the completion of such merger or consolidation, a net worth equal to or greater than Tenant's net worth immediately prior to such merger or consolidation.

(v)     An entity which purchases all or substantially all of Tenant's assets shall mean an entity which: (A) is unrelated to Tenant or any affiliate, subsidiary or parent of Tenant; (B) is subject to the jurisdiction of the courts of the State of New York; (C) fully assumes the liabilities and the obligations of Tenant under this Lease; (D) purchases such assets pursuant to a bona fide, arm's length sale that is not consummated for the purpose of circumventing the restrictions set forth in this Article; and (E) has, on the completion of such sale, a net worth equal to or greater than Tenant's net worth immediately prior to such sale.

In connection with this Article, Landlord shall have the right, at any reasonable time and from time to time, to examine such books and records of Tenant as may be necessary to establish that such entity, subtenant, occupant or assignee remains a related/affiliated entity of Tenant and that no rent is being paid to Tenant by such related entity. Such subletting, occupancy or assignment shall not be deemed to vest in any such related entity any right or interest in this Lease or the Demised Premises, nor shall it relieve, release, impair or discharge any of Tenant's obligations hereunder.

9.05    If Tenant shall assign this lease or to enter into any sublease, other than an assignment or sublease pursuant to Section 9.04 above, Tenant shall in consideration therefor, pay to Landlord, when actually received by Tenant, as additional rent:

(a)     in the case of an assignment, an amount equal to 50% of all sums and other consideration paid to Tenant for Tenant's leasehold interest hereunder by the assignee for or by reason of such assignment (excluding sums paid for the sale of Tenant's fixtures, inventory, leasehold improvements, equipment, furniture, furnishings or other personal property), less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns) and less amounts reasonably attributable to good will, intellectual property and the actual costs (hereinafter referred to as the "**Assignment Expense**") paid by Tenant for alteration costs (or contributions in lieu thereof), advertising, brokerage or consulting fees or commissions, free rent or fixturing periods and legal fees in connection with such assignment; and

(b)     in the case of a sublease, an amount equal to 50% of any rents, additional charge or other consideration paid under the sublease to Tenant for Tenant's leasehold interest hereunder by the subtenant which is in excess of the fixed rent and additional rent accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (excluding sums paid for the sale or rental of Tenant's fixtures, inventory, leasehold improvements, equipment, furniture or other personal property) and less the actual costs (hereinafter referred to as the "**Subletting Expenses**") paid by Tenant for alteration costs (or contributions in lieu thereof), advertising, brokerage or consulting fees or commissions, free rent or fixturing periods and legal fees in connection with such subletting. The sums payable under Sections 9.05 (a) and (b) shall not be paid until Tenant has been first reimbursed for all Assignment Expenses or Subletting Expenses, as the case may be, and shall only be paid to Landlord as and when paid by the assignee or subtenant, as the case may be, to Tenant and upon the execution and delivery of such assignment or sublease, as the case may be, Tenant shall provide to Landlord a statement of the Assignment Expenses or Subletting Expenses, as the case may be, certified as correct by an officer or

principal of Tenant. The provisions of this Section 9.05 shall not be applicable to an assignment or sublease made in accordance with Section 9.04.

(c)     Upon assignment of this Lease, except in the case of an assignment to a related entity (or other transfer under Section 9.04(a)), fixed rent payable hereunder shall increase by ten percent (10%). Landlord and Tenant shall, at Landlord's request, execute and deliver an amendment to this Lease evidencing such increase in the fixed rent.

9.06    Notwithstanding anything to the contrary contained in this Lease, Tenant agrees that it and anyone holding through Tenant shall not use, sublet or assign all or any portion of the Premises to any subtenant or assignee who will use the Premises or a portion thereof for any of the following designated uses nor for any other use which is substantially similar to any one of the following designated uses:

(i)     federal, state or local governmental division, department or agency which generates heavy public traffic, including, without limitation, court, social security offices, labor department office, drug enforcement agency, motor vehicle agency, postal service, military recruitment office;

(ii)    union or labor organization;

(iii)   office for the practice of medicine, dentistry or the rendering of other health related services;

(iv)    chemical or pharmaceutical company provided; however, that the subletting or assignment to such a company which will use the premises only for executive, general and sales offices and waive the right to conduct any research and development shall not be prohibited;

(v)     insurance claims office, including, but not limited to, unemployment insurance or worker's compensation insurance;

(vi)    brokerage firm;

(vii)   courier or messenger service; or

(viii)  a bar, event space or night club of any kind or nature.

A violation of any of the terms of the provisions of this Article 9 shall give to the Owner the right to restrain the same by injunctive relief and/or cancel and terminate this Lease upon thirty (30) days' notice in writing, and unless Tenant cures same within said thirty (30) day period, this Lease shall terminate on the day fixed in such notice in like manner as if the date were the date originally fixed for the termination thereof herein. Tenant acknowledges that Tenant's agreements as herein set forth constitute a substantial obligation of Tenant and a material inducement for Landlord to enter into this Lease and, but for this inducement, Landlord would not enter into this Lease. A default by Tenant of the foregoing shall be considered a material default under this Lease, for which Landlord

may pursue any and all remedies, including but not limited to, those rights referred to herein.

## ARTICLE 10

### Compliance With Laws And Requirements Of Public Authorities

10.01  Subject to the terms and conditions of this Lease, Landlord, at Landlord's expense, shall cure any presently existing violations affecting the (i) Building to the extent it impacts Tenant's use, and/or (ii) the Demised Premises except for violations which will be cured by the completion of Tenant's Work.  Tenant shall give prompt notice to Landlord of any notice it receives of the violation of any law or requirement of public authority, and at its expense shall comply with all laws and requirements of public authorities which shall, with respect to the Demised Premises or the use and occupation thereof, or the abatement of any nuisance, impose any violation, order or duty an Landlord or Tenant, arising from (i) Tenant's specific manner of use of the Demised Premises (and not retail or its Permitted Use generally), (ii) the manner of conduct of Tenant's business or operation of its installations, equipment or other property therein (and not retail or its Permitted Use generally), (iii) any cause or condition created by or at the instance of Tenant, other than by Landlord's performance of any work for or on behalf of Tenant, or (iv) breach of any of Tenant's obligations hereunder.  Furthermore, Tenant need not comply with any such law or requirement of public authority so long as Tenant shall be contesting the validity thereof, or the applicability thereof to the Demised Premises, in accordance with Section 10.02. Landlord, at its expense, shall comply with all other such laws and requirements of public authorities as shall affect the Demised Premises, but may similarly contest the same subject to conditions reciprocal to Subsections (a), (b) and (d) of Section 10.02. Notwithstanding anything to the contrary set forth herein, Tenant shall not be responsible for compliance with any laws, regulations, or the like requiring (i) structural repairs or modifications or (ii) repairs or modifications to the utility or building service equipment located outside of or not exclusively serving the Demised Premises, unless such repairs, modifications, or installations are required (a) due solely to Tenant's work, alterations, or repairs in the Demised Premises, or (b) due solely to the negligence or willful misconduct of Tenant or any agent, employee, or contractor of Tenant. Tenant shall not do or permit any act or thing to be done in or to the Demised Premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Landlord with respect to the Demised Premises or the Building, or which shall or might subject Landlord to any liability or responsibility to any person or for property damage, nor shall Tenant keep anything in the Demised Premises except as now or hereafter permitted by the Fire Department, Board of Fire Underwriters, Fire Insurance Rating Organization or other authority having jurisdiction, and then only in such manner and such quality so as not to increase the rate of fire insurance applicable to the Building, nor use the Demised Premises in a manner which will increase the insurance rate for the Building or any property located therein over that in effect prior to the Commencement of Tenant's occupancy.  Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Landlord by reason of Tenant's failure to comply with the provisions of this Article applicable to Tenant and if by reason of such failure the fire insurance rate shall, at the beginning of this Lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Landlord, as additional rent hereunder,

for that portion of all fire insurance premiums thereafter paid by Landlord which shall have been charged because of such failure by Tenant, and shall make such reimbursement upon the first day of the month following such outlay by Landlord. In any action or proceeding wherein Landlord and Tenant are parties to a schedule or "makeup" of rate for the Building or Demised Premises issued by the New York Fire Insurance Exchange, or other body making fire insurance rates applicable to the Building shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to the Building. Landlord agrees that the Permitted Use shall not cause an increase in Landlord's insurance policies. Tenant shall not place a load upon any floor of the Demised Premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. As and if applicable, Landlord reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment, ovens, refrigeration and freezer units, dishwashing machines and equipment, and ventilation and filtration systems, but Tenant shall have the right to designate heavy equipment elsewhere if Tenant properly reinforces the structural floor of said areas. Such installations shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Landlord's reasonable judgment, to absorb and prevent vibration, noise, odor, and annoyance. For purposes of this Article, the cost of any alteration or improvement made shall be deemed to include the cost of preparing any necessary plans and the fees for filing such plans.

If, at any time during the term of this Lease, Landlord expends any sums for alterations or improvements to the Building (but not for any sums directly attributable solely to another tenant in the Building) which are required to be made pursuant to any law, ordinance or governmental regulation, or any portion of such law, ordinance or governmental regulation enacted after the Lease Commencement Date, Tenant shall pay to Landlord, as additional rent, the same percentage of such cost as is set forth in the provision of this Lease which requires Tenant to pay increases in Real Estate Taxes, within thirty (30) days after written demand therefor. If, however, the cost of such alteration or improvement is one which is required to be amortized over a period of time pursuant to applicable governmental regulations, Tenant shall pay to Landlord, as additional rent, during each year in which occurs any part of the Lease term, the above-stated percentage of the reasonable annual amortization of the cost of any alteration or improvement made. For purposes of this Article, the cost of any alteration or improvement made shall be deemed to include the cost of preparing any necessary plans and the fees for filing such plans.

10.02   Tenant may, at its expense (and if necessary, in the name of but without expense to Landlord) contest, by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Demised Premises, of any law or requirement of public authority, and Landlord shall cooperate with Tenant in such proceedings, provided that:

(a)   Landlord shall not be subject to criminal penalty or to prosecution for a crime nor shall the Demised Premises or any part thereof be subject to being condemned or vacated, by reason of non-compliance or otherwise by reason of such contest;

(b)   Tenant shall defend, indemnify and hold harmless Landlord against all liability, loss or damage which Landlord shall suffer solely by reason of such non-compliance or contest, including reasonable attorney's fees and other expenses reasonably incurred by Landlord;

(c)     Such non-compliance or contest shall not constitute or result in any violation of any superior lease or superior mortgage, or if such superior lease and/or superior mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by Landlord, such action shall be taken and such security shall be furnished at the expense of Tenant; and

(d)     Tenant shall keep Landlord advised as to the status of such proceedings.

Without limiting the application of Subsection (a) above thereto, Landlord shall be deemed subject to prosecution for a crime within the meaning of said Subsection, if Landlord, or any officer of Landlord individually, is charged with a crime of any kind or degree whatever, whether by service of a summons or otherwise, unless such charge is withdrawn before Landlord or such officer (as the case may be) is required to plead or answer thereto.

Tenant shall have the right but not the obligation, at its sole cost and expense, to prepare and file, or cause to be prepared and filed, an application to the State Liquor Authority and/or any other appropriate governmental or quasi-governmental body for a liquor license (either, at Tenant's option, a "full" liquor license or a "beer and wine" license). Landlord shall cooperate fully with such application and license, at no cost to Landlord, and Tenant shall reimburse Landlord for any reasonable attorney's fees or other professional fees in Landlord's reviewing such application. Notwithstanding anything to the contrary contained in this Lease, if Tenant will be serving any type of alcoholic beverages, Tenant shall either (i) obtain an endorsement on its commercial general liability policy eliminating the liquor liability exclusion or (ii) obtain a liquor liability policy on or before the Lease Commencement Date and keep in force during the Lease Term, insuring Tenant and all additional insured(s) required under this Lease against any liability to person(s) and/or property and/or death of any person(s) based on the provisions of all applicable statutes rules, laws, and regulations relating to alcohol consumption and/or any successor or other statute of law providing for dram shop liability. Such policy shall be written by one or more responsible insurance companies satisfactory to Landlord. The limits of such insurance shall be not less than $2,000,000.00. Licensee shall deliver to Licensor certificates of insurance evidencing such policies. Unless otherwise expressly set forth in this provision, any liquor liability policy shall be subject to the same provisions as set forth herein with regard to commercial general liability insurance.


# ARTICLE 11

## Insurance

11.01   Tenant shall not violate, or permit the violation of, any condition imposed by the standard fire insurance policy then issued for office buildings in the Borough of Manhattan, City of New York, and shall not do, or permit anything to be done, or keep or permit anything to be kept in the Demised Premises which would subject Landlord to any liability or responsibility for personal injury or death or property damage, or which would increase the fire or other casualty insurance rate on the Building or the property therein over the rate which would otherwise then be in effect assuming the use of the Demised Premises for the Permitted Use (unless Tenant pays the resulting premium as provided in Section 11.03) or which would result in insurance

companies of good standing refusing to insure the Building or any of such property in amounts reasonably satisfactory to Landlord.

11.02   Tenant covenants to provide on or before the Commencement Date and to keep in force during the term hereof the following insurance coverage:

(a)   For the benefit of Landlord and Tenant a comprehensive policy of liability insurance protecting Landlord and Tenant against any liability customarily covered by such policies occasioned by accident within or upon the Demised Premises or any appurtenances thereto.  Without limiting the generality of the foregoing, if Tenant shall sell or serve alcoholic beverages in the Demised Premises, such insurance shall include (or alternatively, Tenant shall carry separate) coverage with respect to any potential liability of either Landlord or Tenant under any so-called "Dram Shop" laws or acts or any other similar law or requirement of public authority.  Such policy is to be written by good and solvent insurance companies rated A and authorized to do business in the state of New York, naming Landlord, Landlord's managing agent, if any, and if required of Landlord, Landlord's mortgagees and ground lessor whose names and addresses have been previously furnished to Tenant as additional insureds, and the limits of liability thereunder shall not be less than the amount of Five Million ($5,000,000.00) Dollars in respect of any one person, in the amount of Ten Million ($10,000,000.00) Dollars in respect of any one accident (which additional $5,000,000 may be provided by umbrella or excess coverage), and in the amount of Five Hundred Thousand ($500,000.00) Dollars in respect of property damages and the full value of the Tenant's leasehold improvements, including but not limited to its equipment.  Such insurance may be carried under a blanket policy covering the Premises and other locations of Tenant, if any, provided that each such policy shall in all respects comply with this Section 11 and shall specify (i) that the portion of the total coverage of such policy that is allocated to the Premises is in the amounts required pursuant to this Section 11 and (ii) any sublimits in such blanket policy and such policy shall specify, or Tenant shall furnish Landlord a written statement from the insurer under such policy, that the protection afforded Tenant under any such blanket policy shall be no less than that which would have been afforded under a separate policy relating only to the Premises.

(b)   Fire and extended coverage and such other risks and hazards as are insurable under then available standard forms of "all risk" property insurance policies for the full insurable value thereof or in an amount adequate to cover the cost of replacement, whichever is greater,  of all personal property, fixtures, furnishing and equipment and all alterations and improvements to the Demised Premises, including Tenant's Work located in the Demised Premises.  Such policy shall be written by good and solvent insurance companies rated A and authorized to do business in the State of New York naming Landlord, Landlord's managing agent, if any, and if required of Landlord, Landlord's mortgagees and ground lessor whose names and addresses have been previously furnished to Tenant as additional insureds.

(c)   during the performance of any Tenant's Work or any repairs, until completion thereof, Builder's risk insurance on an "all risk" basis and on a completed value form including a Permission to Complete and Occupy endorsement, for full replacement value covering the interest of Landlord and Tenant (and their respective contractors and subcontractors), any Superior Mortgagee and any Ground Lessor whose names and addresses have been previously

furnished to Tenant in all work incorporated in the Building and all materials and equipment in or about the Demised Premises.

(d)     Worker's Compensation Insurance, New York State disability benefits and any other statutory form of insurance now or hereafter required by law.

(e)     Plate and other glass insurance.

(f)     Business interruption insurance in an amount not less than twelve (12) months of Fixed Rent.

(g)     Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

(h)     Such other insurance in such amounts as Landlord, any Superior Mortgagee and/or any ground lessor may reasonably require from time to time provided same is generally required by other owners or ground lessors of similar buildings in the general vicinity of the Building.

Prior to the time such insurance is first required to be carried by Tenant and thereafter, prior to the expiration of any such policies, Tenant agrees to deliver to Landlord certificates evidencing such insurance. All liability coverage shall name Landlord (and any designees of Landlord with an insurable interest, provided Tenant has received written notice of the name(s) and address(es) of the same) as additional insureds. Tenant's failure to provide and keep in force the aforementioned insurance shall be regarded as a material default hereunder if such coverages are not in place within three (3) business days of written notice from Landlord, thus entitling Landlord to exercise any or all of the remedies as provided in this lease in the event of Tenant's default.

All such policies shall require notice of any cancellation or change affecting the coverage or protection of the Landlord hereunder to be given to Landlord in accordance with the provisions of the policy. The Tenant shall promptly pay the required premiums for such insurance and deliver to the Landlord the original policy and the duplicate receipt evidencing payment thereof. All premiums and charges for all of said policies shall be paid by the Tenant, and if the Tenant shall fail to make any such payment when due, or fail to carry any such policy, the Landlord may, but shall not be obligated to make such payment or carry such policy and the amount paid by the Landlord with interest thereon at the rate of 10% per annum shall be repaid to the Landlord as Additional Rent by the Tenant on demand, and all such amounts so repayable together with such interest shall be considered as additional rent, payable hereunder, for the collection of which the Landlord shall have all the remedies provided for therefor in this Lease or by law provided, for the collection of rent. Landlord acknowledges and agrees that Tenant shall have the right to pay its premium in installments. Payment by the Landlord of any such premiums or the carrying by the Landlord of any such policy shall not be deemed a waiver, or release the default of the Tenant with respect thereof.

Landlord, may twice during the Term but not prior to the third (3rd) anniversary of the Lease term, require Tenant to increase such coverage, from time to time, to that amount of

insurance which in Landlord's reasonable judgment is then being customarily required by landlords for similar space in similar buildings in "Wall Street" area of New York County.

11.03   Landlord and Tenant shall each secure an appropriate clause in, or an endorsement upon, each fire or extended coverage policy obtained by it and covering the Building, the Demised Premises or the personal property, fixtures and equipment located therein or thereon, pursuant to which the respective insurance companies waive subrogation or permit the insured, prior to any loss, to agree with a third party to waive any claim it might have against said third party. The waiver of subrogation or permission for waiver of any claim hereinbefore referred to shall extend to the agents of each party and its employees and, in the case of Tenant, shall also extend to all other persons and entities occupying or using the Demised Premises in accordance with the terms of this lease. Landlord or Tenant shall notify the other if and to the extent that such waiver or permission can be obtained only upon payment of an additional charge. In such case, following such notice and except as provided in the following two paragraphs, the party benefiting from the waiver or permission shall pay such charge upon demand, or shall be deemed to have agreed that the party obtaining the insurance coverage in question shall be free of any further obligations under the provisions hereof relating to such waiver or permission.

11.04   In the event that Landlord notifies Tenant that it shall be unable at any time to obtain one of the provisions referred to above in any of its fire and extended coverage insurance policies, at Tenant's option Landlord shall cause Tenant to be named in such policy or policies as one of the named insureds, but if any additional premium shall be imposed for the inclusion of Tenant as such as a named insured, Tenant shall pay such additional premium upon demand or Landlord shall be excused from its obligations under this paragraph with respect to the insurance policy or policies for which such additional premiums would be imposed. In the event that Tenant shall have been added as a named insured in any of Landlord's policies in accordance with the foregoing, Tenant shall endorse promptly to the order of Landlord, without recourse, any check, draft or order for the payment of money representing the proceeds of any such policy or any other payment growing out of or connected with said policy to the extent relating to, or paid in connection with, the loss of or any damage to Landlord's property, and Tenant hereby irrevocably waives any and all rights in and to such proceeds and payments.

11.05   In the event that Tenant shall be unable at any time to obtain one of the provisions referred to above in any of its fire and extended coverage insurance policies, at Landlord's option, Tenant shall cause Landlord to be named in such policy or policies as one of the named insureds, but if any additional premium shall be imposed for the inclusion of Landlord as a named insured, Landlord shall pay such additional premium upon demand or Tenant shall be excused from its obligations under this paragraph with respect to the insurance policy or policies for which such additional premiums would be imposed. In the event that Landlord shall have been added as a named insured in any of Tenant's policies in accordance with the foregoing, Landlord shall endorse promptly to the order of Tenant, without recourse, any check, draft or order for the payment of money representing the proceeds of any such policy or any other payment growing out of or connected with said policy to the extent relating to, or paid in connection with, the loss of or any damage to Tenant's property, and Landlord hereby irrevocably waives any and all rights in and to such proceeds and payments.

11.06  Subject to the foregoing provisions of Sections 11.04 and 11.05, and insofar as may be permitted by the terms of the insurance policies carried by it, each party hereby releases the other with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damages or destruction with respect to its property by fire or other casualty (including rental value or business interruption, as the case may be) occurring during the term of this lease.

11.07  If, solely by reason of a failure of Tenant to comply with the provisions of Section 10.01 or Section 11.01 following notice from Landlord and a reasonable opportunity to cure, the rate of fire insurance with extended coverage on the Building or equipment or other property of Landlord shall be higher than it otherwise would be for the Permitted Use, Tenant shall reimburse Landlord, on demand, as additional rent, the increase in premiums directly attributed by the insurer to such failure on the part of Tenant.

11.08  If any dispute shall arise between Landlord and Tenant with respect to the incurrence or amount of any additional insurance premium referred to in Sections 11.03, 11.04 or 11.05, the dispute shall be determined by arbitration.

11.09  A schedule or make up of rates for the Building or the Demised Premises, as the case may be, issued by the New York Fire Insurance Rating Organization or other similar body making rates for fire insurance and extended coverage for the premises concerned, shall be prima facie evidence of the facts therein stated and of the several items and charges in the fire insurance rate with extended coverage then applicable to such premises.

11.10  Landlord agrees to carry such fire and extended coverage insurance as may be required by the Ground Lease and the holder of any superior mortgage.  At any time that the Building and Land are not affected by a Ground Lease or superior mortgage, Landlord shall obtain and keep in full force and effect, so-called "All Risk" or "Direct Risk of Physical Loss" commercial property insurance insuring the Building and Landlord's property, fixtures and equipment therein or thereupon (excluding any property which Tenant is obligated to insure hereunder) for the amount of the full replacement of its value as such value may exist from time to time.

## ARTICLE 12

### Rules And Regulations

12.01  Tenant and its employees and agents shall faithfully observe and comply with the Rules and Regulations annexed hereto as Exhibit F, and such reasonable changes therein (whether by modification, elimination or addition) as Landlord at any time or times hereafter may make and communicate in writing to Tenant, which: (i) do not unreasonably affect the conduct of Tenant's business in the Demised Premises or the Outdoor Dining Area (provided Tenant has secured and continues to maintain all permits and other governmental or quasi-governmental authorizations for such Outside Dining Area), (ii) increase Tenant's financial obligations in more than a de minimus manner, (iii) reduce its rights except as required by any governmental law, rule, regulation, ordinance or similar decree and (iv) do not unreasonably impact Tenant's use (subject to the terms and conditions of this Lease) of the freight elevators and loading docks; provided, however, that in case of any conflict or inconsistency between the

provisions of this lease and any of the Rules and Regulations as originally promulgated or as changed, the provisions of this lease shall control.

12.02   Nothing in this lease contained shall be construed to impose upon Landlord any duty or obligation to Tenant to enforce the Rules and Regulations or the terms, covenants or conditions in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant or its employees, agents or visitors. However, Landlord shall not enforce any of the Rules and Regulations in such manner as to discriminate against Tenant or anyone claiming under or through Tenant.

## ARTICLE 13

### Tenant's Changes and Tenant's Work

13.01   Subject to the terms and conditions of this Lease, Tenant may from time to time during the term of this lease, at its expense, make such non-structural alterations, additions, installations, substitutions, improvements and decorations not requiring a permit or other governmental or quasi-governmental approval (hereinafter collectively called "**changes**" and, as applied to changes provided for in this Article, "**Tenant's Changes**") in and to the Demised Premises, excluding structural changes (which Tenant acknowledges and agrees may be withheld by Landlord in its sole discretion) , as Tenant may reasonably consider necessary for the conduct of its business in the Demised Premises, on the following conditions:

(a)     The outside appearance (as distinct from interior changes visible from the exterior) or the strength of the Building or of any of its structural parts (i.e. bearing walls) shall not be adversely affected.

(b)     Except for the Outdoor Dining Area, no part of the Building outside of the Demised Premises shall be physically affected.

(c)     The proper functioning of any of the mechanical, electrical, sanitary and other service systems of the Building shall not be adversely affected and the usage of such systems by Tenant shall not be materially increased or the systems adversely affected.

(d)     In performing the work involved in making such changes, Tenant shall be bound by and observe all of the conditions and covenants contained in the following Sections of this Article.

(e)     Before proceeding with any Tenant Changes the estimated cost of which shall exceed $100,000.00 (in 2015 Dollars) in any calendar year (exclusive of the costs of decorating work such as the replacement of floor or wall coverings and items constituting "Tenant's Property", as defined in Article 14, and of any architect's and engineer's fees), or any Tenant's Work (including, but not limited to any change to the mechanical, electrical, sanitary, and/or other service systems), Tenant shall submit to Landlord plans and specifications for the work to be done, for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord may as a condition of its consent require Tenant to make reasonable revisions in and to the plans and specifications.  If Landlord fails to respond to Tenant's request for consent to any plans and specifications for the work to be done within ten

(10) business days after the receipt of a written request for such consent, Tenant may within five (5) business days thereafter (time being of the essence) give Landlord a second notice. If Landlord fails to respond to such second notice from Tenant for Landlord's consent to such plans and specifications for the work to be done by Tenant, within five (5) business days after said second request, such plans and specifications shall be deemed approved.

13.02   Tenant, at its expense, shall obtain all necessary governmental permits and certificates for the commencement and prosecution of Tenant's Changes and Tenant's Work and for final approval thereof upon completion, and shall cause Tenant's Changes and Tenant's Work to be performed in compliance therewith and with all applicable laws and requirements of public authorities, and with all applicable requirements of insurance bodies, and in good and workmanlike manner, using new or like new materials and equipment at least equal in quality and class to the original installations in the Building. At no cost to Landlord, Landlord agrees that it will sign such applications as owner of the Building as requested by Tenant. Tenant's Changes shall be performed in such manner as not to unreasonably interfere with any other occupants of the Building (unless Tenant shall indemnify Landlord therefor to the latter's reasonable satisfaction) or impose any material additional expense upon Landlord in the renovation, alteration, maintenance or operation of the Building unless Tenant agrees to pay such additional expense. Throughout the performance of Tenant's Changes and Tenant's Work, Tenant, at its expense, shall carry, or cause to be carried, workmen's compensation insurance in statutory limits and general liability insurance for any occurrence in or about the Building as set forth in Section 11.02 hereof, in which Landlord and its agents, ground lessor and superior mortgagee(s) shall be named as additional named insureds to the extent of their insurable interests, in such limits as Landlord may reasonably prescribe, with insurers reasonably satisfactory to Landlord. Tenant shall furnish Landlord with satisfactory evidence that such insurance is in effect at or before the commencement of Tenant's Changes and Tenant's Work and, on request, at reasonable intervals thereafter during the continuance of Tenant's Changes and Tenant's WorK. All electrical, life, fire and safety, riser and plumbing work in connection with Tenant's Changes and Tenant's Work (as the case may be) shall be performed by contractors or subcontractors licensed therefor by all governmental agencies having or asserting jurisdiction (or at Landlord's sole election with respect to life, fire and safety and riser work, by Landlord's contractor at Tenant's expense). Tenant shall also submit to Landlord for its written approval a list of contractors and subcontractors for the major trades, which approval of Landlord shall not be unreasonably withheld, conditioned or delayed ("Tenant's Contractors"). Tenant further agrees that Tenant shall not make any material changes in Tenant's Plan or Tenant's Contractors subsequent to approval by Landlord unless Landlord consents to such changes. Landlord shall have the right to refuse to consent to any such changes if in the reasonable judgment of Landlord or Landlord's Architect (as defined hereinafter) such changes violate the terms of this Lease.

13.03   Tenant, at its expense, and with diligence and dispatch, shall procure the cancellation or discharge of all notices of violation arising from or otherwise connected with Tenant's Changes and Tenant's Work which shall be issued by the Department of Buildings or any other public or quasi-public authority having or asserting jurisdiction. In the event Tenant shall be unable to obtain any governmental permits or approvals for Tenant's Changes and Tenant's Work by reason of any existing violation against the Building (and not resulting from the acts or omissions of Tenant), Landlord shall, at its expense, and with diligence and dispatch,

correct the same such that Tenant shall be able to obtain any such permit or approval. Except with respect to Landlord's obligations under Section 10.01 hereof. Tenant shall defend, indemnify and save harmless Landlord against any and all mechanic's and other liens filed in connection with Tenant's Changes and Tenant's Work, including the liens of any security interest in, conditional sales of, or chattel mortgages upon, any materials, fixtures or articles so installed in and constituting part of the Demised Premises and against all costs, expense and liabilities incurred in connection with any such lien, security interest, conditional sale or chattel mortgage or any action or proceedings brought thereon. Tenant, at its expense, shall procure the bonding, satisfaction or discharge of all such liens within fifteen (15) days after Landlord delivers to Tenant notice of the same and makes written demand therefore. However, nothing herein contained shall prevent Tenant from contesting, in good faith and at its own expense, any such notice of violation, provided that Tenant shall comply with the provisions of Section 10.02.

13.04    Tenant agrees that the exercise of its rights pursuant to the provisions of this Article 13 shall not be done in a manner which would create any work stoppage, picketing, labor disruption or dispute involving Landlord or materially adversely interfere with the business of Landlord or any Tenant or occupant of the Building. In the event of the occurrence of any condition described above arising from the exercise by Tenant of its right pursuant to the provisions of this Article 13, Tenant shall, immediately upon notice from Landlord, cease the manner of exercise of such right giving rise to such condition. In the event Tenant fails to cease such manner of exercise of its rights as aforesaid, Landlord, in addition to any rights available to it under this lease and pursuant to law, shall have the right to injunctive relief. With respect to Tenant's Changes and Tenant's Work, Tenant shall make all arrangements for, and pay all expenses incurred in connection with, use of the freight elevators servicing the Demised Premises (as same may be allowed to be used by Tenant under this Lease).

13.05    Nothing contained in this Lease shall be deemed, construed or interpreted to imply any consent or agreement on the part of Landlord to subject Landlord's interest or estate to any liability under any mechanics' or other lien law. Tenant shall secure partial and/or full lien waivers, as the case may be, from any and all contractors and subcontractors performing work in the Demised Premises simultaneous with their payment(s) to such contractors and subcontractors (as the case may be) ("Lien Waivers"), and within five (5) business days of such payment by Tenant, deliver a copy of same to Landlord. If any mechanic's or other lien or any notice of intention to file a lien is filed against the Demised Premises or any part thereof, for any work, labor, services or materials claimed to have been performed or furnished for or on behalf of Tenant or anyone holding any part of the Demised Premises through or under Tenant, Tenant shall cause the same to be canceled and discharged of record by payment, bond or order of a court of competent jurisdiction within fifteen (15) days after notice by Landlord to Tenant.

13.06    Following compliance by Tenant with its obligations under the foregoing Sections and approval of Tenant's Plan and Tenant's Contractors by Landlord, Tenant shall commence Tenant's Changes and Tenant's Work and it shall proceed diligently with same, in order to complete same within a reasonable period of time using new first class materials and in a good and workmanlike manner.

13.07    Landlord may, at any time and from time to time, at Tenant's expense, in addition to any other right of access given to Landlord pursuant to the terms of this Lease, enter

upon the Demised Premises with one or more engineers and/or architects of Landlord's selection (collectively, "Landlord's Architect") to determine the course and degree of completion of Tenant's Changes and Tenant's Work and its compliance with Tenant's Plan and the terms and conditions of this Lease, provided neither interferes with Tenant's Changes and Tenant's Work or Tenant's Contractors.

13.08 Notwithstanding the provisions of Article 13, no approval of plans or specifications by Landlord or consent by Landlord allowing Tenant to make any alterations, installations, additions or improvements in the Demised Premises at any time during the term shall in any way be deemed to be an agreement by Landlord that the contemplated alterations, installations, additions or improvements comply with any legal requirements or any certificate of occupancy for the building nor shall it be deemed to be a waiver by Landlord of such compliance by Tenant or of any of the terms of this Lease. Notice is hereby given that neither Landlord, Landlord's agent, nor any mortgagee of the building shall be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for such labor or material shall attach to or affect any estate or interest of Landlord or any such mortgagee in and to the Demised Premises or the building. Tenant shall keep records of all alterations, installations, additions or improvements costing in excess of $25,000.00 and the cost thereof, and within fifteen (15) days after demand by Landlord, Tenant shall furnish to Landlord copies of such records if Landlord shall request the same.

13.09 Without in any manner whatsoever limiting the terms and provisions of this Article, Tenant herein must comply with all proper codes which compliance shall include but not be limited to:

(i) Architectural and mechanical plans are reviewed for compliance with Building Standard and New York City Building Code.

(ii) Insertion of appropriate standard Building Department notes and details.

(iii) Certification by a professional architect or engineer as to compliance with the Building Code.

(iv) Filing plans and specifications with the Department of Buildings and processing to approval.

(v) Making controlled inspection of air conditioning system, complete inspection of entire installation and filing any applicable forms indicating proper completion of said installation with the Department of Buildings. Tenant shall obtain final approval from any required governmental agency, an approved Certificate of Completion ("Completion Certificate"), to be filed by Tenant with the Department of Buildings. A Tenant installation will not be considered complete until an approved Completion Certificate is filed with the Department of Buildings.

13.10 (i) Tenant hereby acknowledges and agrees that notwithstanding anything to the contrary contained in this Lease, if the Demised Premises do not currently contain sprinklers or require additional sprinklers as a consequence of Tenant's use of the Demised Premises, it shall be Tenant's sole responsibility at Tenant's sole cost and expense to install said

37

sprinklers and any life fire safety system as required by any rules, regulations, laws and/or codes of any governmental or quasi-governmental agency prior to the opening of Tenant's business operations (the "Sprinkler Work").

(ii)     Tenant agrees that its Tenant's Changes and Tenant's Work as described in this Article 13, and any alterations performed by or for Tenant in the Demised Premises, shall conform to the requirements of the Americans With Disabilities Act ("ADA") and any successor statutes. Additionally, Tenant shall, at its sole cost and expense, comply with installation and maintenance of the emergency lighting and "EXIT" sign requirements of Local Law 16.

(iii)  Tenant's Changes and Tenant's Work shall be made and diligently completed at Tenant's sole cost and expense, in a good and workmanlike manner, in accordance with accepted building practices, applicable laws (including, but not limited to, building codes, fire and sprinkler codes, environmental laws and zoning ordinances), insurance requirements as required by the Board and in accordance with any reasonable and customary alteration agreement and/or construction rules and regulations of the Building.

13.11  If the performance of Tenant's Changes and Tenant's Work or other repairs shall unreasonably interfere with the comfort and/or convenience of tenants, residents (if applicable), or occupants of the Building or materially delay operation or maintenance of any portion of the Building, Tenant, upon Landlord's demand, shall promptly discontinue, remedy or remove the condition or conditions complained of. The performance of Tenant's Changes and Tenant's Work or other repairs shall not result in any expense to Landlord. For sake of clarity, Tenant acknowledges and agrees that (i) the performance of Tenant's Changes and Tenant's Work shall only take place during the hours of Monday through Friday from 7:00 am until 5:00 pm (however, no "power machinery or equipment" shall be used before 9:00 am nor after 4:00 pm) and (ii) on Saturdays and Sundays, only quiet, cosmetic work shall be allowed to be performed by Tenant.

13.13  The approval of Tenant's Plans, or the consent by Landlord to the making of any Tenant's Changes and Tenant's Work or other repairs, does not constitute Landlord's agreement or representation that such plans, specifications, Tenant's Changes and Tenant's Work or other repairs are complete, sufficient, or comply with law and any applicable certificate of occupancy.

13.14  In addition to any other remedies available to Landlord under this Lease, a violation of any of the terms of this Article 13 shall give to the Landlord the right to restrain the same by injunctive relief. Tenant acknowledges that Tenant's agreements as herein set forth in this Article 13 constitute a substantial obligation of Tenant and a material inducement for Landlord to enter into this Lease and, but for this inducement, Landlord would not enter into this Lease. An uncured default by Tenant of the foregoing shall be considered a material default under this Lease, for which Landlord may pursue any and all remedies, including but not limited to, those rights referred to herein.

13.15  Notwithstanding anything to the contrary contained in this Lease, Tenant shall give Landlord prior written notice with it Plans of any proposed "Specialty Alterations" (as defined hereinafter), with copies of proposed plans and as-built plans upon completion of the Specialty Alterations. Specialty Alterations shall be defined as those alterations, installations,

additions or improvements consisting of raised floors, vaults, filing systems, internal staircases, dumbwaiters, pneumatic tubes, vertical and horizontal transportation systems, any alterations which are structural in nature or penetrate or otherwise affect any floor slab and any textured, mirrored and/or decorative walls, ceilings, floors and other alterations of like character or nature. Provided that Tenant, simultaneous with its delivery of its Plans to Landlord for approval, in a writing addressed to Landlord in **BOLD CAPS SPECIFICALLY ASKING LANDLORD WHETHER OR NOT LANDLORD WILL REQUIRE TENANT TO REMOVE SUCH SPECIALTY ALTERATIONS PRIOR TO THE LEASE EXPIRATION DATE OR EARLIER TERMINATION OF THIS LEASE AND REPAIR ANY AND ALL DAMAGE AS A CONSEQUENCE OF SUCH REMOVAL OF SUCH SPECIALTY ALTERATIONS** (the "Specialty Alterations Removal Request"), Landlord shall notify Tenant when it approves or rejects such Plans whether or not Tenant shall be required to remove such Specialty Alterations prior to the Lease Expiration Date or earlier termination of this Lease and repair any and all damage done to the Demised Premises as a consequence of the removal of such Specialty Alterations. Provided Tenant delivers the Specialty Alterations Removal Request in the manner described above, if Landlord fails to notify Tenant whether or not such removal of any Specialty Alteration is required, Landlord shall be deemed to have waived its right to have such Specialty Alteration(s) removed which are contained on Tenant's Plans. All such Specialty Alterations shall be done at Tenant's sole expense and the making thereof shall not interfere with the use of the Building by other tenants.

## ARTICLE 14

### Tenant's Property

14.01   Except as otherwise provided in Sections 3.02, 13.15 and 14.02 hereof, all fixtures, equipment, improvements and appurtenances attached to or built into the Demised Premises at the commencement of or during the term of this lease, whether or not by or at the expense of Tenant, shall be and remain a part of the Demised Premises, shall be deemed the property of Landlord and shall not be removed by Tenant, except as otherwise provided in this lease.

14.02   All paneling, movable partitions, lighting fixtures, special cabinet work, other business and trade fixtures, machinery and equipment, whether or not attached to or built into the Demised Premises, which are installed in the Demised Premises by or for the account of Tenant or consist of the Remaining Property and can be removed without structural damage to the Building, and all furniture, furnishings and other articles of movable personal property owned by Tenant and located in the Demised Premises (all of which are sometimes called "**Tenant's Property**") shall be and shall remain the property of Tenant and may be removed by it at any time during the term of this lease; provided that if any of Tenant's Property is removed, Tenant or any party or person entitled to remove same shall repair or pay the cost of repairing any damage to the Demised Premises or to the Building resulting from such removal. Any fixtures (other than trade fixtures) or other property attached to the real estate for which Landlord shall have granted any allowance or credit to Tenant prior to the Rent Commencement Date (excluding any period of so-called "free rent" set forth in Exhibit C attached hereto) shall not be deemed to have been installed by or for the account of Tenant, without expense to Landlord, and shall not be considered Tenant's Property.

14.03   At or before the Expiration Date, or the date of any earlier termination of this lease, or as promptly as practicable after such an earlier termination date, Tenant at its expense, shall remove from the Demised Premises, and repairing all damage to the Demised Premises resulting from such removal, all of Tenant's Property except such items thereof as Tenant shall have expressly agreed in writing with Landlord were to remain and to become the property of Landlord, and shall fully repair any damage to the Demised Premises or the Building resulting from such removal. Tenant's obligation herein shall survive the termination of the lease. Notwithstanding anything to the contrary set forth herein, Tenant shall not be obligated to remove from the Demised Premises those articles of Tenant's Property which are attached or built into the Demised Premises (except for Specialty Alterations as described in Section 13.15 hereinabove). In any event, the Demised Premises shall be surrendered to Landlord in a broom-clean and vacant condition.

14.04   Any other items of Tenant's Property (except money, securities and other like valuables) which shall remain in the Demised Premises after the Expiration Date or after a period of fifteen (15) days following an earlier termination date, may, at the option of the Landlord, be deemed to have been abandoned, and in such case either may be retained by Landlord as its property or may be disposed of, without accountability, at Tenant's expense in such manner as Landlord may reasonably see fit.

## ARTICLE 15

### Repairs And Maintenance

15.01   Subject to Landlord's obligations as herein provided, Tenant shall take good care of the Demised Premises and, at its expense, shall promptly make all repairs, ordinary or extraordinary, structural or non-structural, to the interior of the Demised Premises, subject to reasonable wear and tear, obsolescence and damage from the elements, fire and other casualty; provided, however, Tenant shall have no obligation to perform structural repairs to the Demised Premises or the Building or any part thereof or any repairs to, or replacements of, any Building systems (other than Building systems located entirely within and exclusively serving the Demised Premises), except if the necessity for same shall have been caused by the intentional, wrongful or negligent acts or omissions of Tenant's and/or Tenant's contractors, agents, employees and/or invitees). Subject to Sections 11.03 and 11.06, Tenant shall make repairs to the Building, as shall be required by reason of (i) Tenant's Work or Tenant's Changes and Tenant's Work (except to the extent such repairs to the Building relate to the curing of pre-existing violations of applicable codes or regulation, which cure(s) shall be made by Landlord at its sole cost and expense), (ii) the installation, use or operation of Tenant's Property in the Demised Premises, (iii) the moving of Tenant's Property in or out of the Building, or (iv) the negligence or intentional acts of Tenant or any of its employees, agents or contractors; but Tenant shall not be responsible for any of such repairs as are required by reason of Landlord's neglect or willful misconduct.

15.02   Subject to the terms and conditions of this Lease, Landlord, at its expense, shall keep and maintain the Building (including without limitation the roof, foundation, structural steel, slabs and structural elements of exterior walls) and its fixtures, appurtenances, systems and facilities, in good working order, condition and repair, including without limitation, all structural

elements of the Demised Premises, the exterior of the Building (excluding Tenant's signage), all building systems which are located in, but do not serve the Demised Premises exclusively and the common portions of HVAC, plumbing, electrical and other Building systems to extent serving with the Demised Premises and other portions of the Building. Landlord, at its expense, shall make all repairs and replacements to the sidewalks and curbs adjacent to the Building, exclusive of the Outdoor Dining Area which shall be Tenant's responsibility. Landlord, at its expense, shall cause the prompt removal of ice and snow from all sidewalks and entranceways serving the Building. Landlord shall make all such repairs promptly such that access to, and Tenant's operations from, the Demised Premises are not unreasonably impaired. In addition, Landlord shall make all repairs to the Demised Premises resulting from the negligence or willful misconduct of Landlord or any of its employees, agents or contractors.

15.03 Except to extent resulting or arising from the negligence or wrongful intentional acts of Landlord, its agents, employees or contractors or as expressly otherwise provided in this lease, Landlord shall have no liability to Tenant by reason of any inconvenience, annoyance, interruption or injury to business arising from Landlord's making any repairs or changes which Landlord is required or permitted by this lease, or required by law, to make in or to any portion of the Building or the Demised Premises, or in or to the fixtures, equipment or appurtenances of the Building or the Demised Premises, provided that Landlord shall use due diligence with respect thereto and shall perform such work, except in case of emergency, at times reasonably convenient to Tenant and otherwise in such manner as will not materially interfere with Tenant's use of or access to the Demised Premises. In the event Tenant is preventing from operating from all or any material portion of the Demised Premises (other than the Outdoor Dining Area) by reason of the negligence or willful misconduct of Landlord, its agents, employees or contractors, the rent payable by Tenant hereunder shall equitably abate until such interference shall cease and Tenant shall re-open the entire Demised Premises. For sake of clarity and emphasis, and notwithstanding anything to the contrary contained in this Lease, if (i) there shall be an interruption or suspension of any of the Building's services, causing an interruption of the conduct of Tenant's business in the Demised Premises, as a result of the performance by Landlord of its repair obligations under this Lease (an "Interruption"), (ii) such Interruption shall continue for at least five (5) business days following receipt by Landlord of written notice from Tenant describing such Interruption, (iii) such Interruption shall not have been caused, by reason of the failure on the part of any public utility company servicing the Building to provide such applicable service and (iv) such Interruption shall not have been caused, in whole or in part, by reason of (a) an event which is covered under any article of the Lease relating to casualty or condemnation, (b) an act or omission on the part of Tenant in default or violation of this Lease or Tenant's obligations hereunder, (c) a force majeure event, or (d) the negligence of Tenant or Tenant's agents, servants, employees, contractors or visitors (with respect to visitors, when in the Demised Premises) (an Interruption that satisfies all of the foregoing conditions, a "Material Interruption"), then, as Tenant's sole remedy in connection with such Material Interruption, Tenant shall be entitled to a fair diminution of the Fixed Rent and Additional Rent for the period which shall begin on the sixth (6th) consecutive business day of such Material Interruption and which shall end on the earlier of (x) the day following the day on which such Material Interruption shall cease or (y) Tenant shall recommence the use of the Demised Premises for the conduct of Tenant's business.

15.04   If Landlord fails to make required repairs within thirty (30) days after Tenant's written notice, and such failure materially and adversely affects access to, or Tenant's ability to operate its business from the Demised Premises, Tenant may, at its option, undertake such repairs and send an invoice to Landlord for the reasonable, actual and documented cost thereof and Landlord shall reimburse Tenant within ten (10) business days from the date Landlord receives Tenant's invoice. Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter written notice as is practicable under the circumstances, and if Landlord fails to make such repairs after promptly being notified by Tenant, Tenant may undertake such repairs and Landlord shall reimburse Tenant within ten (10) business days from the date Landlord receives Tenant's invoice.

15.05   Landlord agrees that if scaffolding will be used at the Building at during the term of this Lease, Landlord will: (i) give Tenant reasonable prior written notice, (ii) use commercially reasonable efforts to minimize interference with access to the Demised Premises, the use of the Outdoor Dining Area and any obstruction of Tenant's signage and (iii) permit Tenant to install temporary signage on scaffolding.

## ARTICLE 16

### Electricity

16.01   At Tenant's sole cost and expense as provided for in Article 16.05 hereinafter, Landlord shall furnish electricity to the Demised Premises 24 hours a day, 365 days a year. Notwithstanding the foregoing, however, Tenant agrees that Landlord shall not in any way be liable or responsible to Tenant for any loss, damage, or expense that Tenant may sustain or incur if either the quantity or character of electrical service is changed, is no longer available, or is unsuitable for Tenant's requirements.

16.02   As applicable, Landlord shall cause the Demised Premises to have the electrical capacity as set forth in Landlord's Work. Tenant covenants and agrees that, at all times, its use of electric current shall never exceed the capacity of the feeders to the Building or the risers or wiring installation thereof. In connection therewith, Tenant expressly agrees that all installations, alterations and additions of and to the electrical fixtures, appliances, or equipment within the Demised Premises shall be subject to Landlord's prior written approval, and, if such approval shall be given, rigid conduit only shall be permitted. If, in connection with any request for such approval, which approval shall not be unreasonably withheld, conditioned, delayed or denied, Landlord shall, in its sole judgment, determine that the risers of the Building servicing the Demised Premises shall be insufficient to supply Tenant's electrical requirements with respect thereto, Landlord shall, at the sole cost and expense of Tenant, install any additional feeders that Landlord shall deem necessary with respect thereto, provided, however, that, if Landlord shall determine, in its reasonable judgment, that the same will cause permanent damage or injury to the Building or to the Demised Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expense, or unreasonably interfere with, or disturb, the other tenants or occupants of the Building, then Landlord shall not be obligated to make such installation, and Tenant shall not make the installation, alteration, or addition with respect to which Tenant requested Landlord's consent. In addition to the installation of such riser or risers, Landlord will also, at the sole cost and expense of Tenant, install all other

equipment necessary and proper in connection therewith, subject to the aforesaid terms and conditions. All of the aforesaid costs and expenses are chargeable and collectible as additional rent, and shall be paid by Tenant to Landlord within ten (10) days after rendition of any bill or statement to Tenant therefor.

16.03 Provided that it is physically possible for Tenant to receive electric current in the Demised Premises directly from the public utility company serving the area in which the Building is located, Landlord may discontinue the aforesaid service upon ninety (90) days' notice to Tenant without being liable to Tenant therefor and without in any way affecting this Lease or the liability of Tenant hereunder, and the same shall not be deemed to be a lessening or diminution of services within the meaning of any law, rule, or regulation now or hereafter enacted, promulgated, or issued or, Tenant may elect, on ninety (90) days prior notice to Landlord to obtain electric current directly from the public utility. In the event that either party gives such notice of discontinuance, Landlord shall permit Tenant to receive such service directly from such public utility company and shall permit Landlord's wires and conduits, to the extent available, suitable and safely capable, to be used for such purpose. Any additional wires, conduits, or other equipment necessary and proper in connection therewith shall be installed by Landlord in accordance with the terms of, and subject to the conditions contained in, Section 16.02. In the event that Landlord exercises its rights under this Section 16.03, then Tenant shall contract for such electrical service directly with the said public utility for all of Tenant's electric current requirements.

16.04 For purposes of Section 16.04:

(a) **Usage** shall mean the number of kilowatt hours and kilowatts of electric current consumed in the Demised Premises, as measured by a meter or meters through which the electric current supplied to the Demised Premises is drawn, for each calendar month during the term of this Lease.

(b) **Rate** shall mean the amount per kilowatt hour (including energy and demand) that would be charged, at the time in question, by the public utility company supplying electric current to the Building, at the rate schedule payable by Landlord (including the demand factors for the Building) for the entire Building;

(c) **Tenant's Cost** shall mean 105% of an amount equal to the product of the Rate multiplied by the Usage. Tenant's Cost includes Landlord's expenses incurred in connection with submetering.

16.05 Landlord represents that there is or will be a separate meter or submeter which measures the Usage exclusively. Landlord shall, from time to time, furnish Tenant with a statement indicating the appropriate period during which the Usage was measured and the amount of Tenant's Cost payable by Tenant to Landlord for furnishing electrical current. Within ten (10) days after receipt of each such statement, Tenant shall pay the amount of Tenant's Cost set forth thereon to Landlord as additional rent.

(a)        16.06 Tenant, within ninety (90) days of its receipt of any statement delivered to it under this Article 16, shall have the right upon written notice to Landlord to periodically audit the Usage, Rate and Tenant's Cost.    In the event of any dispute as to any Additional Rent due under this Article 16, an officer of Tenant or Tenant's certified public accountant (but in no event shall Tenant hire or employ an accounting firm or any other person to audit Landlord as set forth under this Paragraph who is compensated or paid for such audit on a contingency basis) shall have the right after reasonable notice and at reasonable times to inspect Landlord's accounting records at Landlord's accounting office. If after such inspection, Tenant still disputes such Additional Rent, upon Tenant's written request therefor, a certification as to the proper amount of Usage, Rate and Tenant's Cost and the amount due to or payable by Tenant shall be made by an independent certified public accountant mutually agreed to by Landlord and Tenant. If Landlord and Tenant cannot mutually agree to an independent certified public accountant, then the parties agree that Landlord shall choose an independent certified public accountant to conduct the certification as to the proper amount of Usage, Rate and Tenant's Cost due by Tenant for the period in question; provided, however, such certified public accountant shall not be the accountant who conducted Landlord's initial calculation of such costs to which Tenant is now objecting. Such certification shall be final and conclusive as to all parties. If the certification reflects that Tenant has overpaid Tenant's share of such costs for the period in question, then Landlord shall credit such excess to Tenant's next payment of Usage, Rate and Tenant's Cost or, at the request of Tenant, promptly refund such excess to Tenant and conversely, if Tenant has underpaid Tenant's costs, hereunder Tenant shall promptly pay such additional costs to Landlord. Tenant agrees to pay the cost of such certification and the investigation with respect thereto and no adjustments in Tenant's favor shall be made unless it is determined that Landlord's original statement was in error in Landlord's favor by more than five percent (5%). Tenant waives the right to dispute any matter relating to the calculation of its costs hereunder or Additional Rent under this Paragraph 16 if any claim or dispute is not asserted in writing to Landlord within ninety (90) days after delivery to Tenant of the original billing statement with respect thereto.

## ARTICLE 17

### Other Utilities

17.01   Tenant shall purchase and receive water directly from the public or private utility company serving the Building. Landlord shall permit its mains, pipes and conduits and other such facilities to be used for such purposes. Prior to the Delivery Date, Landlord shall install, at Landlord's sole cost and expense, a water meter to exclusively measure Tenant's water consumption for all purposes and, throughout the duration of Tenant's occupancy, Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's sole cost and expense. From and after the Commencement Date, Tenant agrees to pay for water consumed, as shown on said meter, within ten (10) days of Tenant's receipt of the bills and, if Tenant is in default in making such payment, Landlord may pay such charges and collect the same from Tenant upon demand therefor as additional rent. If such meter is installed by Landlord in accordance with the foregoing, Tenant covenants and agrees to pay the sewer rent or charge or any other tax, rent, levy or charge, based upon readings of said meter, which now or hereafter is assessed, imposed or a lien upon the Demised Premises or the Building pursuant to

law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage connection or system.

17.02   At Tenant's sole cost and expense (and payable to Landlord as Additional Rent), Landlord shall make available to Tenant steam heat to the Demised Premises during the hours that Tenant is open for business in such a manner as to maintain a reasonably comfortable temperature. Tenant shall make its own arrangements for hot water, air conditioning and ventilation.

17.03   At Tenant's sole cost and expense (and payable to Landlord as Additional Rent), Landlord shall furnish the following to the Demised Premises during the hours that Tenant is open for business: condenser water (80-100 gpm). Landlord represents that the current cost for such condenser water is $500.00 per ton per annum.

17.03   It is expressly understood that, except as expressly set forth to the contrary in this lease, Landlord shall not supply to the Demised Premises any utilities or building services of any kind. Tenant agrees to make its own arrangements with the public utility company servicing the Demised Premises for the furnishing of, and payment of all charges for, water, steam, gas and all other utilities consumed by Tenant in the Demised Premises, and shall furnish its own air conditioning to the Demised Premises at its own cost and expense. In no event shall Landlord be responsible for charges for steam, heat, gas, water, or any other utilities consumed in the Demised Premises by Tenant (including, but not limited to, electric). All meters at the premises for the purposes of measuring Tenant's consumption of the respective utilities (water, electricity, steam, gas, etc.) shall be maintained (and where and as necessary, installed and/or replaced) by Tenant, at Tenant's sole cost and expense, in good order and condition.

## ARTICLE 18

### Other Services

18.01   Tenant, at its expense, shall cause the Demised Premises to be cleaned. Tenant agrees that Tenant shall, at its sole cost and expense, remove or cause to be removed all of its rubbish and refuse from the Demised Premises and the Building subject to such reasonable rules and regulations as Landlord shall now or hereafter promulgate with respect to the same. Tenant covenants and agrees to store its rubbish and refuse in proper containers (including, as appropriate, refrigerated containers or in other types of containers in a refrigerated area) so as to maintain the Building and the Demised Premises in a sightly condition, free of all unusual or obnoxious odors.

18.02   Landlord reserves the right, without any liability to Tenant, except as otherwise expressly provided in this lease, upon reasonable prior notice to Tenant (except in an emergency) to stop service of any of the Building systems serving the Demised Premises, or the rendition of any of the other services required of Landlord under this lease, whenever and for so long as may be reasonably necessary, by reason of accidents, emergencies, strikes or the making of repairs or changes which Landlord is required by this lease or by law to make or in good faith deems necessary, by reason of difficulty in securing proper supplies of fuel, steam, water electricity, labor or supplies, or by reason of any other cause beyond Landlord's reasonable control. Subject to the terms and conditions of this Lease, in the event Tenant is prevented from operating from

all or any material portion of the Demised Premises (other than the Outdoor Dining Area) by reason of the negligence, willful misconduct of Landlord, its agents, employees or contractors, the rent payable by Tenant hereunder shall equitably abate until such interference shall cease. Landlord agrees to use commercially reasonable efforts in the exercise of its rights hereunder to minimize any interference with Tenant's operations and any interference with Tenant's access to and use of the Demised Premises and the Outdoor Dining Area.

Landlord agrees that Tenant shall have the non-exclusive right, at all times during the term, to access and utilize the Delivery Area of the Building and, subject to the terms and conditions of this Lease, to use Landlord's Freight Elevator but only (i) if Tenant's New Freight Lift shall fail to operate (as defined and located on Exhibit L) and (ii) the usage of Landlord's Freight Elevator shall not exceed ten (10) consecutive days (but in no event for more than fifteen (15) days in the aggregate in any consecutive thirty (30) day period). The aforesaid period shall be referred to as "Permitted Freight Elevator Period". Tenant shall also have the exclusive right to use the New Freight Lift that will be constructed by Landlord as part of Tenant's Work, at Tenant's sole cost and expense, in accordance with such plans and specifications as approved by Landlord. Landlord agrees that it shall, and it shall cause all other tenants in the Building, to reasonably accommodate Tenant's scheduled delivery of goods in and through the Delivery Area and Tenant's use of New Freight Lift to move such goods to the Demised Premises. Landlord further agrees that Tenant shall have the non-exclusive right to have unimpeded access to the Demised Premises.

Landlord and Tenant hereby acknowledge and agree that during the Permitted Freight Elevator Period, a security guard or other personnel ("Freight Security Guard") will be needed to operate Landlord's Freight Elevator for deliveries to the Premises by way of Landlord's Freight Elevator, and as such:

(i)     For the first three (3) days of any Permitted Freight Elevator Period, Landlord shall be responsible for the cost of the Freight Security Guard; and

(ii)     For any and all days in excess of the first three (3) days of any Permitted Freight Elevator Period that Tenant needs to use the Landlord's Freight Elevator as permitted hereunder, Tenant shall reimburse Landlord, as Additional Rent, for the cost of the Freight Security Guard.

Subject to the terms and provisions of this Lease and Exhibit L, Tenant may use certain space in the loading dock area of the Building ("Loading Dock") for the maintenance and operation of the New Freight Lift to be installed by Landlord on behalf of Tenant at Tenant's sole cost and expense. Tenant shall also be responsible for the cost of the service, repair, replacement and maintenance of the New Freight Lift and related equipment, cabling, conduits, wire and transfer switches and for any repair or damage caused by the New Freight Lift or by Tenant or any of its employees, agents, contractors or invitees. The New Freight Lift shall be treated as if the New Freight Lift were part of Tenant's personal property located within the Demised Premises (however, at Landlord's sole option, Landlord may inform Tenant that Tenant may not remove such New Freight Lift from the Demised Premises at any time whatsoever, such New Freight Lift becoming Landlord's property at the expiration or earlier termination of this Lease). Without limiting the generality of the foregoing, all provisions of this Lease with respect to

Tenant's alterations and Tenant's obligations to comply with laws and insurance requirements, maintaining insurance, indemnifying Landlord and performing repairs and maintenance shall apply to Tenant's installation, use and maintenance of the New Freight Lift. Tenant shall maintain the New Freight Lift in good order and repair and Tenant, its employees, agents and contractors shall have access to the Loading Dock area for the purposes of maintenance and repair of Tenant's New Freight Lift at reasonable times. Tenant acknowledges and agrees that as part of its repair and maintenance obligations, Tenant shall maintain on site (in a storage area if necessary that Landlord shall provide at no additional charge), essential spare components and parts for the New Freight Lift. Notwithstanding the foregoing to the contrary, Tenant's right to operate and maintain the New Freight Lift shall be subject to Tenant obtaining all necessary governmental permits and approvals required for the operation of the New Freight Lift, including, without limitation, all federal, state and local permits and approvals, which permits and approvals shall remain in effect at all times that the New Freight Lift are located in the Loading Dock area. Tenant shall procure, in a prompt and diligent manner after the execution of this Lease, at its sole cost and expense, a service contract for said New Freight Lift, and supply a copy of same to Landlord and its managing agent. In addition, notwithstanding anything to the contrary contained in any article of this Lease, Tenant acknowledges and agrees that said New Freight Lift shall become the property of Landlord as described above, and shall remain at the Demised Premises upon the termination of this Lease.

Landlord (or its construction manager) shall solicit bids from no less than three (3) contractors for any and all costs pertaining to the construction of the New Freight Lift. Tenant, within five (5) business days of Tenant's receipt of all of the bids and an award recommendation from Landlord (or its construction manager), shall submit to Landlord either written (a) approval of at least one (1) of the bids (which approval shall not be unreasonably withheld or conditioned) or (b) disapproval of all of the bids, accompanied by the reasonable reasons therefore. In the event Tenant has rejected all of the bids, Tenant shall meet with Landlord within three (3) business days thereafter to attempt to resolve its objections. Within ten (10) business days following Tenant's written approval of the costs for Landlord's Work, Landlord shall enter into a contract with the selected contractor for the construction of the New Freight Lift.


## ARTICLE 19

### Sprinklers

19.01  Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or any bureau, department or official of the federal, state, or city government shall require for any reason whatsoever that any changes, modifications, alterations, or additional sprinkler heads, or other equipment be made or supplied in the sprinkler system, to be installed by Tenant, for any reason, of if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment in the Demised Premises, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any fire insurance company, Tenant shall make such sprinkler system installations, changes, modifications alterations, and supply additional sprinkler heads or other equipment as required within the Demised Premises whether the work involved shall be structural or non-structural in nature (or at Landlord's sole :

option, such work can be performed by Landlord at Tenant's sole cost and expense). Tenant shall submit to Landlord for its written approval a list of Tenant's contractors and subcontractors used for such sprinkler system installations, changes and modifications. Notwithstanding anything to the contrary set forth herein, Landlord, and not Tenant, shall be responsible for all such changes, modifications, alterations or additional work if the need for any of the same is triggered by the negligent acts of Landlord or any other tenant of the Building. In such event, Landlord shall complete such work promptly and in a manner designed to minimize interference with Tenant's operations. Tenant may, subject to Landlord's prior approval, not be unreasonably withheld, delayed, conditioned or denied, connect to Landlord's lines or mains located in the common areas of the Building used in Landlord's sprinkler system for such common areas.

## ARTICLE 20

### Access, Changes in Building Facilities, Name

20.01 . Except as otherwise provided, all spaces above the dropped ceiling, behind walls, inside columns or beneath the floor of the Demised Premises are reserved to Landlord for the installation, repair and maintenance of shafts, stacks, pipes, conduits, fan room ducts, electric or other utilities sinks or other Building facilities, and the use thereof, as well as access thereto through the Demised Premises at reasonable times and on reasonable prior notice for the purpose of operation, maintenance, decoration and repair, are reserved to Landlord. Except if due to the negligence, omissions or intentional acts of Tenant, Landlord shall be responsible for the maintenance and repair of all the areas described in this Section 20.01 and for the repairs of any damage to the Demised Premises caused by Landlord's entry hereunder. Landlord agrees to use reasonable efforts to minimize any disruption with Tenant's business at any time landlord enters the Demised Premises.

20.02 Tenant shall permit Landlord to install, use, replace and maintain pipes, ducts and conduits within the demising walls, bearing columns and ceilings of the Demised Premises; provided that such work is done at such times and in such manner as to minimize any disruption to Tenant's business, and any pipes or conduits hereafter erected shall not decrease the usable floor area of the Demised Premises in more than a deminimus manner or materially adversely affect Tenant's use of the Demised Premises.

20.03 Landlord or Landlord's agent shall have the right, upon prior written notice (except in emergency under clause (ii) hereof, in which case telephonic notice shall be given to Tenant either before or immediately after such entrance) to enter and/or pass through the Demised Premises or any part thereof, at reasonable times during reasonable hours and on reasonable prior notice (i) to examine the Demised Premises and to show them to the fee owners, lessors of superior leases, holders of superior mortgages, or prospective purchasers, mortgagees or lessees of the Building as an entirety, and for the purpose of making such repairs or changes in or to the Demised Premises or in or its facilities, as may be provided for by this lease or as may be mutually agreed upon by the parties or as Landlord may be required to make by law or in order to repair and maintain said structure or its fixtures or facilities. Landlord shall be allowed to take all materials into and upon the Demised Premises that may be required for such repairs, changes, repainting or maintenance, without liability to Tenant, but Landlord shall not unreasonably interfere with Tenant's use of or access to the Demised Premises and the Landlord

shall not store such materials in the Premises. Landlord shall also have the right to enter on and/or pass through the Demised Premises, or any part thereof, at such times as such entry shall be required by circumstances of emergency affecting the Demised Premises or said structure. Landlord agrees that it shall at all times it or its agents or contractors are in the Demised Premises, use commercially reasonable efforts to minimize interference with Tenant's use of and access to the Demised Premises at reasonable times and during reasonable hours.

20.04  During the period of twelve (12) months prior to the Expiration Date, Landlord may exhibit the Demised Premises to prospective tenants upon prior written notice to Tenant at reasonable times and during reasonable hours.

20.05  Subject to the remaining terms and conditions of this lease including, without limitation, the provisions of Section 15.05, Landlord reserves the right, at any time, without incurring any liability to Tenant therefor, to make such changes in or to the Building and the fixtures and equipment thereof (exclusive of the Demised Premises and Tenant's Property), as well as in or to the street entrances, halls, passages, elevators, escalators and stairways thereof, as it may deem necessary or desirable, provided such changes neither: (i) materially adversely affect Tenant's access to the Demised Premises; (ii) materially adversely affects the size, dimensions or visibility thereof of the signage installed by Tenant; or (iii) materially adversely affects reasonable use of the Outdoor Dining Area and the sidewalks adjacent to the Building.

20.06  Landlord may adopt any name for the Building. Landlord reserves the right to change the name of the Building at any time upon at least thirty (30) days' prior written notice to Tenant.

20.07  For the purposes of Article 20, the term "Landlord" shall include lessors of leases and the holders of mortgages to which this lease is subject and subordinate as provided in Article 7.

## ARTICLE 21

### Notice Of Accidents

21.01  Tenant shall use reasonable efforts to give notice to Landlord, promptly after Tenant learns thereof, of (i) any accident in or about the Demised Premises for which Landlord might be liable, (ii) all fires in the Demised Premises, (iii) all damages to or defects in the Demised Premises, including the fixtures, equipment and appurtenances thereof, the repair of which Landlord might be responsible, and (iv) all damage to or defects in any parts or appurtenances of the Building's sanitary, electrical, heating, ventilating, air-conditioning, elevator and other systems located in or passing through the Demised Premises or any part thereof. Tenant's failure to provide such notice shall not waive Landlord's obligations hereunder.

# ARTICLE 22

## Non-Liability And Indemnification

22.01   Neither Landlord nor any agent or employee of Landlord shall be liable to Tenant for any injury or damage to Tenant or to any other person or for any damage to, or loss (by theft or otherwise) of, any property of Tenant or of any other person, irrespective of the cause of such injury, damage or loss, except to the extent arising or resulting from the negligence, willful misconduct or intentional acts of Landlord, its agents, contractors or employees occurring within the scope of their respective employments without negligence on the part of Tenant, it being understood that no property, other than such as might normally be brought upon or kept in the Demised Premises as an incident to the reasonable use of the Demised Premises for the purpose herein permitted, will be brought upon or be kept in the Demised Premises.

22.02   Except to the extent arising or resulting from the negligence, willful misconduct or wrongful acts of Landlord, its agents, employees or contractors, Tenant shall indemnify and save harmless Landlord and its agents against and from (a) any and all claims to the extent (i) arising from (x) the conduct of Tenant or management by Tenant of the Demised Premises or of any business therein, or (y) any work or thing whatsoever done, or any condition created (other than by Landlord for Landlord's or Tenant's account) in or upon the Demised Premises during the term of this lease or during the period of time, if any, prior to the Commencement Date that Tenant may have been given access to the Demised Premises, or (ii) arising from any negligent or otherwise wrongful act or omission of Tenant or any of its subtenants or licensees or its or their employees, agents or contractors, and (b) all costs, expenses and liabilities incurred by Landlord in or in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding is brought against Landlord by reason of any such claim, Tenant, upon notice from Landlord which Landlord agrees to use reasonable efforts to give, shall resist and defend such action or proceeding. Landlord agrees that without Tenant's prior written consent (not to be unreasonably withheld or delayed), it will not settle any claim which might give rise to a claim of indemnification from Tenant unless such settlement results in the full release of Tenant without any cost or liability to Tenant.

22.03   Except as otherwise expressly provided in this lease, the time allotted either Tenant or Landlord in the performance of their respective obligations under this lease shall be extended by the period of delay in performance directly attributable to strike, labor trouble, governmental pre-emption or priorities or other controls in connection with a national or other public emergency or shortages of fuel supplies or labor resulting therefrom, acts of God or other like cause, whether similar or dissimilar to the foregoing, beyond such party's reasonable control, excluding however, delays for adjustments of insurance and delays due to shortage or unavailability of funds (individually, a "Force Majeure Event"). Nothing herein shall waive, limit or otherwise modify any payment obligations of Landlord or Tenant.

22.04   Landlord shall indemnify and save harmless Tenant against and from (i) any and all claims to the extent (x) arising from (A) the conduct or management of the Building, or (B) any work or thing whatsoever done, or any condition created in or about the Building by Landlord, its agents, contractors, servants or employees during the term of this lease, or (y) arising from any negligent or otherwise wrongful act of Landlord or any of its employees,

servants, agents or contractors, or the breach by Landlord of its obligations under this lease, and (ii) all reasonable out of pocket third party costs, expenses and liabilities (excluding consequential and punitive damages) incurred by Tenant in or in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding be brought against Tenant by reason of any such claim, Landlord, upon notice from Tenant, which Tenant agrees to use reasonable efforts to give, shall resist and defend such action or proceeding with counsel reasonably acceptable to Tenant. The provisions of this Section 22.04 shall not constitute a waiver of liability of Tenant for the negligence of Tenant, its agents, contractors, servants or employees.

## ARTICLE 23

### Destruction Or Damage

23.01  If the Building or the Demised Premises shall be partially or totally damaged or destroyed by fire or other cause, then, whether or not the damage or destruction shall have resulted from the fault or neglect of Tenant, or its employees, agents or visitors (and if this lease shall not have been terminated as in this Article hereinafter provided), Landlord shall repair the damage and restore and rebuild the Building and/or the Demised Premises, at its expense, with reasonable dispatch after notice to it of the damage or destruction; provided, however, that Landlord shall not be required to repair or replace any of Tenant's Property nor to restore any Tenant's Work. Tenant shall cooperate with Landlord's restoration by removing from the Demised Premises, as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Except to the extent Landlord is hereby obligated to restore the Demised Premises or this lease is terminated by Landlord or Tenant as hereinafter provided, Tenant shall repair, redecorate and refixture the Demised Premises and restock the contents thereof in a manner, and to at least a condition equal to, that existing prior to its destruction or casualty.

23.02  If the Building or the Demised Premises (or access thereto) shall be partially damaged or partially destroyed by fire or other cause, the rents payable hereunder shall be abated to the extent that the Demised Premises shall have been rendered untenantable for the period from the date of such damage or destruction to the date the damage shall be repaired or restored to substantially the same condition as existed immediately before such casualty. If the Demised Premises or a major part thereof shall be totally (which shall be deemed to include substantially totally) damaged or destroyed or rendered completely (which shall be deemed to include substantially completely) untenantable on account of fire or other cause (which include the loss of access thereto), the rents shall abate as of the date of the damage or destruction and until Landlord shall repair, restore and rebuild to a condition permitting the Tenant to open the Demised Premises for business; provided, however, that should Tenant reoccupy a portion of the Demised Premises during the period the restoration work is taking place and prior to the date that the same are made completely tenantable, rents allocable to such portion shall be payable by Tenant from the date of such occupancy and opening.

23.03  If the Building or the Demised Premises shall be totally damaged or destroyed by fire or other cause, or if the Building shall be so damaged or destroyed by fire or other cause (whether or not the Demised Premises are damaged or destroyed) as to require a reasonably

estimated expenditure of more than 35% of the full insurable value of the Building immediately prior to the casualty, then in either such case Landlord may terminate this lease by giving Tenant notice to such effect within one hundred eighty (180) days after the date of the casualty. In case of any damage or destruction mentioned in this Article, Tenant may terminate this lease, by notice to Landlord, if (i) Landlord has not, for any reason excluding a Force Majeure Event, completed the making of the required repairs and restored and rebuilt the Building and the Demised Premises within the earlier of (A) nine (9) months from the date of such damage or destruction or (B) six (6) months form when Landlord becomes aware of the amount of insurance proceeds available for restoration form its insurance carrier, or (ii) more than thirty-five percent (35%) of the Demised Premises are rendered unusable by fire or other casualty within the last three (3) years of the term.

23.04   No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any damage or destruction, repair or restoration of any portion of the Demised Premises or of the Building pursuant to this Article or any other provision of this lease. Landlord shall use commercially reasonable efforts to effect such repair or restoration promptly and in such manner as to not unreasonably interfere with Tenant's use and occupancy of and access to the Demised Premises.

23.05   Notwithstanding any of the foregoing provisions of this Article, if Landlord or the lessor of any superior lease or the holder of any superior mortgage shall be denied any portion of its rent loss coverage insurance proceeds applicable to damage or destruction of the Demised Premises or the Building by fire or other cause, solely by reason of the intentional acts of Tenant or any of its employees, agents or contractors, then, without prejudice to any other remedies which may be available against Tenant, there shall be no abatement of Tenant's rents, but the total amount of such rents not abated (which would otherwise have been abated) shall not exceed the amount of the uncollected insurance proceeds.

23.06   Landlord will not carry insurance of any kind on Tenant's Property or Tenant's Work, and, except as provided by law or by reason of its fault or its breach of any of its obligations hereunder, shall not be obligated to repair any damage thereto or replace the same.

23.07   The provisions of this Article shall be considered an express agreement governing any case of damage or destruction of the Demised Premises by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, providing for such a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application in such case.

## ARTICLE 24

### Eminent Domain

24.01   If the whole of the Building shall be lawfully taken by condemnation or in any other manner for any public or quasi-public use or purpose, this lease and the term and estate hereby granted shall forthwith terminate as of the date of vesting of title in such taking (which date is hereinafter also referred to as the "date of the taking"), and the rents shall be prorated and adjusted as of such date.

24.02  If only a part of the Building shall be so taken, this lease shall be unaffected by such taking, except that Tenant may elect to terminate this lease in the event of a partial taking, if the remaining area of the Demised Premises shall not be reasonably sufficient for Tenant, in the exercise of its reasonable business judgment, to continue commercially feasible operation of its business.  Tenant shall give notice of such election to Landlord not later than thirty (30) days after (i) notice of such taking is given by Landlord to Tenant, or (ii) the date of such taking, whichever occurs sooner.  Upon the giving of such notice by Tenant this lease shall terminate and the date of such taking and the rents shall be prorated as of such termination date.  Upon such partial taking and this lease continuing in force as to any part of the Demised Premises, the rents apportioned to the part taken shall be prorated and adjusted based on the respective values of the Demised Premises before and after the taking, as of the date of taking and from such date the fixed rent for the Demised Premises and additional rent shall be payable pursuant to Article 5 according to the rentable area remaining.

24.03  Landlord shall be entitled to receive the entire award in any proceeding with respect to any taking provided for in this Article without deduction therefrom for any estate vested in Tenant by this lease and Tenant shall receive no part of such award, except as hereinafter expressly provided in this Article.  Tenant hereby expressly assigns to Landlord all of its right, title and interest in or to every such award.  Notwithstanding anything herein to the contrary, Tenant may, at its sole cost and expense, make a claim with the condemning authority for Tenant's moving and relocation expenses, the value of Tenant's Property or Tenant's Changes and Tenant's Work  which do not become part of the Building or property of the Landlord, provided however that Landlord's award is not thereby reduced or otherwise materially adversely affected.

24.04  If the temporary use or occupancy of all or any part of the Demised Premises shall be taken by condemnation or in any other manner for any public or quasi-public use or purpose during the term of this lease, Tenant shall be entitled to receive that portion of the award for such taking which represents compensation for the use and occupancy of the Demised Premises and, if so awarded, for the taking of Tenant's Property and for moving and relocation expenses, and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of restoration of the Demised Premises.  This lease shall be and remain unaffected by such taking and Tenant shall continue responsible for all of its obligations hereunder insofar as such obligations are not affected by such taking and shall continue to pay in full the fixed rent and additional rent when due.  If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award which represents compensation for -the use or occupancy of the Demised Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period prior to the Expiration Date and Landlord shall receive so much thereof as represents the period subsequent to the Expiration Date.  All moneys received by Tenant as, or as part of, an award for temporary use and occupancy for a period beyond the date to which the rents hereunder have been paid by Tenant shall be received, held and applied by Tenant as a trust fund for payment of the rents falling due hereunder.

24.05  In the event of any taking of less than the whole of the Building which does not result in a termination of this lease which does not extend beyond the Expiration Date, Landlord, at its expense, and to the extent any award or awards shall be sufficient for the purpose, shall

proceed with reasonable diligence to repair, alter and restore the remaining parts of the Building and the Demised Premises to a condition comparable to that which existed immediately prior to the taking. Landlord shall make all repairs to the Building to the extent necessary to constitute the remaining portion of the building a complete architectural unit.

24.06   Should any part of the Demised Premises be taken to effect compliance with any law or requirement of public authority other than in the manner hereinabove provided this lease, or in the event of a taking for a temporary use or occupancy of all or any part of the Demised Premises which does not extend beyond the Expiration Date and is otherwise covered in this Article, then (i) if such compliance is the obligation of Tenant under this lease, Tenant shall not be entitled to any diminution or abatement of rent or other compensation from Landlord therefor, but (ii) if such compliance is the obligation of Landlord under this lease, the fixed rent hereunder shall be reduced and additional rents under Article 5 shall be adjusted in the same manner as is provided in Section 24.02 according to the reduction in rentable area of the Demised Premises resulting from such taking.

24.07   Any dispute which may arise between the parties with respect to the meaning or application of any of the provisions of this Article shall be determined by arbitration in the manner provided in Article 35.

24.08   Landlord represents that, as of the date hereof, it has not received any written notice of any pending or threatened condemnation.

# ARTICLE 25

## Surrender

25.01   On the last day of the term of this lease, or upon any earlier termination of this lease, or upon any re-entry by Landlord upon the Demised Premises, Tenant shall quit and surrender the Demised Premises to Landlord in substantially the same condition as existed on the Rent Commencement Date, except for ordinary wear and tear, obsolescence and damages from the elements, fire and other casualties, and Tenant shall have removed all of Tenant's Property therefrom to the extent expressly provided in this lease and shall have repaired any damage to the Demised Premises to the extent required hereunder. Landlord agrees that no part of Tenant's Work is required to be removed upon surrender and that all of Tenant's Work may, at Tenant's election, remain within the Demised Premises.

25.02

A.   Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from and against any loss, cost, liability, claim, damage, fine, penalty and expense (including reasonable attorneys' fees and disbursements) resulting from delay by Tenant in surrendering the Demised Premises upon the termination of this Lease as provided in the preprinted form of this Lease and elsewhere in this Lease, including any claims made by any succeeding tenant or prospective tenant or Successor Landlord founded upon such delay.

B.   If Tenant holds over its possession after the expiration or sooner termination of the original term or of any extended term of this Lease, such holding over shall not be deemed to

extend the term or renew the Lease, but such holding over thereafter shall continue upon the covenants and conditions herein set forth, except that the charge for use and occupancy of such holding over for each calendar month or part thereof (even if such part shall be a small fraction of a calendar month) shall be the sum of:

(1)    1/12 of the highest annual fixed rent rate set forth on Exhibit C annexed hereto, one and one-half (1.5) times for the first thirty (30) days Tenant holds over and two (2) times for any period of time thereafter Tenant so holds over, plus

(2)    1/12 of the net increase, if any, in annual fixed rental due solely to increases in the cost of the value of electric service furnished to the Demised Premises (if any) in effect on the last day of the term of the Lease, plus

(3)    1/12 of all other items of annual additional rental, which annual additional rental would have been payable pursuant to this Lease had this Lease not expired, plus

(4)    those other items of Additional Rent (not annual additional rent) which would have been payable monthly pursuant to this Lease, had this Lease not expired, which total sum Tenant agrees to pay to Landlord promptly upon demand, in full, without set-off or deduction. Neither the billing nor the collection of use and occupancy of the above amount shall be deemed a waiver of any right of Landlord to collect damages for Tenant's failure to vacate the Demised Premises after the expiration or sooner termination of this Lease. The aforesaid provisions of this Article shall survive the expiration or sooner termination of this Lease.

## ARTICLE 26

### Conditions of Limitation

26.01    To the extent permitted by applicable law this lease and the term and estate hereby granted are subject to the limitation that whenever Tenant shall make an assignment of the property of Tenant for the benefit of creditors, or shall file a voluntary petition under any bankruptcy or insolvency law, or an involuntary petition alleging an act of bankruptcy or insolvency shall be filed against Tenant under any bankruptcy or insolvency law, or whenever a petition shall be filed or against Tenant under the reorganization provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a petition shall be filed by Tenant under the arrangement provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a permanent receiver of Tenant or of or for the property of Tenant shall be appointed, then, Landlord, (a) at any time after receipt of notice of the occurrence of any such event, or (b) if such event occurs without the acquiescence of Tenant, at any time after the event continues for ninety (90) days, Landlord may give Tenant a notice of intention to end the term of this lease at the expiration of five (5) days from the date of service of such notice of intention, and upon the expiration of said five (5) day period this lease and the term and estate hereby granted, whether or not the term shall theretofore have commenced, shall terminate with the same effect as if that day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article 27.

26.02   The foregoing are each an "Event of Default":

(a)   whenever Tenant shall default in the payment of any installment of fixed rent, or in the payment of any additional rent or any other charge payable by Tenant to Landlord, on any day upon which the same ought to be paid, and such default shall continue for ten (10) days after Landlord shall have given Tenant a written notice specifying such default; or

(b)   whenever Tenant shall do or permit anything to be done, whether by action or inaction, in violation of any of Tenant's obligations hereunder, and if such situation shall continue and shall not be remedied by Tenant within twenty (20) days after Landlord shall have given to Tenant a notice specifying the same, or, in the case of a happening or default which cannot with due diligence be cured within a period of twenty (20) days and the continuance of which for the period required for cure will not subject Landlord to the risk of criminal liability (as more particularly described in Section 10.02) or termination of any superior lease or foreclosure of any superior mortgage, if Tenant shall not, (i) within said twenty (20) day period advise Landlord of Tenant's intention to duly institute all steps necessary to remedy such situation, (ii) duly institute within said twenty (20) day period, and thereafter diligently prosecute to completion all steps necessary to remedy the same and (iii) complete such remedy within such time after the date of the giving of said notice of Landlord as shall reasonably be necessary; or

(c)   whenever any event shall occur or any contingency shall arise whereby this lease or the estate hereby granted or the unexpired balance of the term hereof would, by operation of law or otherwise, devolve upon or pass to any person, firm or corporation other than Tenant, except as expressly permitted by Article 9, or then in any of said cases set forth in the foregoing Subsections (a), (b) and (c), Landlord may give to Tenant a notice of intention to end the term of this lease at the expiration of five (5) days from the date of the service of such notice of intention, and upon the expiration of said five (5) days this lease and the term and estate hereby granted, whether or not the term shall theretofore have commenced, shall terminate with the same effect as if that day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article 27.

26.03   If Tenant shall default in the payment of the Rent reserved herein, or any item of Additional Rent herein mentioned, or any part of either, during any two (2) consecutive months in any six (6) month period, and (i) each such default continued for more than five (5) business days after written notice of such default served by Owner to Tenant and, (ii) Owner, after the expiration of the applicable grace period, served upon Tenant petitions and notice of petition to dispossess Tenant by summary proceedings in each such instance, then, notwithstanding that such defaults may have been cured prior to the entry of a judgment against Tenant, any further default in the payment of any money due Owner hereunder which shall continue for more than five (5) business days after Owner shall give a written notice of such default shall be deemed to be deliberate and Owner may thereafter serve a written three (3) days' notice of cancellation of this Lease and the term hereunder shall end and expire as fully and completely as if the expiration of such three (3) day period were the day herein definitely fixed for the end and expiration of this Lease and the term thereof, and Tenant shall remain liable as elsewhere provided in this Lease.

If Tenant defaults in the performance of its obligations under this Lease, Landlord, without thereby waiving such default, following ten (10) days written notice to Tenant and Tenant's failure to cure within such ten (10) day period (or such longer period if required by Tenant and Tenant diligently pursues the same), may perform such obligation for the account of and at the expense of Tenant. All reasonable and actual costs and expenses, including reasonable counsel fees and disbursements, incurred by Landlord in connection with any such performance by it for the account of Tenant or to enforce any obligation by Tenant shall be paid by Tenant to Landlord, as additional rent, within fifteen (15) days of written demand by Landlord.

## ARTICLE 27

### Re-Entry By Landlord

27.01  If Tenant shall default in the payment of any installment of fixed rent, or of any additional rent, on any date upon which the same ought to be paid, and if such default shall continue for ten (10) business days after Landlord shall have given to Tenant a notice specifying such default, or if this lease shall expire as in Article 26 provided, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the Demised Premises, or any part thereof, in the name of the whole, either by summary dispossess proceedings or by any suitable legal action or proceeding at law, without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold and enjoy the Demised Premises again as of its first estate and interest therein. The word re-enter, as herein used, is not restricted to its technical legal meaning. In the event of any termination of this lease under the provisions of Article 26 or if Landlord shall lawfully re-enter the Demised Premises under the provisions of this Article or in the event of the termination of this lease, or of re-entry, by or under any summary dispossess or other legal proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord the fixed rent and additional rent payable by Tenant to Landlord up to the time of such termination of this lease, or of such recovery of possession of the Demised Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 27.

27.02  In the event of a breach by Tenant of any of its obligations under this lease, Landlord shall also have the right of injunction. The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

27.03  If this lease shall terminate under the provisions of Article 26, or if Landlord shall lawfully re-enter the Demised Premises under the provisions of this Article, or in the event of the termination of this lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of an Event of Default hereunder on the part of Tenant, Landlord shall be entitled to retain all moneys, if any, paid by Tenant to Landlord, whether as advance rent, security or otherwise, but such moneys shall be credited by Landlord

against any fixed rent or additional rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article 27 or pursuant to law.

27.04  If this Lease shall terminate under the provisions of Article 26, or if Landlord shall lawfully re-enter the Demised Premises under the provisions of this Article, or in the event of the termination of this Lease, or of re-entry by reason of an Event of Default hereunder by Tenant, Landlord shall use commercially reasonable efforts to mitigate its damages hereunder.

## ARTICLE 28

### Damages

28.01  If this lease is terminated under the provisions of Article 26, or if Landlord shall re-enter the Demised Premises under the provisions of Article 27, or in the event of the termination of this lease, or of re-entry by or under any summary dispossess or other legal proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, subject to the provisions of Section 28.03, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a)  a sum which at the time of such termination of this lease or at the time of any such re-entry by Landlord, as the case may be, represents the "net present value" (discounted at an interest rate per annum equal to the yield-to-maturity of U.S. Treasury obligations having a maturity date equal to the Expiration Date of this lease) of the amount by which the aggregate of the fixed rent and the additional rent payable hereunder which would have been payable by Tenant (conclusively presuming the additional rent to be the same as was payable for the year immediately preceding such termination) for the period commencing with such earlier termination of this lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, had this lease not so terminated or had Landlord not so re-entered the Demised Premises, exceeds the aggregate then market rental value of the Demised Premises for the same period, which fair market rental value shall be determined in accordance with the provisions of Article 40, or

(b)  sums equal to the fixed rent and the additional rent (as above presumed) payable hereunder which would have been payable by Tenant had this lease not so terminated, or had Landlord not so re-entered the Demised Premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the Expiration Date, provided, however, that if Landlord shall relet the Demised Premises during said period, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the actual and documented expenses incurred or paid by Landlord in terminating this lease or in re-entering the Demised Premises and in securing possession thereof, as well as the expenses of reletting, including altering and preparing the Demised Premises for new tenant(s), brokers' commissions, and all other actual and documented expenses properly chargeable against the Demised Premises and the rental therefrom; it being understood that any such reletting may be for a period shorter or longer than the remaining term of this lease; but in no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of damages

pursuant to this Subsection to a credit in respect of any net rents from a reletting, except to the extent that such net rents are actually received by Landlord. If the Demised Premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot basis (for equivalent space) shall be made of the rent received from such reletting and of the expenses of reletting.

If the Demised Premises or any part thereof be relet by Landlord for the unexpired portion of the term of this lease, or any part thereof, before presentation of proof of such damages to any court, commission or tribunal, the amount of rent reserved upon such reletting shall, prima facie, be the fair and reasonable rental value for the Demised Premises, or part thereof, so relet during the term of the reletting (subject to rebuttal by Tenant).

28.02  Suit or suits for the recovery of such damages, or any installments thereof, may be brought by Landlord from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the term of this lease would have expired if it had not been so terminated under the provisions of Article 26, or under any provision of law, or had Landlord not re-entered the Demised Premises. Except as set forth in Section 28.03 herein, nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any Event of Default hereunder on the part of Tenant. Nothing herein contained shall be construed to limit or prejudice the right of Landlord to prove for and obtain as liquidated damages by reason of the termination of this lease or re-entry on the Demised Premises for an Event of default of Tenant under this lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved whether or not such amount be greater, equal to, or less than any of the sums referred to in Section 28.01. Notwithstanding anything to the contrary set forth herein, in no event shall damages be calculated by accelerating all rental obligations of Tenant hereunder for the remainder of the term following termination without reducing such aggregate sum by the then market rental value of the Demised Premises and discounting the sum to net present value as set forth in Section 28.01(a).

28.03  Intentionally Deleted.


## ARTICLE 29

### Waivers

29.01  Tenant, for Tenant, and on behalf of any and all persons claiming through or under Tenant, including creditors of all kinds, does hereby waive and surrender all right and privilege which they or any of them might have under or by reason of any present or future law, to redeem the Demised Premises or to have a continuance of this lease for the term hereby demised after being dispossessed or ejected therefrom by process of law or under the terms of this lease or after the termination of this lease as herein provided.

29.02  For such period of time as Tenant is in default of its monetary obligations hereunder beyond the expiration of any applicable notice and cure period, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items it sees fit, irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payments shall be credited.

29.03  Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with this lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Demised Premises, including any claim of injury or damage, or any emergency or other statutory remedy with respect thereto.

29.04  Landlord and Tenant each agree that in no event shall either be liable to the other for consequential, indirect, special, punitive, exemplary or treble damages.

29.05  The provisions of Articles 17 and 18 shall be considered expressed agreements governing the services to be furnished by Landlord at or in the Demised Premises, and Tenant agrees that, except as expressly provided to the contrary in this lease, any laws and/or requirements of public authorities, now or hereafter in force, shall have no application in connection with any enlargement of Landlord's obligations with respect to such services unless Tenant agrees, in writing, to pay to Landlord, as additional rent, Landlord's reasonable charges for any additional services provided (except to the extent such law and/or requirement prohibits such reimbursement). In no event shall Tenant be obligated to reimburse Landlord for any costs or expenses incurred by Landlord in connection with (a) Landlord's violation of any such laws and/or requirements, or (b) the application of any such laws and/or requirements to any portion of the Building outside the Demised Premises.

## ARTICLE 30

### No Other Waivers Or Modifications

30.01  The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the obligations of this lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. No executory agreement hereafter made between Landlord and Tenant shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this lease, in whole or in part, unless such executory agreement is in writing, refers expressly to this lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge or termination or effectuation of the abandonment is sought.

30.02  The following specific provisions of this Section shall not be deemed to limit the generality of any of the foregoing provisions of this Article:

(a)      No agreement to accept a surrender of all or any part of the Demised Premises shall be valid unless in writing and signed by Landlord.  The delivery of keys to an employee of

Landlord or of its agent shall not operate as a termination of this lease or a surrender of the Demised Premises. If Tenant shall at any time request Landlord to sublet the Demised Premises for Tenant's account, Landlord or its agent is authorized to receive said keys for such purposes without releasing Tenant from any of its obligations under this lease, and Tenant hereby releases Landlord from any liability for loss or damage to any of Tenant's property in connection with such subletting.

(b)     The receipt by Landlord of rent with knowledge of breach of any obligation of this lease shall not be deemed a waiver of such breach.

(c)     No payment by Tenant or receipt by Landlord of a lesser amount than the correct fixed rent or additional rent due hereunder shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this lease or at law provided.

## ARTICLE 31

### Curing Tenant's Defaults, Additional Rent

31.01  If an Event of Default shall occur under this lease, and such default continues beyond the expiration of any applicable notice and cure period, Landlord, without thereby waiving such default, may (but shall not be obligated to) perform the same for the account and at the expense of Tenant, without notice in the case of an emergency, and in any other case, only if such default continues after the expiration of ten (10) business days from the date Landlord gives Tenant notice of intention so to do, or the applicable grace period provided in Section 26.02 or elsewhere in this lease for the cure of such default, whichever occurs later.

(a)     If Tenant is late in making any normally recurring monthly payment or any other payment set forth in a notice from Landlord due to Landlord from Tenant under this lease for ten (10) or more days, then interest shall become due and owing to Landlord on such payment from the date when it was due computed at a twelve percent (12%) annual rate on the unpaid amount.

31.02  Bills for any expenses incurred by Landlord in connection with any such performance by it for the account of Tenant, and bills for all costs, expenses and disbursements of every kind and nature whatsoever' including reasonable counsel fees, involved in successfully collecting the fixed rent or additional rent or any part thereof or successfully enforcing any rights against Tenant following the default of Tenant hereunder in connection with this lease, or pursuant to law, including any such cost, expense and disbursement involved in instituting and prosecuting summary proceedings, as well as bills for any property, material, labor or services provided, furnished, or rendered, by Landlord or at its instance to Tenant, may be sent by Landlord to Tenant monthly, or immediately, at Landlord's option, and, shall be due and payable in accordance with the terms of such bills (but not earlier than thirty (30) days following Tenant's receipt of the same).

If either Landlord or Tenant shall bring an action or proceeding in any court of competent jurisdiction, or in any quasi-judicial proceeding between Landlord and Tenant brought pursuant

to Article 35 of this lease, to enforce its rights or the other party's obligations under the terms, covenants and conditions and provisions of this lease, or seek a declaration of any rights or obligations under this lease, the prevailing party shall be paid or reimbursed by the non-prevailing party for the third party actually incurred reasonable attorneys' fees and disbursements, and other third party reasonable costs and expenses incurred by the prevailing party (including without limitation court costs, the administrative cost of arbitration, and the costs, fees and/or expenses of the arbitrator or arbitrators, as the case may be).

## ARTICLE 32

### Broker

32.01   Tenant and Landlord each covenant, warrant and represent to the other that except for Cushman & Wakefield, Inc. (the "**Broker**") there was no broker or finder instrumental in consummating this lease and that no conversations or negotiations were had with any broker or finder concerning the renting of the Demised Premises.  Tenant agrees to indemnify, defend and hold Landlord harmless (and Landlord agrees to indemnify, defend and hold Tenant harmless) against any claims for a brokerage commission arising out of any conversations or negotiations had by Tenant or Landlord (as the case may be) with any broker or finder other than the Broker or otherwise arising out of a breach by the other of any representation contained in this Section. Landlord agrees to pay the Broker as per separate agreement and Landlord agrees to indemnify, defend and hold Tenant harmless from and against any and all claims by any Broker in connection with any claim, loss or damage arising directly or indirectly from this Lease and the transaction contemplated herein.

## ARTICLE 33

### Notices

33.01   Any notice, statement, demand or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this lease) and shall be deemed to have been properly given, rendered or made (a) if sent by registered or certified mail, return receipt requested, addressed to the other party at the address hereinabove set forth and shall be deemed to have been given, rendered or made on the second business day after the day so mailed, unless mailed outside of the State of New York, in which case it shall be deemed to have been given, rendered or made on the fourth business day after the day so mailed, or (b) if sent overnight by a recognized, national overnight currier service which provides written acknowledgment of receipt, addressed to the other party at the address hereinabove set forth and shall be deemed to have been given, rendered or made on the first business day after the day so mailed. Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demand or other communications intended for it.

## ARTICLE 34

### Estoppel Certificate, Memorandum

34.01    Tenant agrees, at any time and from time to time, as requested by Landlord (and if required of Landlord, by its mortgagee and ground lessor), upon not less than ten (10) days' prior notice, to execute and deliver to Landlord the Landlord's reasonable form of (i) memorandum confirming term (a copy of which is annexed hereto as Exhibit "M") and (ii) estoppel (a copy of which is annexed hereto as Exhibit "N"),  a statement certifying amongst other things (a) that this lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and whether any options granted to Tenant pursuant to the provisions of this lease have been exercised, (b) certifying the dates to which the fixed rent and additional rent have been paid and the amounts thereof, and stating whether or not, to the best knowledge of the signer, the Landlord is in default in performance of any of its obligations under this lease, and, if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by third parties others with whom the party requesting such certificate may be dealing provided the identity of such parties are set forth in the estoppel.

For sake of clarity and emphasis, Tenant shall furnish from time to time when requested by Owner or the holder of any deed to secure debt or mortgage covering the Building, the Demised Premises, or any interest of Owner therein, an accurate and truthful certificate signed by Tenant confirming and containing such reasonable and customary certifications and representations deemed appropriate by Owner or the holder of any deed to secure debt or mortgage covering the Building, the Premises or any interest of Owner therein, and Tenant shall, within ten (10) days following receipt of said certificate from Owner, return a fully executed copy of said certificate to Owner.  If Tenant fails to return a fully executed copy of such certificate to Owner within said period, Tenant shall have approved and confirmed all of the provisions contained in such certificate.  In addition to the foregoing, Owner reserves the right to exercise any further rights or remedies available to it under the Lease, at law or equity by reason of Tenant's default hereunder.

Supplementing the foregoing and for sake of emphasis and clarity:

(1)     At any time and from time to time upon not less than ten (10) days' prior notice by Landlord or the Superior Lessor or the Superior Mortgagee to Tenant, Tenant shall, execute, acknowledge and deliver a statement in writing in the form annexed hereto as Exhibit "E" (or on the Superior Lessor or the Superior Mortgagee form or other form reasonably acceptable to the Superior Lessor or the Superior Mortgagee with changes reasonably acceptable to Lender if so requested by Tenant) addressed to such party as the Landlord or the Superior Lessor or the Superior Mortgagee, as the case may be, may designate (with such minor and immaterial additions or changes as Landlord may request or in form satisfactory to Landlord or the Superior Lessor or the Superior Mortgagee as the case may be) certifying (among such other requirements of Landlord, the Superior Lessor or the Superior Mortgagee), all or any of the following: (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in

full force and effect as modified and stating the modifications), (b) whether the Lease Term has commenced and Fixed Rent and Additional Rent have become payable hereunder and, if so, the dates to which they have been paid, (c) whether or not, to the best knowledge of the signer of such certificate, Landlord is in default in performance of any of the terms of this Lease and, if so, specifying each such default of which the signer may have knowledge, (d) whether Tenant has accepted possession of the Demised Premises, (e) whether Tenant has made any claim against Landlord under this Lease and, if so, the nature thereof and the dollar amount, if any, of such claim, (f) whether there exist any offsets or defenses against enforcement of any of the terms of this Lease upon the part of Tenant to be performed, and, if so, specifying the same, (g) either that Tenant does not know of any default in the performance of any provisions of this Lease or specifying any default of which Tenant may have knowledge and stating what action Tenant is taking or proposes to take with respect thereto, (h) that, to the knowledge of Tenant, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which, if adversely decided, would materially and adversely affect the financial condition or operations of Tenant, or, if any such proceedings are pending or threatened to the knowledge of Tenant, specifying and describing the same, and (i) such further information with respect to the Lease or the Demised Premises as Landlord may request or any Superior Mortgagee or any Superior Lessor may require, it being intended that any such statement delivered pursuant hereto may be relied upon by any prospective purchaser of the Real Property or any part thereof or of the interest of Landlord in any part thereof, by any mortgagee or prospective mortgagee thereof, by any lessor or prospective lessor thereof, by any lessee or prospective lessee thereof, or by any prospective assignee of any mortgage thereof.

(2)    The failure of Tenant to execute, acknowledge and deliver a statement in accordance with the provisions of this subparagraph within said ten (10) day period shall constitute an acknowledgement by Tenant, which may be relied on by any person who would be entitled to rely upon any such statement, that such statement as requested by Landlord or the Superior Lessor or the Superior Mortgagee is true and correct.

    34.02  At the request of either party, Landlord and Tenant shall promptly execute, acknowledge and deliver a memorandum with respect to this lease sufficient for recording. Such memorandum shall not in any circumstances be deemed to change or otherwise affect any of the obligations or provisions of this lease and such tax forms and other documents as may be necessary to record same. If requested by Tenant, any and all fees associated with such recording shall be paid by Tenant.

# ARTICLE 35

## Arbitration

35.01  Either party may request arbitration of any matter in dispute wherein arbitration is expressly provided in this lease as the appropriate remedy. The party requesting arbitration shall do so by giving notice to that effect to the other party, and both parties shall promptly thereafter jointly apply to the American Arbitration Association (or any organization successor thereto) in the City and County of New York for the appointment of a single arbitrator.

35.02  The arbitration shall be conducted in accordance with the then prevailing rules of the American Arbitration Association (or any organization successor thereto) in the City and County of New York. In rendering such decision and award, the arbitrator shall not add to, subtract from or otherwise modify the provisions of this lease.

35.03  If for any reason whatsoever a written decision and award of the arbitrator shall not be rendered within sixty (60) days after the appointment of such arbitrator, then at any time thereafter before such decision and award shall have been rendered either party may apply to the Supreme Court of the State of New York or to any other court having jurisdiction and exercising the functions similar to those now exercised by such court, by action, proceeding or otherwise (but not by a new arbitration proceeding) as may be proper to determine the question in dispute consistently with the provisions of this lease.

35.04  The decision of the arbitrator shall be binding upon the parties hereto. The arbitrator shall be specifically directed to determine the "prevailing party" in such proceedings, and the non-prevailing party shall pay all expenses in accordance with Section 31.2 hereof.

35.05  Notwithstanding anything to the contrary contained in this lease, unless arbitration is specifically referred to in the relevant provision of provisions of this lease as the sole method of resolving a dispute, the parties will be free to seek all remedies at law or in equity, including but not limited to specific performance or injunctive relief if the same are available; provided, however, where arbitration is specifically referred to in the relevant provisions of this lease as the sole method for resolving a dispute, if one of the parties seeks specific performance or injunctive relief as a remedy, the dispute may be removed to a court of competent jurisdiction for such party to seek such remedy without the need to arbitrate.

# ARTICLE 36

## No Other Representations, Construction, Governing Law, Consents

36.01  Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this lease or in any other written agreement which may be made between the parties concurrently with the execution and delivery of this lease and shall expressly refer to this lease. This lease and said other written agreements made concurrently herewith are hereinafter referred to as the "lease documents". It is understood and agreed that all understandings and agreements heretofore had between the parties are merged in the lease documents, which alone fully and

completely express their agreements and that the same are entered into after full investigation, neither party relying upon any statement or representation not embodied in the lease documents, made by the other.

36.02   If any of the provisions of this lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this lease shall be valid and enforceable to the fullest extent permitted by law.

36.03   This lease shall be governed in all respects by the laws of the State of New York.

## ARTICLE 37

### Parties Bound

37.01   The obligations of this lease shall bind and benefit the successors and assigns of the parties with the same effect as if mentioned in each instance where a party is named or referred to, except that no violation of the provisions of Article 9 shall operate to vest any rights in any successor or assignee of Tenant and that the provisions of this Article shall not be construed as modifying the conditions of limitation contained in Article 26.  However, the obligations of Landlord under this lease shall not be binding upon Landlord herein named with respect to any obligations first accruing subsequent to the transfer of its interest in the Building as owner or lessee thereof and in event of such transfer said obligations shall thereafter be binding upon each transferee of the interest of Landlord herein named as such owner or lessee of the Building, but only with respect to the period ending with a subsequent transfer within the meaning of this Article.

37.02   If Landlord shall be an individual, joint venture, tenancy in common, a limited liability company, co-partnership, unincorporated association, or other unincorporated aggregate of individuals and/or entities or a corporation, Tenant shall look only to such Landlord's estate and property in the Building and Landlord's estate, as tenant under the ground lease, the rents, issues and proceeds thereof and where expressly so provided in this lease, to offset against the rents payable under this lease for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default by Landlord hereunder, and no other property or assets of such Landlord or any partner, member, officer or director thereof, disclosed or undisclosed shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this lease, the relationship of Landlord and Tenant hereunder or Tenant's use or occupancy of the Demised Premises.

## ARTICLE 38

### Certain Definitions And Construction

38.01   For the purposes of this lease and all agreements supplemental to this lease, unless the context otherwise requires the definitions set forth in Exhibit E annexed hereto shall be utilized.

38.02  The various terms which are italicized and defined in other Articles of this lease or are defined in Exhibits annexed hereto, shall have the meanings specified in such other Articles and such Exhibits for all purposes of this lease and all agreements supplemental thereto, unless the context shall otherwise require.

## ARTICLE 39

### ADA and Hazardous Materials

39.01  Landlord agrees that following the performance by it of Landlord's Work, that the Demised Premises shall be in compliance with the ADA (as hereafter defined). Tenant agrees that it shall be solely responsible, at its expense in connection with its performance of Tenant's Work, to cause the Demised Premises to remain in compliance with the provisions of the Americans With Disabilities Act of 1990 and any regulations and amendments promulgated pursuant thereto (hereinafter referred to as the "ADA") following the Commencement Date, and Landlord shall have no obligation whatsoever in connection therewith (except to the extent such compliance is triggered by acts or omissions of Landlord, its agents, employees or contractors or by other tenants of the Building).  Within ten (10) days after receipt, Tenant shall advise Landlord in writing, and provide Landlord with copies of, any notices alleging violations of the ADA relating to any portion of the Demised Premises; any claims made or threatened in writing regarding non-compliance with the ADA and relating to any portion of the Demised Premises; or any governmental or regulatory actions or investigations instituted or threatened regarding non-compliance with the ADA and relating to any portion of the Demised Premises.

39.02  Subject to the provisions herein, from and after the Commencement Date, Tenant shall not introduce any "Hazardous Materials" (as hereinafter defined) to the Demised Premises.  Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including reasonable attorneys' fees) which arise during or after the term of this lease as a result of Tenant's breach of its obligations hereunder.  The foregoing indemnification includes, without limitation, costs incurred in connection with any investigation of conditions or any clean-up, remedial work, removal or restoration work in the Demised Premises.  Without limiting the foregoing, if the presence of any Hazardous Materials within the Demised Premises introduced thereto by Tenant results in any contamination of the Demised Premises, Tenant shall promptly take all actions at its sole expense as are necessary to return the Demised Premises to the condition existing prior to the introduction of any such Hazardous Materials to the Demised Premises.  As used in this paragraph, the term "Hazardous Materials" means: (i) polychlorinated biphenyls (PCBs) and (ii) hazardous or toxic materials, wastes and substances, including but not limited in any respect to asbestos or asbestos containing materials, which are defined, determined or identified as such pursuant to any applicable federal, state and municipal governmental laws, rules or regulations.  Tenant shall also comply with all rules and regulations imposed by Landlord with respect to recycling waste, if required by applicable governmental regulations.  Hazardous Materials shall not include products and compounds and equipment used in performing Tenant's Work including the use of acid, oxygen and acetylene tanks as well as products and compounds used for cleaning, pest control and maintenance of the HVAC unit(s) and Tenant's machinery and equipment including, without limitation, propane tanks and grills, as are typically used or sold by

food supermarkets and normal office supplies for their intended use, provided such use and storage is in compliance with all legal requirements including environmental laws.

Except as may be provided for otherwise in this Lease, in no event shall Tenant have any liability or responsibility for Hazardous Substances in the Demised Premises prior to the Commencement Date or Hazardous Materials which migrate to, or are introduced to the Demised Premises during the term of this lease by parties other than Tenant (hereinafter referred to as "Non-Tenant Materials"). If during the term, Non-Tenant Materials cause the Demised Premises or any other material part thereof to be rendered untenantable, or prevent Tenant from operating its business in the Demised Premises in the normal course, Landlord shall promptly utilize reasonable efforts to remove or remediate the Non-Tenant Materials in compliance with all applicable law, and restore the Demised Premises to an acceptable operating condition free of such Non-Tenant Materials. During any period in which Non-Tenant Materials render any part of the Demised Premises untenantable or Tenant is prevented from operating its business therein, all rent payable hereunder shall be abated in proportion to the floor area of the Demised Premises so affected until such time as Tenant is able to commence its business operations from the entire Demised Premises. If the untenantability or inability is so extensive as to render the Demised Premises substantially unfit for occupancy by Tenant for the normal conduct of its business, all rent payable hereunder shall fully abate until such time as Landlord returns the Demised Premises to Tenant to resume the conduct of its business. Notwithstanding anything to the contrary contained in this Lease, Landlord shall have no obligation whatsoever hereunder to the extent that any Hazardous Materials were properly contained or encapsulated as of the Lease Commencement Date but subsequently released due to the acts or omissions of Tenant, its agents, employees, contractors or guests.

## ARTICLE 40

### Tenant's Option to Extend Lease Term

40.01   Tenant shall have the options (the "**Extension Options**") to extend the term of the lease for two (2) additional periods of five (5) years each (the "**Extended Terms**") subject to the conditions contained in this Article 40.

40.02   Provided Tenant has been timely in the payment of its rent and additional rent to Landlord throughout the term of this Lease and at the time of the exercise of such Extension Option, Tenant shall not be in default in the performance of any of the monetary or material non-monetary terms, covenants or conditions herein beyond the expiration of any applicable notice and cure period, then Tenant may exercise its Extension Option, and in the event Tenant elects to exercise any Extension Option, it must send Landlord a written notice (the "**Extension Notice**") indicating its exercise of such Extension Option. Each Extension Notice must be sent at least one (1) year prior to the then Expiration Date.

40.03   Tenant's failure to send the Extension Notice in the time and manner herein specified shall constitute a waiver of its right to exercise such Extension Option or the subsequent extension option as the case may be.

40.04   In the event Tenant sends Landlord a timely Extension Notice, Landlord and Tenant shall attempt to agree upon the Fair Market Rental Value (the "**FMRV**") for the Demised Premises for the Extended Term and such agreement, if any, shall be confirmed in a writing (hereinafter referred to as the "**FMRV Agreement**") which shall be executed by Landlord and Tenant not later than two hundred seventy (270) days prior to the Expiration Date (the "**FMRV Date**"). In the event the parties do not enter into the FMRV Agreement on or before the FMRV Date, Tenant shall have the right, TIME BEING OF THE ESSENCE, by written notice to Landlord to rescind its Extension Notice. "Fair Market Rental Value" shall be defined, as of the date in question, as the then current fixed annual rental charge (taking into consideration the payment of Additional Rent as provided hereunder) for leases then currently being negotiated or executed for comparable retail space located in the applicable Lower Manhattan market. In determining the FMRV for the Extended Term, it shall be assumed that the FMRV is for a renewal in an existing space, except that those elements of the FMRV for new leases which give effect to (i) a building standard landlord work or any other tenant work letter, landlord allowance or economic concessions; (ii) the payment of brokerage commissions; and (iii) any rent abatement period or other special inducements to tenants as amortized over the term of such lease, shall be deducted from the calculation of the FMRV. The "Base Tax Rate" for the Extended Term shall mean the Taxes assessed against the Land and Building for the fiscal period in effect during the last year of the term of the lease. In the event that Landlord and Tenant shall have failed to join in executing the FMRV Agreement on or before the FMRV Date because of their failure to agree upon the Fixed Rent (and Tenant has not elected to rescind its Extension Notice as provided for herein), then the FMRV for the Extended Term shall be determined by arbitration as follows:

(a)   Landlord and Tenant shall each appoint an arbitrator by written notice given to the other party hereto not later than thirty (30) days after the FMRV Date. If either Landlord or Tenant shall have failed to appoint an arbitrator within such period of time and thereafter shall have failed to do so by written notice given within a period of five (5) days after notice by the other party requesting the appointment of such arbitrator, then such arbitrator shall be appointed by the American Arbitration Association or its successor in or closest to the City and State of New York, upon request of either Landlord or Tenant, as the case may be;

(b)   The two (2) arbitrators appointed as above provided shall attempt to reach an agreement as to the FMRV and in the event they are unable to do so within thirty (30) days after their joint appointment, then they shall appoint an impartial third (3rd) arbitrator (the "**Referee**") by written notice given to both Landlord and Tenant, and, if they fail to do so by written notice given within thirty (30) days after their appointment, the Referee shall be appointed as above provided for the appointment of an arbitrator in the event either party fails to do so;

(c)   Each such arbitrator shall be an individual who is not then (and has not been during the prior five (5) calendar years) employed or compensated by either party and who is a qualified real estate broker or appraiser with MAI or comparable credentials, previously or currently affiliated with a recognized real estate brokerage or appraisal firm, and with at least ten (10) years' experience in the New York commercial real estate rental market;

(d)   The three arbitrators, selected as aforesaid, forthwith shall convene and render their decision in accordance with the then applicable rules of the American Arbitration

Association or its successor, which decision shall be strictly limited to a determination of the FMRV of the Demised Premises, within twenty (20) days after the appointment of the Referee. The decision of the arbitrators selected by Landlord and Tenant as to the FMRV shall be in writing and submitted to the Referee within ten (10) days after the conclusion of all hearings. Within ten (10) days after the receipt of the decisions of the arbitrators designated by Landlord and Tenant, the Referee shall decide which of the two decisions shall be utilized as the FMRV for the Demised Premises for the Extended Term. The Referee may not make a separate valuation of the FMRV but must pick the FMRV submitted by Landlord's arbitrator or Tenant's arbitrators as being the nearest approximation of the FMRV the Referee would have determined if the Referee were the sole arbitrator. The decision of the Referee shall be binding upon Landlord and Tenant. Duplicate original counterparts of such decision shall be sent forthwith by the Referee by certified mail, return receipt requested, to both Landlord and Tenant. The arbitrators, in arriving at their decisions, shall be entitled to consider all testimony and documentary evidence that may be presented at any hearing, as well as facts and data which the arbitrators may discover by investigation and inquiry outside such hearings. If, for any reason whatsoever, a written decision of the Referee shall not be rendered within twenty (20) days after the conclusion of all hearings, then, at any time thereafter before such decision shall have been rendered, either party may apply to the Supreme Court of the State of New York or to any other court having jurisdiction and exercising the functions similar to those now exercised by such court, by action, proceeding or otherwise (but not by a new arbitration proceeding) as may be proper, to determine the question in dispute consistently with the provisions of this lease.

(e)     The cost and expense of such arbitration, action, proceeding, or otherwise shall be borne equally by Landlord and Tenant.

40.05   Notwithstanding anything to the contrary contained in this Article 40 (a) the FMRV of the Demised Premises throughout the Extended Term shall in no event be less than the aggregate of (i) the annual rent for the last year of the term prior to the exercise of any Extension Option plus (ii) any Tax Payment per rentable square foot of the Demised Premises payable by Tenant pursuant to the terms of Article 5 hereof for the Tax Year occurring during the least year of the Term, and (b) the Base Tax Rate (as defined in Section 5.01(b) for the Extended Term shall mean the taxes payable for the Tax Year commencing (i) July 1, 2030 and expiring June 30, 2031 for the first Extended Term and (ii) July 1, 2035 and expiring June 30, 2036 for the second Extended Term .

## ARTICLE 41

### Maintenance of the Storefront

41.01   Tenant shall, throughout the Term of this lease and its sole cost and expense, keep the Tenant's Storefront (being the glass portion of Tenant's storefront, the brass components of Tenant's storefront and any awning above such glass) in a clean and orderly condition.

## ARTICLE 42

### [Intentionally Omitted]

## ARTICLE 43

### Ground Lease Provisions

43.01   Tenant acknowledges that Landlord is not a fee owner of the land but the holder of the Ground Lease (as defined in Exhibit E).  Landlord represents that (a) the Ground Lease is presently in full force and effect with no default by Tenant thereunder; (b) no consent is required from the Ground Lessor (as defined in Exhibit E) in connection with the making of this lease, and (c) no provision of the Ground Lease conflicts with, or would result in the reduction of, any of the rights of Tenant under this lease.

43.02   In the event that Tenant shall send Landlord a notice of any default on the part of Landlord, under this lease, Tenant shall send a copy thereof to Ground Lessor at the address listed in Section 43.04 or such other address as Tenant shall have been notified in writing. Tenant agrees that Ground Lessor shall have the right, but not the obligation to cure any such default within:

(a)   Thirty (30) days from the date of such notice in the event such default shall consist of a failure to pay a sum of money; or

(b)   Thirty (30) days from the date of such notice to cure any other default which is susceptible of being cured with due diligence within said 30 days; or

(c)   If such default is not susceptible of being cured with due diligence within said 30 days, then Ground Lessor shall have the right to commence to cure such default within 30 days from the date of such notice and diligently present such cure to completion.

43.03   Tenant further agrees that this lease shall not terminate or be terminable by Tenant or the Ground Lessor by reason of any termination of the Ground Lease by summary proceedings or otherwise, and in the event of such termination, the Ground Lessor shall recognize all rights of Tenant under this lease, and Tenant shall attorn to Ground Lessor.

43.04   Any notice from Tenant to the Ground Lessor shall be addressed as follows:

> 40 Wall Limited Partnership and
> New Scandic Wall Limited Partnership
> c/o The Pyne Companies, Ltd.
> 40 Wall Street
> New York, New York 10005

# ARTICLE 44

## HVAC System

44.01    Tenant shall have the right to utilize or modify the existing HVAC system (excluding the cooling tower) located in the Demised Premises. Landlord makes no representation concerning the condition or possible utilization of the existing HVAC system.

Tenant shall procure, in a prompt and diligent manner at its sole cost and expense, a service contract for the HVAC system and any supplemental air conditioning units contained within in the Demised Premises by Tenant (whether now existing or installed after the date hereof), and supply a copy of same to Landlord and its managing agent. In addition, Tenant acknowledges and agrees that all unit(s) within the Demised Premises (whether now existing or hereinafter installed by either party, except as provided for hereinafter) are the property of Landlord, and shall remain at the Demised Premises upon the termination of this Lease.

Landlord and Tenant agree to operate the HVAC equipment in accordance with its design criteria unless a recognized energy conservation law, program, guideline or regulation promulgated by any Federal, State, City or other governmental or quasi-governmental bureau, board, department, agency, office, commission or other subdivision thereof or the American Society of Heating, Refrigeration and Air Conditioning Engineers, Inc. or any successor thereto or other organization serving a similar function shall provide for any reduction in operations below said design criteria in which case such equipment shall be operated so as to provide reduced service in accordance with such law, program, guideline or regulation.

Tenant acknowledges that Tenant's agreements as herein set forth constitute a substantial obligation of Tenant and a material inducement for Landlord to enter into the Lease and, but for this inducement, Landlord would not enter into the Lease. A default by Tenant of its obligations under this Article 44 shall be considered a material default under the Lease, for which Landlord may pursue any and all remedies at law, equity and/or under this Lease, including but not limited to, self-help rights.

# ARTICLE 45

## [Intentionally Omitted]

# ARTICLE 46

## Go Dark Event

46.01    If a Go Dark Event occurs, the same shall not constitute an Event of Default but Landlord shall have the options described in Article 2.09 of this Lease (including but not limited to the right to recapture possession of the Demised Premises, which option shall be exercisable by Landlord giving notice thereof to Tenant ("***Dark Recapture Notice***") at any time after the Go

Dark Event.  A "Go Dark Event" means, subject to the provision of Articles 23 and 24: (i) the failure to operate a business in at least fifteen thousand (15,000) square feet of the Building and (ii) the continuation of such failure for a period in excess of one hundred eighty (180) days.  If Landlord delivers the Dark Recapture Notice, then such recapture shall be effected on the date that is thirty (30) days after the date of the Dark Recapture Notice (hereinafter called the "Dark Recapture Date").  If Landlord exercises its option to recapture possession of the Premises pursuant to this Section 46.01, then (x) Landlord shall be entitled to draw upon and retain the Security Amount and (y) Tenant shall vacate same and deliver possession thereof to Landlord pursuant to the terms of this Lease by no later than the Dark Recapture Date, as if said date were the Expiration Date of the Term.

## ARTICLE 47

### Miscellaneous

47.01  Landlord shall permit Tenant to utilize Landlord's trash removal company, or another company selected by Tenant but reasonably acceptable to Landlord, for its trash removal and Landlord shall identify a reasonable location and daily hours when Tenant may have its trash removed.

47.02  The hours during which Tenant may receive deliveries are as follows: 5 AM ET to 6 PM ET (with occasional exceptions from time to time as reasonably agreed upon between Tenant and Landlord).

47.03  The exclusive use of the area immediately surrounding the New Freight Lift (the "New Freight Lift Area"; to be attached as Exhibit L)

47.04  Landlord shall assist Tenant in scheduling all of Tenant's construction material deliveries entering the Demised Premises on Wall Street with the Security Vendor of NYSE.

## ARTICLE 48

### Landlord's Managing Agent

48.01  Tenant agrees that all of the representations, warranties, waivers and indemnities made in this Lease by Tenant for the benefit of Landlord shall also be deemed to inure and to be for the benefit of Landlord's managing agent.

## ARTICLE 49

### Pets

50.01  With the exception of seeing-eye dogs or any other service animal, Landlord bans pets or other animals from the Demised Premises. Tenant hereby acknowledges its understanding

of the foregoing and agrees that, with the exception of seeing-eye dogs and other service animals, Tenant and its employees, invitees, contractors or guests shall not bring animals into the Building. Such representation by Tenant is a material inducement for Owner to enter into this Lease. Any breach of this Article 84 shall be considered a material default under this Lease.

## ARTICLE 51

### Exculpation

51.01 The term Landlord as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of the Landlord's interest in the Project. Tenant acknowledges and agrees, for itself and its successors and assigns, that no trustee, director, officer, employee or agent of Landlord shall be personally liable for any of the terms, covenants or obligations of Landlord hereunder, and Tenant shall look solely to Landlord's interest in the Building for the collection of any judgment (or enforcement or any other judicial process) requiring the payment of money by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed or performed by Landlord and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any obligation due Tenant or its successors or assigns.

## ARTICLE 52

### Noise

52.01 Tenant's right of QUIET ENJOYMENT as set forth in Article 8 of this Lease is modified as follows and Section 2.05(p) as it pertain to noise and vibrations is supplemented as follows: Tenant or Tenant's successor in interest shall not create any noise levels which shall materially interfere with the quiet enjoyment of the tenants occupying other portions of the Building, of which the Demised Premises are a part. Tenant agrees to promptly notify Landlord in writing of all noise complaints or summons which it receives in writing, and to submit a proposal reasonably satisfactory to Landlord as to how to handle same and assure that such complaints shall not recur. Tenant expressly acknowledges that the floors above its premises are residential and/or of a commercial nature requiring sensitivity to the loud sounds, noises and /or vibrations, and as such, agrees to take whatever reasonable steps that may be necessary to eliminate any noise or vibrations that may emanate from the Premises. Failure to comply with this provision shall constitute a material breach of this Lease.

52.02 Notwithstanding anything to the contrary contained in the foregoing and this Lease:

(i) Tenant shall not perform any acts or carry on any practice which may be a nuisance or disturbance to other tenants and business invitees. In the event Landlord, in Landlord's sole but reasonable discretion, believes that Tenant's business operation is producing objectionable noise and/or vibrations which may be a nuisance and/or disturbance to other tenants and business invitees, then upon written notice from Landlord Tenant shall promptly

install sound and vibration attenuation countermeasures or other reasonable measures to mitigate such disturbance, such as insulating the walls, ceiling and/or installing a rubberized floor mat.

(ii)    A violation of any of the terms of this provision shall give to the Landlord the right to restrain the same by injunctive relief. Tenant acknowledges that Tenant's agreements as herein set forth constitute a substantial obligation of Tenant and a material inducement for Landlord to enter into the Lease and, but for this inducement, Landlord would not enter into the Lease. A default by Tenant of the foregoing shall be considered a material default under the Lease, for which Landlord may pursue any and all remedies, including but not limited to, those rights referred to herein.

(iii)    In the event Tenant fails to perform the reasonable actions required by Landlord within five (5) business days of Landlord's notice, Landlord may (but shall not be required to) install the sound and vibration attenuation countermeasures or other reasonable measures to mitigate such disturbance and upon completion of such work and presentation of a bill therefore, Tenant shall immediately pay Landlord's cost for such work , as Additional Rent. In the event such sound and vibration attenuation countermeasures or other reasonable measures to mitigate such disturbance (whether installed by or at the direction of Tenant or Landlord) do not adequately resolve the nuisance or disturbance caused by Tenant's business operation, Tenant, upon written notice from Landlord, shall immediately cease the activities causing the nuisance or disturbance.

## ARTICLE 52

### Odors

52.01   Tenant shall not permit objectionable odors to emanate from the Demised Premises as reasonably determined by Landlord.  Tenant shall, within thirty (30) days after notice from Landlord, install, at its own cost and expense, reasonable control devices or procedures to eliminate such odors, if any.  Without limiting the foregoing, Tenant shall install chemical extinguishing devices (such as ansul or a similar device) as may be required if any, air purification and filtration systems and any other equipment and appliances as may be required by, and otherwise fully comply with, all applicable governmental codes and regulations (including, but not limited to, those imposed by the fire department, state board of fire underwriters or any fire insurance rating organization) and as required by Landlord's insurers, including but not limited to, fire alarm, smoke alarm, fire extinguisher appliances and systems. Tenant shall keep such devices under service as required by such agency In addition to any other remedy available to Landlord, Tenant shall, within fifteen (15) days after notice from Landlord, install, at its own cost and expense, reasonable and additional control devices or procedures to eliminate such odors, if any.  Landlord shall have the right to enter the Demised Premises at any time to inspect the same and ascertain whether they are clean and free from odors.

52.02   In the event such condition is not remedied within said fifteen (15) day period, Landlord may, at its discretion, either (a) cure such condition and thereafter add the cost and expense incurred by Landlord therefor to the next monthly rental to become due and Tenant shall pay said amount as Additional Rent; or (b) treat such failure on the part of Tenant to eliminate such obnoxious odors as a material default hereunder entitling Landlord to any of its remedies

pursuant to the terms of this Lease; provided, however, same shall not be a default if the condition cannot be corrected within said fifteen (15) day period and Tenant has proceeded to cure such deficiency within said period and diligently proceeds to complete same. Landlord shall have the right to enter the Demised Premises at any time to inspect the same and ascertain whether they are clean and free from odors.

52.03   In addition to any and all other rights of Landlord under this Lease, a violation of any of the terms of this provision shall give to the Landlord the right to restrain the same by injunctive relief Tenant acknowledges that Tenant's agreements as herein set forth constitute a substantial obligation of Tenant and a material inducement for Landlord to enter into this Lease and, but for this inducement, Landlord would not enter into this Lease. A default by Tenant of the foregoing shall be considered a material default under this Lease, for which Landlord may pursue any and all remedies, including but not limited to, those rights referred to herein.

## ARTICLE 53

## CORPORATE GUARANTY

## [NOT APPLICABLE]

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this lease as of the day and year first above written.

40 WALL STREET LLC
By: 40 Wall Street Member Corp.

By: _____
Donald J. Trump, President


DEAN & DELUCA , INC.

By: _____
Sorapoj Techakraisri, Chairman

## EXHIBIT "A"

## Floor Plan



**EXHIBIT A**

**FLOOR PLAN**

Ex. A



THE TRUMP BUILDING

40 WALL STREET

— LOBBY —

LOBBY



ADJACENT PROPERTY
NYSC SPORTS CLUB

LOCATION SPRINKLER SIAMESE

LOCATION OF COMBINATION STANDPIPE & SIAMESE 3FT CLEARANCE REQ'D

LOCATION OF COMBINATION STANDPIPE & SIAMESE

PROPOSED RETRACTABLE AWNING ABV.

BUILDING ENTRANCE

PROPOSED RETRACTABLE AWNING ABV.

EXISTING REVOLVING DOOR

EXISTING REVOLVING DOOR

PROPOSED LOCATION OF RAILING SIGN

SERVICE AISLE

EQ    EQ

SERVICE AISLE

RAILING MAX HEIGHT 36"

11'-3"    15'-4"    20'-8"

USPS MAILBOX

EXIST. CURB

EXIST. VAULT GRATING

EXIST. CON ED UTILITY MANHOLE COVERS

NOTES:
1. SIDEWALK CAFE SUBJECT TO CONSUMER AFFAIRS AND LANDMARKS PRESERVATION COMMISSION (LPC) APPROVAL
2. ALL SIGNAGE AND AWNINGS ARE SUBJECT TO LPC APPROVAL

WALL STREET

Exhibit A-2

WALL STREET SIDEWALK CAFE    8-20-14

N

8'   4   8'

DWG. NUMBER
2

## EXHIBIT "B"

### Description

All that plot of land in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Wall Street distant 70 feet 1 inch westerly from the corner formed by the intersection of the said northerly side of Wall Street with the westerly side of William Street; running

THENCE Northerly along a line which forms an angle of 87 degrees 05 minutes 15 seconds on its westerly side with said northerly side of Wall Street, 123 feet and 1/4 of an inch;

THENCE Westerly along a line which forms an angle of 92 degrees 33 minutes 30 seconds on its southerly side with the last course, 14 feet 2-1/2 inches;

THENCE Northerly along a line which forms an angle of 94 degrees 00 minutes 45 seconds on its easterly side with the last course, 71 feet 7-1/2 inches to the southerly side of Pine Street;

THENCE Westerly along said southerly side of Pine Street, 45 feet 9-3/4 inches to an angle in said southerly side of Pine Street;

THENCE continuing Westerly along said southerly side of Pine Street, 163 feet 5-3/4 inches;

THENCE Southerly along a line which forms an angle of 87 degrees 31 minutes 10 seconds on its easterly side with said southerly side of Pine Street, 74 feet 9-5/8 inches;

THENCE Easterly along a line which forms an angle of 91 degrees 19 minutes 10 seconds on its northerly side with the last course, 40 feet 3-3/4 inches;

THENCE continuing Easterly along a line which forms an angle of 179 degrees 41 minutes 00 seconds on its northerly side with the last course, 35 feet 4 inches;

THENCE Southerly along a line which forms an angle of 91 degrees 45 minutes 00 seconds on its westerly side with the last course, 18 feet 4-1/2 inches;

THENCE continuing Southerly along a line which forms an angle of 180 degrees 38 minutes 50 seconds on its westerly side with the last course, 102 feet 11 inches to the said northerly side of Wall Street;

THENCE Easterly along said northerly side of Wall Street, 75 feet 1-1/4 inches to an angle in said northerly side of Wall Street;

THENCE continuing Easterly along said northerly side of Wall Street, 74 feet 11-1/2 inches to the point or place of Beginning.

<u>**EXHIBIT C**</u>

| Period | RENT<br>Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| First fifteen (15) months after the Commencement Date* | - 0 - | - 0 - |
| Year 1 | $1,400,000.00 | $116,666.67 p/m |
| Year 2 | $1,400,000.00 | $116,666.67 p/m |
| Year 3 | $1,400,000.00 | $116,666.67 p/m** |
| Year 4 | $1,400,000.00 | $116,666.67 p/m*** |
| Year 5 | $1,400,000.00 | $116,666.67 p/m |
| Year 6 | $1,575,000.00 | $131,250.00 p/m |
| Year 7 | $1,575,000.00 | $131,250.00 p/m |
| Year 8 | $1,575,000.00 | $131,250.00 p/m |
| Year 9 | $1,575,000.00 | $131,250.00 p/m |
| Year 10 | $1,575,000.00 | $131,250.00 p/m |
| Year 11 | $1,771,875.00 | $147,656.25 p/m |
| Year 12 | $1,771,875.00 | $147,656.25 p/m |
| Year 13 | $1,771,875.00 | $147,656.25 p/m |
| Year 14 | $1,771,875.00 | $147,656.25 p/m |
| Year 15 | $1,771,875.00 | $147,656.25 p/m |

*subject to the terms and conditions of the Lease

**subject to the terms and conditions of the Lease, Fixed Rent for the first (1st) month of Year 3 (i.e., the twenty fifth (25th) month subsequent to the Rent Commencement Date) shall be abated

***subject to the terms and conditions of the Lease, Fixed Rent for the first (1st) month of Year 4 (i.e., the thirty seventh (37th) month subsequent to the Rent Commencement Date) shall be abated

# Exhibit D
## Landlord's Work and Tenant's Work

**PART A:     LANDLORD'S WORK**

1.     Within sixty (60) days of receiving DOB Permits, Landlord agrees that it will complete at its own expense the following work in the Demised Premises except item (j) *(which although being performed by Landlord at Tenant's Cost, it is considered to be part of Tenant's Work)*:

   (a) Removal of all fixtures, furnishing and equipment which Tenant desires be removed.

   (b) Perform demolition and related work pursuant to the DOB permitted drawings (extent of work to be mutually agreed upon).

   (c) Deliver the Demised Premises in a broom-clean condition.

   (d) Cause the floor(s) to be raised pursuant to the DOB permitted drawings (extent of same, if any, to be mutually agreed upon).

   (e) Confirm the sewer line servicing the Demised Premises is in good working order with no obstructions.

   (f) Electrical Service: Landlord shall deliver up to 1200 amps, 208 volt, 3 phase electrical service subject to Tenant's load letter. Electrical distribution panels currently exist in the Demised Premises and can be relocated at the Tenant's expense.

   (g) Landlord shall provide access points to the Base building fire alarm system so Tenant can install the required fire alarm devices as per applicable codes.

   (h) Gas Service: Landlord shall supply a 3" metered gas line to the Demised Premises located in a closet in the men's locker room.

   (i) Plumbing: Landlord will deliver a 2" metered, domestic cold water line stubbed to the Demised Premises and a waste line not less than 4", and no greater than 6" in diameter.

   (j) Landlord will supply and install a freight lift for the Tenant's use, at the Tenant's sole cost and expense. This lift will operate between the Building's loading dock on the 2nd floor and the 1st floor directly below the loading dock. *The Tenant will be allowed to use this lift between the hours of 5:00 am 6:00pm (with occasional exceptions from time to time as reasonably agreed upon by Landlord and Tenant) Monday through Friday for receiving materials and removing rubbish.* Rubbish will be placed on the Pine Street sidewalk one (1) hour prior to pick up *(but in no event prior to 8:00 p.m)* and Tenant will be responsible for keeping this portion of the sidewalk clean at all times.

*THE AFORESAID SIXTY (60) DAY PERIOD SHALL BE PUSHED BACK ONE (1) DAY FOR EACH DAY THAT TENANT DOES NOT RESPOND TO LANDLORD WITHIN THE TIME PERIODS DESCRIBED IN THIS LEASE FOR WHICH TENANT IS REQUIRED TO RESPOND AND/OR PROVIDE INFORMATION TO LANDLORD.*

2.     Within ten (10) days from the date of execution of the Lease, Landlord agrees that it will provide Tenant with a complete New York City ACP-5 for the Demised Premises.

**PART B: TENANT'S WORK**

Tenant shall perform in accordance with Tenant's Plans, (as hereinafter defined) any physical improvements it intends to make in the Demised Premises and all labor and materials which are to be furnished in connection therewith is herein called the **"Tenant's Work"** and shall be performed by Tenant's contractor or sub-contractors as part of the Work Cost.

1.    Promptly after receipt of Landlord's approval of Tenant's Plans, Tenant will procure and negotiate bids from contractors and sub-contractors reasonably acceptable to Landlord.

**PART C: TENANT'S PLANS, SPECIFICATIONS AND DRAWINGS**

1.    Tenant, at its sole cost and expense, shall prepare and submit to Landlord, for Landlord's approval, which approval shall not be unreasonably withheld architectural drawings and specifications prepared by Tenant's architect herein referred to as **"Tenant's Plans"** for any work to be done by Tenant which shall include, without limitation, the installation of a mechanical freight vertical lift in the general location described on Exhibit A to the Lease. Utilizing the information shown on Tenant's Plans, Tenant shall cause mechanical and structural plans to be prepared by an engineer(s), reasonably acceptable to Landlord, the cost of which will be part of the Work Cost ("Construction Plans"). Landlord's architect and engineer will review Tenant's Plans and shall, within ten (10) days of receipt of Tenant's Plans, issue in writing any comments or objections they have to Tenant's Plans. Tenant will need to correct these objections to Tenant's Plans before Landlord approval will be issued.

2.    All plans and specifications for all work to be performed in and to the Demised Premises (including, without limitation, Tenant's Plans) are subject to Landlord's prior written approval, which, as to non-structural work shall not be unreasonably withheld. All plans submitted by the Tenant for the Demised Premises will be reviewed by the Landlord's architect and engineers. These reviews by the Landlord's architect and engineers will be part of the "Work Cost". Within ten (10) days after notification from Landlord of any objections to Tenant's Plans, Tenant shall submit to Landlord new plans (the **"Revised Tenant's Plans"**) curing Landlord's objections.

3.    Tenant's Plans and the Revised Tenant's Plans shall comply with and conform to the plans of the Building filed with the Department of Buildings of the City of New York, and with all rules, regulations and/or other requirements of any governmental department having jurisdiction over the construction of the Building and/or the Demised Premises. Tenant shall, as part of the Work Cost, promptly file all necessary architectural plans, together with any mechanical plans and specifications, in such form (building notice, alteration, or other form) as may be necessary, with the appropriate governmental agencies. Any changes required by any governmental department affecting the Tenant's Work shall be complied with by Tenant in completing the Tenant's Work.

4.    Tenant shall have the right to make changes from time to time in Tenant's Plans or the Revised Tenant's Plans (other than changes necessitated by Landlord's objections)

by submitting to Landlord revised plans and specifications (herein called the **"Revisions"**). All Revisions shall be subject to Landlord's prior written approval, which as to non-structural work shall not be unreasonably withheld. Landlord shall provide written approval or denial within ten (10) days of Landlord's receipt of the proposed Revisions. Upon receipt and approval of any Revisions, Tenant shall submit the Revisions so approved to its general contractor or construction manager.

## PART D: DEFINITIONS:

(a) **"Work Cost"** shall mean the aggregate of (i) the contract or purchase price (excluding general conditions) charged by Tenant's general contractor under an overall construction contract or by subcontractors, under subcontracts made by Tenant (**"Contract Costs"**), plus utilities during construction (i.e. water power and HVAC billed at cost without markup) plus (ii) filing fees and permit costs incurred in connection with the Work plus (iii) the cost to Landlord for reasonable consultant fees in connection with the Tenant's Work which shall not exceed one-half of one percent (.5%) of Contract Costs but in any event such fee shall be capped at One Hundred Thousand and 00/100 Dollars ($100,000.00). It is expressly agreed to that all costs and expenses incurred by Landlord in connection with Landlord's Work shall not be considered Work Costs or Construction Costs, and shall be payable solely by Landlord. Notwithstanding anything to the contrary contained herein, Contract Costs shall not include the cost of improvements, materials, fixtures, equipment and the like.

(b) **"Work"** shall mean the Tenant's Work under Part B.

## PART E: PAYMENT OF WORK COSTS:

The Work Cost shall be Tenant's obligation, and shall be borne by the Tenant.

## Definitions

1.     The term **mortgage** shall include an indenture of mortgage and deed of trust to a trustee to secure an issue of bonds, and the term **mortgagee** shall include such a trustee.

2.     The terms **include, including** and **such as** shall each be construed as if followed by the phrase "without being limited to".

3.     The term **obligations of this lease**, and words of like import, shall mean the covenants to pay rent and additional rent under this lease and all of the other covenants and conditions contained in this lease.  Any provision in this lease that one party or the other or both shall do or not do or shall cause or permit or not cause or permit a particular act, condition, or circumstance shall be deemed to mean that such party so covenants or both parties so covenant, as the case may be.

4.     The term **Tenant's obligations hereunder**, and words of like import, and the term **Landlord's obligations hereunder**, and words of like import, shall mean the obligations of this lease which are to be performed or observed by Tenant, or by Landlord, as the case may be. Reference to **performance** of either party's obligations under this lease shall be construed as "performance and observance".

5.     Reference to Tenant being or not being **in default hereunder**, or words of like import, shall mean that Tenant is in default in the performance of one or more of Tenant's obligations hereunder, or that Tenant is not in default in the performance of any of Tenant's obligations hereunder beyond any applicable grace period, or that a condition of the character described in Article 17 has occurred and continues or has not occurred or does not continue, as the case may be.

6.     References to Landlord as having **no liability to Tenant** or being **without liability to Tenant**, shall mean that Tenant is not entitled to terminate this lease, or to claim actual or constructive eviction, partial or total, or to receive any abatement or diminution of rent, or to be relieved in any manner of any of its other obligations hereunder, or to be compensated for loss or injury suffered or to enforce any other kind of liability whatsoever against Landlord under or with respect to this lease or with respect to Tenant's use or occupancy of the Demised Premises.

7.     The term **laws and/or requirements of public authorities** and words of like import shall mean laws and ordinances of any or all of the Federal, state, city, county and borough governments and rules, regulations, orders and/or directives of any or all departments, subdivisions, bureaus, agencies or offices thereof, or of any other governmental, public or quasi-public authorities, having jurisdiction in the premises, and the specific direction of any public officer pursuant to law.

8.     The term **requirements of insurance bodies** and words of like import shall mean rules, regulations, orders and other requirements of the New York Board of Fire Underwriters and/or the New York Fire Insurance Rating Organization and/or any other similar body

performing the same or similar functions and having jurisdiction of the Building and/or the Demised Premises.

9. The term **repair** shall be deemed to include restoration and replacement as may be necessary to achieve and/or maintain good working order and condition.

10. Reference to **termination of this lease** includes expiration or earlier termination of the term of this lease or cancellation of this lease pursuant to any of the provisions of this lease or to law. Upon a termination of this lease, the term and estate granted by this lease shall end at noon of the date of termination as if such date were the date of expiration of the term of this lease and neither party shall have any further obligation or liability to the other after such termination (i) except as shall be expressly provided for in this lease, or (ii) except for such obligation as by its nature or under the circumstances can only be, or by the provisions of this lease, may be, performed after such termination, and, in any event, unless expressly otherwise provided in this lease, any liability for a payment which shall have accrued to or with respect to any period ending at the time of termination shall survive the termination of this lease.

11. The term **in full force and effect** when herein used in reference to this lease as a condition to the existence or exercise of a right on the part of Tenant shall be construed in each instance as including the further condition that at the time in question no default on the part of Tenant exists, and no event has occurred which has continued to exist for such period of time (after the notice, if any, required by this lease), as would entitle Landlord to terminate this lease or to dispossess Tenant.

12. The term **Tenant** shall mean Tenant herein named or any assignee or other successor in interest (immediate or remote) of Tenant herein named, while such tenant or such assignee or other successor in interest, as the case may be, is in possession of the Demised Premises as owner of the Tenant's estate and interest granted by this lease and also, if Tenant is not an individual or a corporation, all of the persons, firms and corporations then comprising Tenant.

13. Words and phrases used in the singular shall be deemed to include the plural and vice versa, and nouns and pronouns used in any particular gender shall be deemed to include any other gender.

14. The rule of **ejusdem generis** shall not be applicable to limit a general statement following or referable to an enumeration of specific matters to matters similar to the matters specifically mentioned.

15. All references in this lease to numbered Articles, numbered Sections and lettered Exhibits are references to Articles and Sections of this lease, and Exhibits annexed to (and thereby made part of) this lease, as the case may be, unless expressly otherwise designated in the context.

16. Definitions from various Sections of the lease:
ADA - as defined in Section 39.01
Additional Rent or additional rent - as defined in Section 1.04(b)
Assignment Expense -- as defined in Section 9.05(a)

Base Tax Rate - as defined in Section 5.01(b)

Broker – as defined in Article 32

Building - the structure known as 40 Wall Street and all appurtenances thereto

Cancellation Effective Date – as defined in Section 42.01

Cancellation Fee – as defined in Section 42.03

changes - as defined in Section 13.01

Commencement Date - as defined in Section 1.03

Continuous Operation Period – as defined in Section 2.09

Contract Costs – as defined in Part D of Exhibit D

Dark Recapture Date – as defined in Section 46.01

Dark Recapture Notice – as defined in Section 46.01

Demised Premises, demised premises, Premises or premises shall mean the space in the Building leased to Tenant as shown on Exhibit A

Excavator – as defined in Section 6.01

Expiration Date - as defined in Section 1.03

Extended Term – as defined in Section 40.01

Extension Notices – as defined in Section 40.02

Extension Options – as defined in Section 40.01

First Effective Date – as defined in Section 45.01

Fixed Rent – as defined in Section 1.04(a)

FMRV – as defined in Section 40.04

FMRV Agreement – as defined in Section 40.04

FMRV Date – as defined in Section 40.04

Go Dark Event – as defined in Section 46.01

Ground Lease - the Amended and Restated Lease dated as of November 30, 1995 between Nautilus Real Estate, Inc. and Scandic Wall Limited Partnership, as landlord and 40 Wall Development Associates, LLC, as tenant.

Ground Lessor - 40 Wall Limited Partnership and New Scandic Wall Limited Partnership or any successor thereof.

Hazardous Materials - as defined in Section 39.02

Issuing Bank – as defined in Section 4.01

Land - shall mean the parcel of property described on Exhibit B

Landlord - same meaning as Owner

Landlord's Initial Expenses – as defined in Section 42.03

Landlord's Work – as defined in Exhibit D

lessor - as defined in Section 7.01

Letter of Credit – as defined in Section 4.02

Non-Renewal Notice – as defined in Section 4.02

Outdoor Dining Area – as defined in Section 1.02

Owner - 40 Wall Street LLC or any successor thereof

Parties – as defined in Section 1.03

Property - shall mean the Land and Building

Rate – as defined in Section 16.04(b)

Referee – as defined in Section 40.04(b)

Remaining Property – as defined in Section 3.03

Rent, additional rent or fixed rent - as defined in Section 1.04

Rent Commencement Date - as defined in Section 1.03

Revised Tenant's Plans – as defined in Part C of Exhibit D

Revisions – as defined in Part C of Exhibit D

Second Effective Date – as defined in Section 45.01

Security Amount – as defined in Section 4.01

SNDA – as defined in Section 7.04

Subletting Expense – as defined in Section 9.05(b)

successor landlord - as defined in Section 7.03

superior leases - as defined in Section 7.01

superior mortgages - as defined in Section 7.01


Taxes - as defined in Section 5.01(a)

Tax Payment - as defined in Section 5.02

Tax Statement - as defined in Section 5.05

Tax Year - as defined in Section 5.01(c)

Tenant - as defined in Exhibit E Item 12

Tenant's Cancellation Notice – as defined in Section 42.01

Tenant's Changes - as defined in Section 13.01

Tenant's Cost – as defined in Section 16.04(c)

Tenant's Exclusive Use – as defined in Section 2.08

Tenant's Notice – as defined in Section 2.08

Tenant's Plans – as defined in Part C of Exhibit D

Tenant's Projected Share of Taxes - as defined in Section 5.01(e)

Tenant's Property - as defined in Section 14.02

Tenant's Proportionate Share – as defined in Section 5.01(d)

Tenant's Proportionate Share of Storefront Maintenance – as defined in Section 41.03(b)

Tenant's Work – as defined in Part B of Exhibit D

Term – as defined in Section 1.03

Total Storefront Maintenance Expense – as defined in Section 41.03(a)

Total Storefronts – as defined in Section 41.03(c)

Transfer Acceptance Notice – as defined in Section 9.01(b)

Transfer Term Sheet – as defined in Section 9.01(a)

Usage – as defined in Section 16.04(a)

Work Cost – as defined in Part D of Exhibit D

# Exhibit F
## Rules and Regulations

1.     The rights of tenants in the entrances, corridors and elevators of the Building are limited to ingress to and egress from the tenants' premises for the tenants and their employees, licensees and invitees, and except as specifically provided in their respective leases for signage and other permitted usage, no tenant shall use, or permit the use of, the entrances, corridors, or elevators for any other purpose. No tenant shall invite to the tenant's premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of any of the entrances, corridors elevators and other facilities of the Building by other tenants. Fire exits and stairways are for emergency use only, and they shall not be used for any other purpose by the tenants, their employees, licensees or invitees. No tenant shall encumber or obstruct, or permit the encumbrance or obstruction of any of the sidewalks, entrances, corridors, elevators, fire exits or stairways of the Building. The Landlord reserves the right to control and operate the public portions of the Building and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally.

2.     Any person whose presence in the Building at any time shall, in the judgment of the Landlord, be prejudicial to the safety, character, reputation and interests of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion, the Landlord may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building. Except for persons exiting directly from the Demised Premises, the Landlord may require any person leaving the Building with any package or other object to exhibit a pass from the tenant from whose premises the package or object is being removed, but the establishment and enforcement of such requirement shall not impose any responsibility on the Landlord for the protection of any tenant against the removal of property from the premises of the tenant The Landlord shall, in no way, be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the tenant's premises or the Building under the provisions of this rule. Canvassing, soliciting or peddling in the Building is prohibited and every tenant shall cooperate to prevent the same.

3.     Except as otherwise set forth in this Lease, no tenant shall obtain or accept for use in its premises barbering, boot blacking, floor polishing, lighting maintenance, cleaning or other similar services from any persons not authorized by the Landlord in writing to furnish such services, provided that the charges for such services by persons authorized by the Landlord are not excessive and, where appropriate and consonant with the security and proper operation of the Building, sufficient persons are so authorized for the same service to provide tenants with a reasonably competitive selection. Such services shall be furnished only at such hours, in such places within the tenant's premises and under such reasonable regulations as may be fixed by the Landlord.

4.     The cost of repairing any damage to the public portions of the Building or the public facilities or to any facilities used in common with other tenants, caused by a tenant or the employees, licensees or invitees of the tenant, shall be paid by such tenant.

5.     Except as otherwise set forth in this Lease, no lettering, sign, advertisement, notice or object shall be displayed in or on the windows or doors, or on the outside of any tenant's premises, or at any point inside any tenant's premises where the same might be visible outside of such premises, except that the name of the tenant may be displayed on the entrance door of the tenant's premises, subject to the approval of the Landlord as to the size, color and style of such display.

6.     No awnings or other projections over or around the windows shall be installed by any tenant, and only such window blinds as are supplied or permitted by the Landlord shall be used in a tenant's premises.  Linoleum, tile or other floor covering shall be laid in a tenant's premises only in a manner approved by the Landlord.

7.     The Landlord shall have the right to prescribe the weight and position of safes and other objects of excessive weight, and no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept upon a tenant's premises.  If, in the reasonable judgment of the Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of Tenant and in such manner as the Landlord shall determine.  The moving of safes and other heavy objects shall take place only outside of ordinary business hours upon previous notice to the Landlord, and the persons employed to move the same in and out of the Building shall be reasonably acceptable to the Landlord and, if so required by law, shall hold a Master Rigger's license.  Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the premises only in the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by the Landlord.  Arrangements will be made by the Landlord with any tenant for moving large quantities of furniture and equipment into or out of the building.

8.     No machines or mechanical equipment of any kind, other than typewriters and other ordinary portable business machines, may be installed or operated in any tenant's premises without Landlord's prior written consent, and in no case (even where the same are of a type so excepted or as so consented to by the Landlord) shall any machines or mechanical equipment be so placed or operated as to disturb other tenants butmachines and mechanical equipment which may be permitted to be installed and used in a tenant's premises shall be so equipped, installed and maintained by such tenant as to prevent any disturbing noise, vibration or electrical or other interference from being transmitted from such premises to any other area of the Building.

9.     No noise, including the playing of any musical instruments, radio or television, which, in the reasonable judgment of the Landlord, might disturb other tenants in the Building, shall be made or permitted by any tenant.  Nothing shall be done or permitted in any tenant's premises, and nothing shall be brought into or kept in any tenant's premises, which would impair or interfere with any of the Building services or the proper and economic heating, cleaning or other servicing of the Building or the premises, or the use or enjoyment by any other tenant of any other premises; nor shall there be installed by any tenant any ventilating, air conditioning,

electrical or other equipment of any kind which, in the judgment of the Landlord, might cause any such impairment or interference. No dangerous, inflammable, combustible or explosive object or material shall be brought into the Building by any tenant or with the permission of any tenant. Any cuspidors or similar containers or receptacles used in any tenant's premises shall be cared for and cleaned by and at the expense of the tenant.

10.    No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them. The water and wash closets and other plumbing fixtures in or serving any tenant's premises shall not be used for any purpose other than the purposes for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein.

11.    Upon the termination of a tenant's lease, all keys of the tenant's premises and toilet rooms shall be delivered to the Landlord.

12.    All entrance doors in each tenant's premises shall be left locked and all windows shall be left closed by the tenant when the tenant's premises are not in use.

13.    Hand trucks not equipped with rubber tires and side guards shall not be used within the Building.

14.    The Landlord reserves the right to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in its judgment, it deems it necessary, desirable or proper for its best interest and for the best interests of the tenants, and no alteration or waiver of any rule or regulation in favor of one tenant shall operate as an alteration or waiver in favor of any other tenant. The Landlord shall not be responsible to any tenant for the non-observance or violation by any other tenant of any of the rules and regulations at any time prescribed for the Building.

**Exhibit G**
**Certificate of Occupancy**

**Exhibit H**
**Approved Signage**
**INTENTIONALLY DELETED**

**Exhibit H-1**
**Approved Awning(s)**
**INTENTIONALLY DELETED**

## Exhibit I
## Construction Rules and Regulations



# THE TRUMP BUILDING

At

40 Wall Street

## CONSTRUCTION
## RULES & REGULATIONS

*Updated:   July 1, 2014*

# TABLE OF CONTENTS

**SECTION I**

WELCOME...........................................................................................4

EMERGENCY PHONE LIST (Building Personnel)............................................5

BUILDING SERVICES.............................................................................6

DELIVERIES & OVERTIME FREIGHT...........................................................8

BASIC RULES.....................................................................................10

**SECTION II**

BUILDING REGULATIONS........................................................................12

REGARDING FILING PERMITS...................................................................14

GENERAL NOTES.................................................................................15

TENANT & GENERAL CONTRACTOR REQUIREMENTS.....................................19

GENERAL CONTRACTOR (& SUB-CONTRACTOR) REQUIREMENTS.....................22

ACCIDENT PREVENTION.........................................................................35

ADDITONAL INFORMATION.....................................................................39

ELEVATOR INFORMATION......................................................................40

RULES FOR CONSTRUCTION WORKERS (Sign to Be Posted).............................42

**APPROVED GENERAL CONTRACTORS & SUB-CONTRACTORS
ARE PROVIDED ON A SEPARATE LIST**

# SECTION I

# THE TRUMP BUILDING
## AT
## 40 WALL STREET

### Welcome to 40 Wall!

This manual is designed to act as a reference to Tenants and General Contractors for Building Construction Rules & Regulations, information, policies and emergency information.

It is our desire to ensure that your working environment at 40 Wall Street is productive and safe. If you have any suggestions about how we can serve you better, please let us know.

All applicable costs will be billed directly to the Tenant within one month of the service being provided and are subject to reasonable change by Landlord from time to time. If your Lease includes details that are different from the information provided here, please contact Steve Lafiosca or Andrea Sawyers in the Management Office for clarification. The provisions of your Lease will always override any conflict with this Tenant Information Manual.

### Office Hours and Contact Information:
Office Hours: 9:00 am to 5:00 pm Monday to Friday
Office Phone Number: (212) 344-2213
Office Fax Number: (212) 482-6875

During Holidays, the Building is open; however, depending upon which union is providing a particular service, there will be a charge for services requested on the holidays listed below. Any request for services during these holidays must be made in writing at least 2 days in advance. You may always arrange for services on any of these days that you are regularly open for business for services to be so provided throughout your Lease Term.

New Years Day
Martin Luther King Jr. Day
President's Day
Good Friday
Memorial Day
Independence Day
Labor Day
Columbus Day
Thanksgiving Day
The day after Thanksgiving Day
Christmas Day

# EMERGENCY PHONE LIST
# BUILDING PERSONNEL

In the event of an emergency, you may call the following personnel in the order listed below until you reach someone.

- **Steve Lafiosca**
  Vice President of Property Management

  (212) 715-7203 – Office
  (201) 401-2233 – Cell
  slafiosca@trumporg.com

- **Andrea Sawyers**
  Assistant Property Manager

  (212) 715-7295 – Office

  asawyers@trumporg.com

- **Marilyn Rosario**
  Administrative Assistant

  (212) 715-7294 – Office

  mrosario@trumporg.com

- **James Mullen**
  Chief Engineer

  (212) 715-7238 – Office
  (917) 612-8355 - Cell
  jmullen@trumporg.com

- 
  Director of Security

  (212) 715-7246 – Office

- **Michael Calamari**
  Director of Construction

  (212) 715-7261 – Office
  (917) 217-0727 - Cell
  MikeCalamari@trumporg.com

- **Matthew Calamari**
  Chief Operating Officer,
  Executive Vice President

  (212) 715-7270 – Office
  (917) 692-4414 - Cell
  MCalamari@trumporg.com

# BUILDING SERVICES

The Management Office will coordinate the services listed below and we are happy to coordinate additional services as requested. The following is a brief description of typical building services and their applicable charges.

In order to ensure your request is handled timely and professionally, we ask that the general Contractor sign up for Workspeed. Workspeed is our building services internet based system that helps the Tenants communicate with the management office.

EVERY TENANT REQUEST must be made through Workspeed.

# ENGINEERING

Our Engineering Staff can perform sprinkler Shut downs and any other work that will affect the building.

If the Engineering Staff is utilized, the charge for the service is as quoted below. If we coordinate the use of an outside contractor, pricing will be obtained for your prior approval.

*If your lease provides for this service, there will be no charge.*

**CHARGE:** $130.00 per hour
All work will be billed to the Hour.
Weekend & Holiday work is billed at an Eight (8) minimum.
(Prices are subject to Change)

# AFTER-HOUR REQUEST FOR HVAC
### (Heating, Ventilating, and Air Conditioning)

The Management Office will also coordinate your after-hour requests for HVAC.
After-hour HVAC is available after 6:00 pm Monday through Friday, and as requested with an eight (8) hour minimum on Saturdays, Sundays and Holidays.

We require notice 2 days before services are required to schedule the necessary labor required for this service.

# RUBBISH REMOVAL

If you need to remove excess items from your space, we can make containers available to you.

Please send your request to schedule a container delivery and its subsequent removal to the Management Office.

**CHARGE:** $85.00 / container
(Prices are subject to Change)

# DELIVERIES & OVERTIME FREIGHT

No outside vendor or contractor may enter the Building (either to perform work or make a delivery) without first providing management with a valid certificate of insurance exactly as shown in our sample, a copy of which may be obtained through the Management Office.

Routine deliveries, such as food, office supplies, or those other items that can be delivered utilizing a hand truck with rubber wheels shall be made through the Pine Street loading dock.

**Bulk delivery, such as the movement of furniture or boxes or delivery of merchandise, and which requires the use of the freight elevator and security must be coordinated through the Management Office.**

A four (4) hour minimum will be charged for Saturday or Sunday use of the freight elevator. Moving contractors or general contractors using the freight elevator must ensure that corridors and doorways are not obstructed and that all corridors, elevators and public areas of the Building are protected from damage.

Masonite and plywood or corner boards should be used in corridors and lobbies leading from the loading dock to the freight elevator and from the freight elevator or the Tenant area. Walk-off mats should also be used to protect door thresholds. An inspection of public areas will be conducted prior to and after any delivery.

Tenant may be required to leave security deposit prior to a move in or out. If any damage occurs, any required repairs will be made at the sole expense of the Tenant.

**CHARGE FOR USE OF FREIGHT ELEVATOR:  $175.00 / Hr – Monday through Friday**
$175.00 / Hr – Saturday & Sunday (4 hr. minimum)

The cost for Freight usage equals the cost for 1 porter per hour ($90.00/hour) and one security guard ($85.00/hour)

Tenant must cancel scheduled appointments in time for management to cancel labor from coming to work; otherwise Tenant is responsible to pay the four (4) hour minimum.

(Prices are subject to Change)

# OUTSIDE BUILDING SERVICES

## DELIVERIES

Passenger elevators are solely for transporting Building tenants and their guests to and from their office. For this reason, all deliveries, other than of small, hand-carried objects, are restricted to the loading dock, freight elevator and other service facilities of the Building. Notwithstanding, this provision does not apply to internal elevators or stairs entirely within Tenant's Demised Premises. This does not include the fire stairs.

Specifically, Building regulations prohibit all deliveries and inter-floor activities on passenger elevators which require the use of hand-trucks, or two or four wheeled carts, such as mail carts, as well as movement of bulky objects regardless of how they are carried. In addition, construction personnel are required to use the freight elevator for all inter-floor movement as a means of controlling dust and debris.

## SECURITY

Building security personnel are on duty twenty-four (24) hours a day, every day of the year, including holidays. Through use of remote cameras and/or direct inspection, the security staff monitors the lobby/atrium, retail areas, freight elevators and loading docks/sub-cellar, and access to the Building outside of normal business hours.

## EQUIPMENT REMOVAL

Building security personnel are instructed not to allow anyone to remove equipment, furniture, computers, etc., from the Building without prior authorization from Tenant. Such authorization shall be set forth on Tenant's letterhead listing the property to be removed, the person permitted to remove such property and signed by the authorized tenant representative as indicated on the Tenant Authorization Form (attached).

## BATHROOMS

Tenant contractors shall at all times access the Demised Premises through the loading dock and freight cars only. Contractors shall only use the restroom facilities located in the Demised Premises.

# BASIC RULES

- Please do not block the halls, elevators or other public spaces or use them for any purpose other than traveling to and from your space. This rule includes storage of freight, merchandise, displays or showcases in any common area used by people outside your company. An exception can be made for infrequent receptions or other gatherings which may involve use of public space with prior approval by Building Management.

- Please do not alter the exterior appearance of the Building by installing signs, advertisements, notices or other graphics on exterior walls, or interior surfaces visible from the outside, without prior permission or as provided in Tenant's Lease. Similarly, electrical fixtures hung in offices or other spaces along the perimeter of the Building which affect its exterior appearance must be fluorescent, of a color and type previously approved by Building Management.

- Interior signs on doors and any directory tablet shall be of a size, color and style previously approved by Building Management not to be unreasonably withheld or delayed.

- Please to not use plumbing fixtures for anything other than their intended purpose. Depositing sweepings, rubbish, rags, acids or other substances (particularly coffee grinds) in sinks, and tampons or sanitary napkins in toilets, can result in mechanical damage and repair charges to Tenant.

- Please do not disturb others. This rule prohibits any noise audible from the hallway, adjoining office suites or other floors whether created by musical instruments, radios, television sets, group activities or any other source.

- Key Trak is a key access system maintained by Building Security for "Emergency Only" situations, (i.e.: tenant lockouts), and in the event of a fire or leak in your Demised Premises. It is strongly recommended that you deliver a copy of your key to the Director of Security. He in turn will maintain it in the Key Trak System in the event of an emergency.

Building rules are subject to change at the discretion of Landlord subject to provisions of Tenant's Lease. (Prices are also subject to Change)

NOTE: If for any reason NYFD responds to an actual emergency in your space, they will use whatever means necessary to gain access to your Demised Premises. Damage caused by these officials is then your responsibility. Help us to save time and save your valuables by maintaining your key with security and the Key Trak System.

Canvassing, soliciting and the peddling of products or services is prohibited in the Building.

# SECTION II

# The Trump Building at 40 Wall Street

**40 WALL STREET**
**NEW YORK, N.Y. 10005**
**(212) 344-2213**
**FAX: (212) 482-6875**

THE FOLLOWING CONSTITUTES BUILDING REGULATIONS FOR THE TENANT, GENERAL CONTRACTOR, SUB-CONTRACTORS & CONSULTANTS:

## *KICK-OFF MEETING*

The purpose of the Kick-Off Meeting will be to introduce the parties as follows:

| Owner Representatives: | Tenant Representatives: |
|---|---|
| Property Manager | Principal(s) |
| Building Architect | Tenant Architect |
| Chief Engineer | Tenant Contractor or Construction Manager |

At the Kick-Off Meeting, the parties will review the Tenant Work contemplated as laid out in the Design Drawings. We will discuss any Lease questions with respect to the Work and designate future Job Progress Meetings.

Additionally, we will review the following:

## *Drawing Submittals:*

Tenant's Architect shall submit one (1) set of drawings for review to the attention of the following Owner Representatives:

| | |
|---|---|
| **James Mullen** | **Steve Lafiosca** |
| Chief Engineer | Vice President of Property Management |
| 40 Wall Street, LLC | 40 Wall Street, LLC |
| The Trump Building | The Trump Building |
| 40 Wall Street, BB | 40 Wall Street, 2M |
| New York, NY 10005 | New York, NY 10005 |
| Ph#: 212-715-7238 | Ph#: 212-715-7203 |

Architectural & MEP Drawings shall additionally be sent to the Owner's Architect & Engineer for review:

**Goldstein, Hill & West Architects**
c/o Stephen Hill
11 Broadway — Suite 1700
New York, New York 10004
P: 212-213-8007

*Email: lshill@ghwarchitects.com*

**Tom Veltre P.E.,**
c/o Thomas Veltre
1180 Broadway, 5th Floor
New York, New York 10001
P: 212- 947-2100
F: 212- 947-4909
*Email: tveltre@tomvpe.com*


**WSP — Cantor Seinuk (Structural Engineers)**
c/o Mr. Silvian Marcus
226 East 45th Street, 3rd Floor
New York, New York 10017-3303
P: 212-687-9888
*Email: silvianmarcus.wspcs.com*


All costs associated with construction review will be billed out to the Tenant plus a 15% Administrative Fee.

All drawings MUST be 100% complete before any review can begin. Partial review of incomplete drawings will not be entertained.

Any project changes following the original submission of plans must be submitted to Building Management (with copies to the Landlord's architect and engineer) by the Tenant's architect and/or engineer and properly identified in a clear manner.


The above rules apply to Tenants hiring their own architect or General Contractor picked from the approved list.

# Requirement Regarding Contractor Approval

## Electrical

Additionally, Star Delta LLC, or such other contractor as Landlord shall designate in writing to replace Star Delta LLC, shall be the only electricians permitted to perform work in the electrical closets and installation of the Fire Alarm wiring and devices.

## Fire Safety System

Tenant shall be required to use Case Acme/ Firecom, (or such other Contractor as Landlord shall designate in writing to replace Case Acme / Firecom) to design Tenant's fire alarm system. Tenant may only use Star Delta Electric to install this system and Tenant shall use Case Acme / Firecom, (or such other Contractor as Landlord shall designate in writing to replace Case Acme / Firecom), to approve and tie the fire alarm system into the Building system. The cost of Case Acme /Firecom shall be billed to the Tenant through the Landlord plus a 15% administrative fee paid by the Tenant.

*ALL FIRE ALARM DEVICES AND TESTING WILL BE PURCHASED DIRECTLY THROUGH THE LANDLORD AND MUST BE OMITTED FROM ANY PROPOSAL FROM THE INSTALLER OF THE DEVICES.*

## _Landlord's Information regarding the filing of permits is as follows:_

## **PLAN WORK APPROVAL / APPLICATION FORM PW-1**

_Type of Ownership_: **Other**
_Last Name_: **Lafiosca**
_First Name_: **Steve**
_Title_: **Vice President of Property Management**
_Business Name / Agency_: **40 Wall Street, LLC**
_Address_: **725 Fifth Avenue, 16th Floor**
_City_: **New York**
_State_: **NY**
_Zip_: **10022**
_Phone_: **(212) 715-7203**
_Name of Signator_: **Steve Lafiosca**
_Relationship to Building Owner_: **Agent for Owner**

_If Corporation, name of second officer:_
_Last Name_: **Calamari**
_First Name_: **Matthew**
_Title_: **Executive Vice President / Chief Operating Officer**
_Address_: **725 Fifth Avenue, 16th Floor**
_City_: **New York**
_State_: **NY**
_Zip_: **10022**
_Phone_: **(212) 715-7270**

## TECHNICAL REPORT:

_Owner:_ **40 Wall Street, LLC**
_Name:_ **Steve Lafiosca**
_Title:_ **Director of Commercial Properties**

The Trump Building at 40 Wall Street is protected by the **NYC Landmarks Preservation Committee**. All applications must be completed and filed by the Tenant.

<u>Contractors are to review the following checklist of items compiled by the Building's code consultant:</u>

- ❑ Copy of work permit for general construction.
- ❑ Copy of work permit for plumbing work.
- ❑ Copy of work permit for mechanical work.
- ❑ Copy of work permit for sprinkler work.
- ❑ Original equipment use permits for commercial air conditioning equipment over three tons.
- ❑ Electrical sign-off by licensed electrician from Bureau of Electrical Control.
- ❑ Fire Department sign-off for completed fire alarm work or an affidavit of self-certification for completed work by the fire alarm installer or the licensed electrician.
- ❑ Department of Buildings sign-off for completed work or an affidavit of self-certification for completed sprinkler modifications by the sprinkler sub-contractor.
- ❑ Sign-off letter from the Department of Buildings indicating that the application folder has been signed-off.
- ❑ Copy of the microfilm after the folder was signed-off with all documents including drawings.

## GENERAL NOTES:

1. All demolition and rubbish removal must be done before 7:30 AM or after 6:00 PM on business days, Mondays through Fridays and between 8 am and 4 pm on Saturdays or at the discretion of the Building Manager. All such demolition and rubbish debris shall be removed through the Pine Street Loading dock. All containers must have rubber wheels. All refuse must be removed daily. All elevators and floors (except the basement and loading dock) must be protected and all walls affected by the demo trail, throughout the Building, must always be protected.

2. When demolition or construction is in progress, every precaution shall be taken to prevent any dust and/or odors from escaping to adjacent Tenant areas or Building corridors.

3. Contractors are to use their own dumpsters. Any dumpsters used which are owned by the building's carting contractor, will result in a charge to the General Contractor. Containers are to be immediately brought back into the Building after being emptied. Do not leave them in the street.

4. If use of the Freight car prevents the Building personnel from removing nightly trash, Tenant has two options: **1.** At 11:00pm, turn the Freight car back to the Building and allow them to use it to remove garbage until 1:00am. OR **2.** Continue your job till it is finished. The Tenant will receive a bill from the Building for the porters' overtime to throw out the garbage.

5. Prior to demolition, all thermostats MUST be removed. Main pneumatic air line located at shaft is to be properly capped and inspected by the engineering department.

6. Prior to demolition, all temporary lighting must be in place.

7. All dead wiring (power & date) must be removed from the space during demolition. All removal of dead wiring must be under Building supervision.

8. All construction debris must be kept inside the Tenant's area until removed from the job site. Stock piling of debris, which constitutes a fire hazard, will not be permitted.

9. No accumulation of water will be allowed on any floors as floor slabs are not waterproofed.

10. Ceiling return grills will be sealed before demolition and construction is started, area must be inspected by either Building Manager or Chief Engineer.

11. Building Management must be notified prior to any cutting, welding, core drilling, sweating or cutting of wood with power tools so that arrangements can be made to secure the Building's Class "E" System and to ensure compliance with the N.Y.C. Fire Department Regulations. Contractor shall have adequate personnel with Welding Certificates, O2-Combo Gas Licenses and maintain fireguard as necessary. All chasing, chopping, use of nail guns or drilling will be done before 8 A.M. or after 6 P.M. on business days and if any work being done shall constitute a violation of any other Tenant's peace and quiet, said work shall be STOPPED IMMEDIATELY on the advice of the Building Manager's office and completed only at the discretion of the Building Manager.

12. All deliveries of construction materials are to be made before 8 A.M. or after 6 P.M. and shall be coordinated with the Building Manager. When construction materials, debris or equipment is delivered or removed from the job site, all Building corridors, elevators and the loading platform shall be cleaned after work from the delivery is complete.

13. At all times during Tenant construction, material and trades people must travel through unoccupied or vacant space to limit construction activity in the Building common area. There is absolutely NO LOITERING in the common area hallways, lobbies, fire stairwells, and/or Tenant spaces. *Contractors are not permitted to use any passenger elevator cars and shall ONLY use the Building freight service car for ingress and egress to the job site.* Any costs, including the assignment of personnel resulting from the violation of these guidelines shall be borne in total by the Tenant.

14. No contractor or subcontractor will be allowed to enter the Building until a clearance is obtained from the Building Manager.

15. Any trade requiring access to electrical or telephone closets must notify the Chief Engineer of the building to arrange for access . The base building electrician is the only contractor allowed in the electrical closets.

16. All public areas such as elevator lobbies, corridors, toilets and freight cars shall be protected to the reasonable satisfaction of management. Equipment and other property belonging to the Building shall also receive protection, and refurbishing if damaged in the course of construction, to the satisfaction of the Building manager. All precautions to protect base Building floors/walls/ elevators/glass etc., must be presented to and approved by Building Management.

17. All activities after 4:30 pm must be reported to building management.

18. Do not block egress to fire exits or use the fire staircase for any purpose. Do not ever use the electric & telephone closets or the fire stairwells for storage. The elevator corridor must be clear at all times.

19. No trade vehicles are permitted to park in the sub cellar loading dock at any time other than for deliveries and pick-ups. No vehicle is permitted to use the loading dock unless the vehicle has commercial license plates. The security people are there to control the loading dock for management, whoever wants to park there must listen to the security guards.

20. Materials, tools and equipment shall not be placed on window sills or convector covers.

21. Work people will be assigned to one toilet area for which the general contractor will be responsible for damage, cleaning, maintaining and supplying. The general contractor will walk the toilets with a Building Engineer and a punch list before and after construction.

22. No unused ductwork, conduit, piping, BX, troughs, telephone and computer wiring may be abandoned in sheetrock or hung ceilings, but must be removed from same. All splice boxes and troughs must be properly closed after the contractor is finished with the job.

23. Tenant must provide access panels in ceilings and walls, as required, for Building engineers to gain access to base Building and Tenant systems

24. Electrical, Plumbing and HVAC contractors are to contact the Chief Engineer, before starting any work to receive the landlord's requirements for installation.

25. No one is permitted to cut into the Building floor slab at all, without permission from Management. Before cutting the slab, drawings approved by Buildings engineer must be submitted. Any old slab penetrations that are not reused MUST be sealed with cement ONLY.

26. The General Contractor will deliver Certificates of Insurance from themselves and each individual Sub-contractor to the Management Office before the work begins. OSHA policies/procedures must be followed. **The Landlord, Managing Agent, Tenant and the General Contractor will be named on the Certificates of Insurance per a sample provided by the management office. Certificate holder will include the Tenant's name and floor while the additional insured will include the name, address and phone number of the General Contractor.**

27. There is absolutely no smoking in the building as per NYC Law.

28. The Building owners, its employees and/or its agents will be inspecting the construction site to ensure quality workmanship and installation.

29. Proper permits must be presented to Building Management before any gas tank (propane, acetylene, etc.) can be brought into the building. All such tanks are to be properly security while on the premises as per OSHA guidelines. A proper fire watch with a NYC f93 certificate will be maintained while equipment is being used.

30. All Contractors, delivery men, and others moving equipment, tools, etc. are expected to give the "right of way" to Tenants as they move throughout the building.

31. Contractor is not to block any exits, elevator doors, stairwell, etc. or impede the flow of people through emergency exits.

32. The sub-cellar is not to be used as a place of business by contractors (filling out forms) or a "drop off" and "pick up" point for any messengers or delivery man. Our staff is not authorized to accept any packages for Tenants or contractors.

33. Anything damaged by the contractor in the Building should be reported to Building Management immediately so that proper repairs can be made and supervised.

34. Contractors are to open all gang boxes for inspection before removing from Building.

35. **THIS IS A UNION AFFILIATED BUILDING.** All Personnel must be associated with their trades union. Labor harmony MUST be maintained or the job will be shut down by Landlord until the problem is resolved.

36. General Contractor must keep staircases clean from dust and dirt. If the staircases are damaged during construction, the general contractor must repaint and restore the staircases.

37. Site must be kept clean from debris and garbage to avoid potential fire hazards.

## Specific to the Retail Tenants:

If your space has a door accessible from the street, the following applies:
- A security guard must be posted at all open doors during construction on a 24 hour basis to prevent strangers from entering. After each work day is through, the doors should be secured.
- Any damage to the exterior of the Building or the Atrium (including but not limited to the façade, pavers, marble, glass, or trees) is the complete responsibility of the Tenant.

## TENANT & GENERAL CONTRACTOR

## DEVIATIONS:

a. If the Tenant directs the Contractor to deviate from drawings and specifications already submitted to Landlord, it shall be the responsibility of the contractor to notify the Engineer, Architect and Landlord that a discrepancy exists, identify the specific changes requested and await instruction on how to proceed.

b. Where the Contractor intends to use any materials other than that specified or shown on the approved plans and specifications, approval for such deviation must be obtained in writing.

c. Where discrepancies arise between the details and quantities shown and the recommendations of an approved manufacturer, it shall be the responsibility of the contractor to notify the Engineer, Architect and Landlord that a discrepancy exists, and await instruction on how to proceed.

d. If the Contractor deviates from the approved methods and materials as detailed by the Architect, Engineer or Manufacturer, the Contractor will be responsible for the entire removal and the proper installation of the subject deviated areas. The Contractor will also be held accountable for any other damages that may have occurred through his deviations practices.

1. All lock sets throughout the space are to be Building standard in manufacture and design and are to be keyed to Building standard. Card access security systems must have a key override, keyed to the Building standard. All hardware must accommodate schlage base bullion key system, ABSOLUTELY NO EXCEPTIONS. A locksmith designated by the Building Manager MUST be used. Please contact the Management Office for details. All Tenants having double wood or double flush metal entrance doors in public corridors must have astragals.

## BUILDING CORE DOOR HARDWARE:

Schlage D Series Grade 1 Locksets
F Keyway – Interchangeable Core
Athens Lever Design
Satin Chrome or Bright Brass Finish (Depending on the floor)
Schematic Sheet available upon Request

2. The Building's standard window blinds which are removed and not used, are to be turned over to the Building. All window blinds must be approved by the Building manager before installation.

**40 Wall Street standard (required) window blind:**
> Levolor Finish - 112 Alabaster.

**40 Wall Street standard (required) window Sunscreen:**
> Contact the Management Office.

*Please note that no screws are to be applied in the Building window mullions.*

3. The Building standard BATHROOM "Upgrade" fixtures are as follows:

**LIGHT FIXTURES:** Contact the Management Office.

**SINK FAUCET:** Sloan Model# EBF-85-4.

**COMODE FLUSHOMETER:** Sloan Model# g2-81-11  1.6 Gallon.

**URINAL FLUSHOMETER:** Sloan Model# g2-8186-1  1 Gallon Urinal.

**SOAP DISPENSERS:** Bobrick Model# B-822 Soap Dispenser.

4. Where new walls terminate at the window mullions, they are to be installed to accommodate the existing Venetian blinds and blind holders. It is the contractor's responsibility, on any Venetian blinds removed during construction, to replace them in their original position and have them cleaned.

5. In the case of a full floor demolition, all passenger elevators will be placed on secured access (preventing people from stopping on the demo floor) Ingress and egress will be through the freight elevator ONLY. Full floor construction sites will arrange with the management office to have all passenger elevator call buttons and indicators removed by the Building's Elevator Company at the expense of the Tenant. All passenger elevator doorways will be sealed to prevent dust from getting into the shaft.

6. Any costs, including the assignment of personnel, resulting from the violation of any guidelines documented on these pages shall be borne in total by the Tenant.

7. If applicable, Tenant shall be required to pay for the use of the Freight Elevator as well as the use of the operating & security personnel, during non business hours. Arrangements may be made by the General Contractor by calling the Building secretary between 9:00 AM to 4:30 PM, Monday through Friday. We will not accept elevator reservations directly from subcontractors. If a reservation is made but not canceled within 24 hours of the reservation then the Tenant will be charged for a minimum of 4 hours per elevator. If an elevator mechanic is required for stand by, the cost shall be borne entirely by the Tenant.

8. Tenant must arrange to have the Con Edison meters transferred to a Tenant account, prior to the construction/alterations. Tenant shall be responsible to pay for all Con Edison connection charges for its construction.

9. Subject to the provisions of the Tenant's Lease, at the Landlord's discretion, Tenant shall install water meters and pay for the water consumed by any added equipment which uses water. The Building Standard water meter is a 3/4" Hersey 400 Series II - Magnetic Drive Positive Displacement Disc Meter with a remote reader.

10. The Tenant will be responsible for all costs to the Building owner caused by damages and omissions by his contractor.

11. The Tenant (through the contractor) will be responsible to safeguard all Building equipment to prevent unauthorized tampering.

12. Built in furniture must not interfere with the heating convector units along the perimeter of the Building. Building Manager needs to have access to assure proper convection.

13. Except as provided in the Lease, no sign, insignia, advertisement or banners may be displayed on the property, especially from the windows.

14. No showcases or other articles shall be placed by Tenant in the Public Areas.

15. All Tenant space must be separated by a full demising wall. The HVAC and electrical must also be separate. Each Tenant must be individually metered and a direct customer of Consolidated Edison. This includes Tenants and their Sub-Tenants.

16. Roll About "Spot" coolers are **never** allowed in this Building.

17. At the end of each project, "As Built" drawings must be submitted to this office. These drawings must be submitted to us as blueprints and as AutoCAD drawings. The CAD drawings are then entered into the Class "E" System computer by our authorized contractor.

18. Contractor and Tenant MUST be sensitive to the Building rules for security. This may include but not be limited to, Contractor providing a list of names of all workers. Anyone not mentioned on the list will not be allowed up to the space. All workers must show proof of union affiliation and have a valid picture ID with them everyday.

19. All doors on a multi-tenant floor must be made of matching material. Only a letter from the Building management specifically mentioning hallway doors may excuse a Tenant from complying with this rule. If there are no comments as part of the review of plans by Building Architect or other agents or employees of Building pertaining to the doors, this does not excuse the Tenant from installing said doors.

- Please review the general notes above, as there are issues relating to <u>all</u> trades.

## GENERAL CONTRACTOR

1. Before the work begins, the general contractor shall submit the following to the Building Manager's office:

- A complete project list of all contractors and subcontractors.

- The original Building Permits. Copies of all permits must be posted in an appropriate area on the construction site.

- A copy of the construction schedule.

- General Contractor must enroll in the Building Tenant Request website called "Workspeed". This will allow us to document any request made by the contractor. Any cost associated with these requests will be billed the next month to the Tenant.

2. Contractor MUST use fully licensed & insured union personnel <u>ONLY</u> for all trades, pre-approved by the Management Office.

3. Contractor must perform the work as specifically indicated on its approved plans and specifications.

4. Contractor shall thoroughly review the approved plans and specifications, and shall thoroughly acquaint himself with the site and with the field conditions affecting the work. Contractor shall verify all dimensions in the field, and notify the Architect of any discrepancies before starting work.

5. The Contractor shall take his own field measurements and be responsible for the same.

6. Before submitting his bid, the Contractor shall visit the Building to familiarize himself with existing field conditions, access, space limitations, etc. pertinent to proper execution of his work and become aware of the extent of work that may be required above and.beyond that indicated on the drawings. Contractor shall note its findings on its bid for review by Landlord. The Contractor shall verify all dimensions and interpretations of the drawings and demolition notes. Any discrepancy between the approved plans and specifications and actual conditions shall be brought to the Architects attention and confirmed in writing prior to starting the work.

7. The Contractor shall bring to the attention of the Architect any hidden defects which may be discovered during the execution of his work.

8. A mandatory bidder's site visit shall be scheduled for all sub-contractors. Contact the Chief Engineer to coordinate.

9. Contractors Base Bid Proposal should include the following:

- The preparation and filing of all the forms and submissions required by the New York City Department of Buildings, as well as any other municipal or state agencies having jurisdiction in the City of New York. Contractor is responsible for all construction and alteration permits required due to the subject project. The amount of each shall be included in the bid proposal. The Contractor is also responsible for the completion of, and the filing of the forms, required by the municipal and state agencies at the completion of the work.

- All costs and fees required to be paid to the municipal and state agencies for the filing of permits, and/or weekend variances shall be the responsibility of the Contractor.

- All necessary protection of any adjoining roofs, courtyards and work areas shall be the responsibility of the Contractor.

- Contractor to provide a list of all Sub-Trades to be used in the performance of the work.

10. Cleanliness-Dust Damage Prevention:

- Cleanliness and freedom from dust are essential throughout the work. It is of the utmost importance that every measure be taken to prevent dust from being carried into adjacent areas or onto any Tenant's equipment and furnishings. All work shall be executed in a manner that precludes the creation of dust, which may be a nuisance to Building Tenants, neighbors and pedestrians. All E.P.A. and local governing codes must be adhered to. Vacuums must be used during any saw cutting or probe work.

- Contractor must provide temporary enclosures, as required during the course of construction, to protect all work within the Building from damage. Within the Building: close off interior spaces, rooms and/or areas to perform and protect, particular parts of the work and to prevent potential damage.

- Contractor shall be responsible for protection of finished work, at all times, during transportation, storage, installation and until final acceptance.

- All work shall be left neat, clean and in workmanlike condition. Work shall be carefully trimmed. All material to be removed shall be swept, collected and disposed of, legally off of the site by the Contractor.

- The Contractor is to properly protect all areas of the interior and the exterior of the Building from damages, stains and dirt.

- The Contractor and Tenant will be responsible for any damages to the sidewalks, trees, facades, roof and/or terrace areas, as well as interior spaces where such damages are the result of his operations. Splatters on windows, sills, terraces and other areas shall be removed immediately by the Contractor.

- The public corridors will be protected by the laying of thistle Kraft paper and taped down, to the satisfaction of the Building Manager and thereafter, maintained in a clean and safe condition for the duration of construction.

- General Contractor will keep a small piece of carpet at the site entrance to clean dirt from shoes.

- The construction area and hallways will be kept broom clean at all times.

- Contractor is to supply a union laborer to clean stairwells, floors, Building closets and all work areas daily.

- No wet garbage or refuse from food, coffee, etc. is to be left in work spaces.

- All fin tubes are to be thoroughly cleaned by the general contractor on completion of job and inspected by the Building Chief Engineer.

- Where openings on public corridor walls are made, the General Contractor will provide a suitable enclosure to insure against dust carry-over to public corridor.

## 11. Codes, Rules, Permits, Inspections, Fees & Site Safety -

- All materials furnished and all work installed shall comply with the Codes, Rules and Regulations of New York City.

- Contractor shall observe all rules contained herein.

- The Contractor shall be responsible for obtaining all permits, performance of all required tests, the payment of all fees and other costs in connection with this work.

- All Materials and assemblies used in New York City shall have been approved by the New York City Board of Standards and Appeals, or by the Materials and Equipment Acceptance Division of the New York City Department of Buildings, in accordance with sections C23-106.1 and C26-106.2 of sub-article 106.0 of the New York City Building Code.

- The Contractor shall provide immediately and as required, all work protection equipment, such as barriers, scaffolding, required for the protection of his workers, building occupants and general public during the execution of his work. Provide adequate and effective barricades, railings, overhead protection, safety nets, etc., to safeguard the public, occupants, and workmen from falling debris. Provide proper signs and written notification to all personnel and property owners in the immediate and surrounding affected areas, notifying them of duration of construction operations.

- The Contractor shall use equipment in sound operating condition. All procedures shall represent the highest safety considerations for all personnel engaged in the work, as well as building occupants, passersby and the public in general. The Contractor shall observe all OSHA and New York City regulations as well as all other applicable Codes and Ordinances having jurisdiction.

- The Site Safety of the construction shall be the sole responsibility of the Contractor.

- Contractor shall give all necessary notices, obtain all permits, perform all required tests, pay all taxes and fees and other costs in connection with this work.


**12. Precautions Against Fire:**

- Contractor shall take every precaution in the performance of the work to prevent fire. All New York City Fire Department Regulations governing the storage and use of flammable materials will be adhered to. Flammable materials and fire producing equipment shall not be left unattended about the Demised Premises in locations accessible to others. Fire extinguishers and other fire protective equipment shall be provided as required by regulations. Contractor will have personnel on site with current F93 Firewatch Certificate.

- All torch burning operations utilizing oxygen or other combustible gases will be performed in strict accordance with NYFD's current code, specifying Fire Department rules and regulations for issuance of permits and certifications for storage and use of oxygen and combustible gases during temporary and emergency torch burning operations together with the following additional precautionary measures. No oxygen or combustible gas cylinders shall be stored on the Demised Premises. Each oxygen or other combustible work area shall be separated from other areas of the Demised

Premises, and a qualified fire guard shall be maintained on duty to ensure aforementioned separation. "Separated" as used herein, shall mean a temporary barricade to prohibit entrance by unauthorized persons. All compressed gas tanks shall be equipped with a safety cap.

- Full floor build-outs will require the installation of temporary sprinkler loops around the core. Such sprinkler loops shall be maintained and operational until such time as the new sprinkler installation is charged and on-line.

- Both temporary loops and new sprinkler installations shall be witnessed and subjected to a 2-hour hydrostatic test at 200 p.s.i. by the Chief Engineer or a member of his staff.

- Should any open flame, such as welding, brazing, etc., be performed in the course of construction, the Building Chief Engineer and the Fire Safety Director MUST be notified in advance. Smoke alarms will be disarmed and a competent fire watch will be required, at the General Contractor's expense.

- All welders and fire guards shall keep their Fire Department Certificates of Fitness with them at all times and contractors shall supply a sufficient amount of fire extinguishers during torch operations. Any contractor caught in violation of these requirements will be dismissed from the Building immediately.

- Copies of any certificates of compliance required by the City of New York Department of Buildings New York Board of Fire Underwriters, or other authorities having jurisdiction, shall be forwarded to the Building upon completion of work.

- Copies of any affidavits for the proof of flameproof of wood, curtains or other flammable items shall be forwarded to the Building Manager's office.

## 13. Supervision

- The Contractor shall provide the services of an experienced superintendent, who shall be in continual charge of the installation of the work, together with all skilled workmen, helpers, and labor required to perform a complete and top quality job. The foreman must be onsite at least 85% of the day. The use of a laborer to supervise (or keep an eye on the job) is completely unacceptable. The aforementioned foreman must be fluent in speaking, reading and comprehending the English language.

- The Contractor shall evidence that its Superintendent is certified with OSHA's Code of Federal Regulations 29 Part 1926 Rev. 7/1/02.

**14. Required After The Job Is Complete**

- A copy of the plans, stamped and approved by the New York City Department of Buildings, shall be on the Demised Premises at all times, available for inspectors.

- Upon completion of the alterations, final inspection by the New York Department of Buildings shall be requested immediately and a copy of the dismissal notice forwarded to the Building Manager's office.

- A complete set of sepia "As Built" drawings with equipment use permits and Building department sign offs.

- A complete set of pdf and CAD drawings on disc.

- A complete set of approved air balancing reports including changes in ductwork and diffuser location.

- Contractor is to notify Chief Engineer 48 hours prior to performing HVAC air balancing. All air balancing must be witnessed by a representative of 40 Wall Street Engineering. The 40 Wall Street approved air balancer is GSM (listed under the approved contractors list).

**40 Wall Street Management will not be responsible for the comfort of the Tenants until the approved balancing reports have been submitted and studied.**

- Copies of sprinkler hydraulic calculations as prepared by the sprinkler sub contractor.

- Copies of equipment cuts and originals of operation manuals for all equipment installed on the project.

- A completed final list of all the subcontractors with their addresses and all the items for which they are responsible.

- The contractor's final affidavit along with the final waivers from all sub-contractors, suppliers, manufacturers and material people.

- Certification by the Architect that items on the final punch list have been satisfactorily completed.

  * Please review the general notes above, as there are issues relating to all trades.

## ELECTRICIAN

1. All electrical wiring and installation will be standard for the Building. Any new installation of transformers must be approved by the Building. Transformers which are approved must have the proper ventilation (i.e. HVAC ductwork supplied to the closet).

   - **IT IS STRICTLY FORBIDDEN TO CONNECT ANYTHING (I.E. DISCONNECT SWITCHES OR THE LIKE) TO A LIVE ELECTRICAL BUS RISER IN THIS BUILDING. A COMPLETE ELECTRICAL SHUTDOWN WILL BE SCHEDULED THROUGH THE CHIEF ENGINEER'S OFFICE.**

2. BX cable may be used in the Building _EXCEPT_ in common corridors, the electric closet or when running penetrations through and under the slab. In the closet everything must be in conduit.

3. Any alteration to the CLASS "E" System (no matter how small) MUST be installed by the Base Building Electrician to ensure the integrity of the Class E System. This work must be filed and inspected by the New York City Fire Department. Connections to the CLASS "E" System are at the sole cost of the Tenant and can only be arranged through **the Building Management Office**. Any company found making a connection to the Building system will be banned from the Building and the Tenant will pay to have the work performed properly.

4. The Building's standard electrical fixtures, which are removed and not reused, are to be turned over to the Building.

5. The electrical contractor is responsible to file for proper City certificate numbers for meter pans, and then the contractor can make arrangements with Con Edison to have electrical meters installed.

6. Any new service or alteration to existing electrical panels, ( switches , sub-panels or disconnects) will be performed by the base Building Electrical contractor.

7. The electrical contractor is completely responsible to ensure that all electrical panels have their index cards filled in, indicating circuitry. This includes existing as well as newly installed breakers.

8. Contact the Chief Engineer after completion of the job to inspect the electrical closet for proper identification of circuits, meters, reinstallation of panel covers and overall electrical installation.

9. Two copies of an as-built marked up drawing, showing conduit runs and circuitry must be given to the Building Manager at the completion of the job. This must be submitted in CAD, pdf and hard copy form.

10. All slab core bore's or chopping (trenching) must be approved by Building management. Do Not think about touching the slab without discussing it with Management. **Trenching at 40 Wall Street is NOT allowed until reviewed by the Building engineer.**

11. Any poke thru or penetrations through the slab for either electrical, data or communication services must be in continuous conduit from point A to point B. (BX is not allowed.)

12. Any poke thru or penetrations through the slab for either electrical, data or communication services must be fire stopped.

13. Contractor must perform an emergency lighting demonstration in the presence of the Chief Engineer.

14. All existing and additional emergency lighting, except Exit signs, must be removed from the base Building generator (if applicable) and attached to a battery back up.

15. All electrical/telephone/computer wiring (et al) must be braced (or hung) from the ceiling slab and NOT supported by sprinkler lines, hung ceiling or some other creative device that the contractor deems appropriate.

16. No unused ductwork, conduit, piping, BX, troughs, telephone and computer wiring may be abandoned in sheetrock or hung ceilings, but must be removed from same. All splice boxes and troughs must be properly closed after the contractor is finished with the job.

17. Electrical outlets may not be installed on the removable portion of the peripheral convector (heat) covers.

18. Power poles running from the ceiling are NOT allowed.

19. Installation of security cable MUST be performed by a company holding the proper licensing by the City of New York.

20. Installation (hanging) of Televisions must be performed by a Local 3 Electrician.

21. The Building standard BATHROOM "Upgrade" fixture is as follows:

**LIGHT FIXTURES:** Contact the Management Office.

* Please review the general notes above, as there are issues relating to <u>all</u> trades.

## TELECOMMUNICATIONS – DATA & SECURITY WIRES

1. Wire / cabling Installation may only be performed by the following unions:
   - ➤ Low & High Voltage Wiring / Cabling: Local #3
   - ➤ Low Voltage Wiring: CWA NYC Local's

2. CWA Local Workers may only run data wiring/cabling. They may not run any security wiring/cabling.Local #3 also claims the hanging of televisions including the bracket in the wall.

3. Any poke thru or penetrations through the slab for either electrical, data or communication services must be in continuous conduit from point A to point B. (BX is not allowed.)

4. Any poke thru or penetrations through the slab for either electrical, data or communication services must be fire stopped.

\* Please review the general notes above, as there are issues relating to <u>all</u> trades.


## CARPENTERS – SHEET ROCK & CEILING

1. No hanging ceiling shall have its cross members beaming on any masonry wall for support.

2. All Tenant space must be separated by a full demising wall; this includes walls separating Tenant and subtenant.

3. Tenant must provide access panels in ceilings and walls, as required, for Building engineers to gain access to base Building and Tenant systems.

4. In constructing dry wall partitions, metal studs (never lighter than 20 gauge) will be used exclusively and will be anchored to floors and to the slab above. Window mullions, convector enclosures and ductwork will not be drilled into, to support studs under any circumstances. The shooting of anchor nails will be done before 8 A.M. or after 6 P.M. or at the discretion of the Building Manager.

5. All alterations around the convector covers must allow a clearance of 6 inches from the edge of the convector cover to a wall or partition directly parallel to the cover.

6. All wood must be fireproof and meet the requirements of the New York City Building Code. A copy of the fireproof certificates must be submitted to the landlord for their records. Use of a fireproof paint to satisfy the law is completely unacceptable to management.

7. Elevator button & indicator plates may not be recessed into the elevator hallway walls. The elevator contractor must have access to the side screws. Both MUST be surface mounted. This includes the installation of the "You Are Here" signs.

   * Please review the general notes above, as there are issues relating to all trades.


## PLUMBERS & STEAM FITTERS

1. All private bathrooms shall have a membrane waterproofing installed on the slab of the entire room, and run up all partitions 4 inches.

2. All private bathrooms, pantries and kitchens (any room with a sink) must have a floor drain.

3. All water tap offs connected to the main water supply riser must have a HERSEY # MRR4956 water meter with a remote. The line from the meter to the remote must be plenum rated.

4. Hot water pressure relief valves must be piped to a drain.

5. A cold water supply valve should be piped to the relief trap drain to prevent a loss of the water seal. The reason for this is to maintain a water seal which prevents odors from entering the Tenant space.

6. All domestic taps must be installed in a manifold type fashion to provide future taps for supply and return. Taps must be piped in such a way as to allow individual branches to be valved off without affecting other branches.

7. All Sprinkler Shut downs must be scheduled through Workspeed or directly with the management office. There will be a cost relating to this work.

8. All penetrations MUST be fire stopped.

9. See page 20 for the Building standard BATHROOM fixture specifications.

   * Please review the general notes above, as there are issues relating to all trades.

## PAINTERS

1. Convector covers must be removed before they are painted and should not be painted in place. See "General Contractor" section for hot water radiation fin clean up.

2. Any products used by the painters that cause an odor, penetrate another Tenant's space or create discomfort to another Tenant must be used after 6:00 PM. The general contractor must arrange to have the ventilation to that floor shut down during this period.

\* Please review the general notes above, as there are issues relating to <u>all</u> trades.

## HEATING VENTILATION & AIR CONDITIONING

1. Prior to demolition, all thermostats MUST be removed. The main pneumatic air line located at the shaft is to be properly capped and inspected by the engineering department.

2. There will be no changes to an existing air conditioning unit (Upgrade or downgrade in size) without the written approval of the management office.

3. No one has the authority to change or create a variation from the originally submitted and Building management approved drawings without the prior consent of the Building manager.

4. Access doors in ceilings must be provided at all volume control dampers, fire dampers and electrical home run boxes. Size and location of access doors must be reasonably approved by Building Management and consistent with applicable law.

5. There shall be no black iron partitions or lighting fixtures interfering with access doors. These doors shall have free and easy access so maintenance can be performed internally without damaging acoustic hung or drywall ceilings.

6. Tenant is responsible for installing combination fire smoke supply and return isolation dampers at the main shaft on the floor. All control work for the fire dampers must be connected to the base building BMS control system.

7. All VAV boxes MUST be ANEMOSTAT Boxes with Johnson Controls Digital Controls and Thermostat.

8. All VAV's are to have an inlet temperature sensor for warm up mode and programmed for warm up operation. All VAV control wiring must be daisy chained and terminated in the base building mechanical room. The location of the wiring will be determined by the Chief Engineer.

- Universal Temperature Controls is the preferred 40 Wall Street Control Vendor
  Contact: John La Plante,    Office: (631) 471-9180

9. The air balancer must be accompanied by the Building Chief Engineer. Arrangements must be made 48 hours in advance.

- GSM is the preferred 40 Wall Street air balancer GSM (Gentlemen's Sheet metal)
  Contact: Dennis Appel.   Office: (718) 486-6765    Cell: (646) 879-5085

10. All Tenant space must be separated by a full demising wall. The HVAC and electrical must also be separate. Each Tenant must be individually metered and a direct customer of Con Edison. This includes Tenants and their SUB-Tenants.

11. All medium pressured ductwork must be internally insulated.

12. **This is a Landmark Building. Any HVAC work which changes the façade of the building by adding or removing a Louver MUST be done so with the approval of the Management Office and Landmarks. All documentation can be found in the Management Office.**

- Please review the general notes above, as there are issues relating to <u>all</u> trades.


## MASONRY

1. All masonry partitions shall have as a first course; cinder block, floor tile to be removed before setting block.

2. All masonry walls shall be pinned to underside of concrete to a 3/4 inch depth.

* Please review the general notes above, as there are issues relating to <u>all</u> trades.

## STRUCTURAL

1. Floor loading and all structural modification and work shall be subject to the reasonable approval of the landlord's structural engineer, at the Tenant's cost.

2. Equipment shall not be suspended from structural steel or the slab of the floor above without the reasonable approval of the landlord's structural engineer, at the Tenant's cost.

3. Any bolted or welded connection to the Building steel must be reasonably approved by the landlord's structural engineer, at the Tenant's cost.

4. Initial submission of shop drawings will indicate all field dimensions and will indicate the location with respect to existing conditions that may require deviation from structural engineers design.

* Please review the general notes above, as there are issues relating to all trades.

## FIRE SAFETY / CLASS "E" SYSTEM CONNECTION

1. No one other then Landlord's contractor may make connections to the Building Class "E" System.

2. Additionally, if the Class "E" System or devices for the construction floor are not operational, or rendered inoperable by the work being performed, Contractor shall maintain at all times a fire watch until such time as Class "E" devices are restored and on-line.

3. All fire alarm devices and testing are purchased through the Management Office, they are NOT purchased through any electrician or general contractor. Please arrange this early so there are not any last minute delays.

* Please review the general notes above, as there are issues relating to all trades.

# ACCIDENT PREVENTION:

*Safety Organizational Chart*

    a. A project Safety Superintendent, NYC Licensed Site Safety Manager shall be hired by the Contractor.
    b. Trade and Subcontractor Safety Superintendent- A Foreman from each Subcontractor.
    c. Employees- All actively participate in accident prevention.

*Responsibility*

    a. Schedule and conduct safety pre-planning with all Subcontractors prior to their start of work.
    b. To enforce compliance by all parties with principles of the Project Safety, Fire, HazComm & Drug Programs.
    c. Assist all Subcontractors in pre-planning their operations to prevent personal injury or property damage to employees, other Contractor's employees, or the public.
    d. Chair the safety meetings.
    e. Issue safety bulletins for the project.
    f. Review and consider recommendations of all Toolbox Meeting minutes, including Subcontractors.
    g. Conduct periodic safety tours of their own to assure compliance.
    h. Investigate accidents and direct the abatement of hazardous conditions.
    i. Make at least a weekly formal safety tour, with written report to Safety Director and Landlord Representative.
    j. Daily check the safety of the Project.
    k. Gather facts on accidents and thefts. Take the lead in recognition and abatement of hazardous situations.
    l. Periodically attend Trade and Subcontractor toolbox meetings.
    m. Distribute and post all safety meeting minutes, safety bulletins and accident data.
    n. Prepare minutes of project safety meetings.

*Basic Principles*

Contractor shall plan all work to eliminate personal injury and damages to employees or the public. All work must comply with all local, state, and federal rules and regulations.

All subcontractors whose contract on this Project is in excess of $20,000 must submit their company's Project Safety Program to the Project Safety Superintendent prior to the start of their work.

This Program must list the positive steps the subcontractor intends to utilize for the prevention of accidents to their employees, other Subcontractors and the public during their operation on the Project.

Contractor shall ensure their employees (and any subcontractor's employees) possess all the protective equipment and tools and enforce their use as required by this Safety Program, Federal, State, and Local Codes and Regulations.

Contractor shall ensure a scheduled maintenance program for all tools and equipment.

Each subcontractor, regardless of tier, is to submit in writing to the Site Safety Super Toolbox Meeting Minutes containing the following:

- Name of subcontractor and date.
- Name of subcontractor safety superintendent. Name of employees attending.
- Name of employees on site not attending
- Number of employees on their payroll that day.
- Subjects discussed.
- Safety observations of employees.
- First aid, as required by federal, state and local regulations.
- Each job shanty shall be equipped with at least one ABC 20# fire extinguisher in good working order with prominent signage leading to location, and OSHA manual. Shanties with phones shall have posted telephone numbers of the following: a list of doctors, hospitals, ambulance service, fire department and police department.
- If gang boxes are used in lieu of shanty, the gang box shall contain OSHA approved first aid kit and OSHA manual.
- Each subcontractor shall enforce the wearing of ANSI 289.1 approved hard hats during the total construction of this Project and shall remove from the project anyone from their forces not complying with this requirement.
- All personnel shall wear shirts with sleeves, long trousers and proper shoes at all times. No shorts, tennis shoes of any kind will be permitted.
- There are many safety factors involved with the portable aluminum and other lightweight metal ladders. Ladders of this type must not be used on projects.
- Each subcontractor is responsible for their subcontractors and suppliers regardless of tier.
- Any person not directly involved with the on-site construction of this Project must not enter the site without first going to the Site Safety Supervisor's office, signing a visitor's release and obtaining a hard hat which is to be returned to the site Safety Superintendent.
- All fire extinguishers must be a minimum of 20# ABC all purpose. Use of carbon tetrachloride extinguishers is prohibited.
- All cable handrails must be looped connections with two cable clamps on each side of connections (max. cable deflection 3").
- All 120-volt single phase 15 & 20-ampere receptacles shall have approved GFCI's.
- Cylinders shall be secured in an upright position at all times. Oxygen and acetylene cylinders not in use must be separated by 20' or two-hour fire rated wall.
- No ladder jack-type work platforms are permitted without prior approval of the Site Safety Superintendent.

*Sub-Contractor Injury Reporting Requirements*

If an employee is injured:
- Each Contractor shall make provisions for immediate and proper first aid and/or doctor treatment for every work injury.
- The Site Safety Superintendent is to be notified immediately of any injury.
- One copy of all Workmen's Compensation Accident Reports involving Contractor's employees shall be promptly forwarded to the Landlord.
- Contractors will be individually responsible to notify Federal, State and Local authorities in the event of an accident. Each and/or multiply injuries (four or more) within 8-hours of the time of the accident.
- Total man-hours worked number of accidents and lost time due to accidents on this project must be submitted to the Site Safety Superintendent on a monthly basis with a copy to the Landlord.

*Fall Protection*

- Any employee exposed to a fall hazard of 6-feet or more shall be protected by active or passive fall protection in compliance with OSHA – 100% fall protection is to be practiced at all times.
- Personal fall arrest equipment will consist of a full body harness.
- Lanyards will be equipped with double locking snap hooks.
- Static lines and lifelines shall be constructed to meet minimum load requirements and inspected daily.
- All subcontractors will be responsible to meet OSHA standards for fabrication and erection of lifelines and anchor points for attachment of personal fall arrest equipment.
- When normally enclosed live parts are exposed for inspection or servicing, the working space, if in a passageway or general open space shall be guarded. At all other times, exposed live parts must be adequately covered.
- All work done on or in close proximity to energized parts will be performed in strict compliance with OSHA, NEC and NFPA 70 requirements.
- Temporary electric must comply with all applicable codes, rules and regulations.
- All temporary lighting shall be run with sheathes multi-conductor wire. No single strand wiring allowed. Temporary lighting must never be on the same circuits as temporary receptacles.
- All 120-volt single phase 15 & 20-ampere receptacles shall have approved GFCI's.
- Extension cord sets used with portable electric tools and appliances shall be three-wire type and shall be designed for hard or extra hard usage.
- Flexible cords shall be used only in continuous lengths without splice or tap.
- Worn or frayed electric cords or cables shall not be used. Damaged cords will be removed from service immediately.
- Controls that are to be deactivated during the course of work on energized or de-energized equipment or circuits shall be tagged or locked out as required by OSHA.

- Portable electric generators or welding machines used for temporary power shall be equipped with GFCI protection. If protection is not supplies as part of the equipment, portable GFCI decides will be used.
- Where permanent building power is being used for temporary power of tools and equipment, portable FGCI devices will be used for circuit protection. Building power circuits with existing FGCI protection will be checked and verified for proper function prior to use.
- Energized panels must be kept covered with permanent cover or temporary with non-penetrable material such as plywood. Drywall or cardboard covers are prohibited.

*Scaffolding*
- All scaffolding will meet the latest OSHA requirements.
- Employees will not be permitted to work from unsafe or incomplete scaffolding.
- Scaffold shall be erected, moved, dismantled only under the supervision of competent persons.
- Guard rails and toe boards shall be installed on all open sides and ends of platforms more than 6 feet above the ground or floor.
- Where persons are required to work or pass under the scaffold, scaffolds shall be provided with a screen between the toe board and guardrail.
- Access ladder or equivalent safe access shall be provided.
- All working platforms shall be fully planked using scaffold grade lumber or patented planking.
- Scaffolds shall be properly braced by cross bracing or diagonal braces, or both, for securing vertical members together laterally. The cross bracing shall be of such length as will automatically square and align vertical members so that the erected scaffold is always plumb, square and rigid. All brace connections shall be made secure.
- Scaffold legs shall be set on adjustable bases or plain bases placed on mudsills or other foundations adequate to support the maximum rated load.
- To prevent movement, the scaffold shall be secured to the building or structure at intervals required by OSHA.
- Manually propelled mobile scaffold shall no exceed four times the minimum base dimension.
- Employees shall not ride on manually propelled scaffolds while being moved.
- Manually propelled mobile scaffolds shall be equipped with guardrails and toe boards where platform height reaches 6 feet or more above the ground or floor.

## *ADDITIONAL INFORMATION*

## APPLICATION FOR PAYMENTS
## (In the case of Landlord Contribution or Tenant Allowance)

- Any Application for Payment must be submitted to the Property Manager on an AIA Form G701 & G702, signed by the Tenant's Architect. Such Application for Payment shall be verified by the Building Architect. Application for Payments must be submitted with the following:

  O Copy of the check (front and back) paid to the Contractor.

  O Conditional Lien Waivers from Contractor and all Sub-Contractors, indicating the amount each has been paid to date.

- Where there is a "Landlord's Share of Work Cost" the Landlord reserves the right to limit the amount it reimburses to the Tenant by the amount the Tenant has paid the Contractor, i.e. If the Tenant has paid the Contractor 50% of the Contract sum, the Landlord would subsequently reimburse the Tenant 50% of the Landlord's Share of Work Cost. The Landlord further reserves the right to retain 10% as its assurance of full satisfactory performance of the Contract and to deduct from its payment to the Tenant any Building Service Fees that may be due.

## ARCHITECTURAL SPECIFICATIONS

- A copy of the Architectural Specifications must be made available upon request.

## PROJECT CLOSE-OUT

- The Project shall be completed upon receipt of the following:

  o Final sign-off of all permitted work.
  o Perforated set of drawings (Building Number Application Number shall be stamped on all drawings).
  o As-Builts and Mechanical Shop Drawings. (Hard copies and on CAD Disc)
  o Copies of Technical Reports
  o Copies of any Warranty Information.
  o Air balancing reports.
  o Class "E" Fire Alarm sign-off.
  o Copies of all ASI's (Architects Supplemental Information).
  o Punch List Sign-Off (provided by the Architect, Signed by the Tenant).
  o Final "Non-Conditional" Lien Waivers by Contractor and all Sub-Contractors.

- **Final Payment**
  - Final Payment of Landlord's Share of Work Cost and any retainage held shall be made to the Tenant following receipt of the above.

## ELEVATOR INFORMATION

All construction workers and delivery people must enter and exit the Building through the Pine Street Loading Dock. From there they take a freight car to the floor 2M and pick up a 2nd freight car depending on which floor they are working.

Elevator cab measurements are available upon request.

### NORMAL ELEVATOR HOURS: 9:00am to 5:00pm  Monday – Friday.

All "non-Construction" and "non-Furniture" deliveries can come to the Building during normal elevator hours as long as they are not utilizing the loading dock and elevator for more then 45 minutes. If you need to exceed the 45 minutes, the rules listed below will apply.

1. Materials, supplies, etc., may only be hoisted on top of the elevators or through the hatchway upon a scheduled appointment with the building elevator mechanic - Schindler. This is called a "hatch opening" and the additional cost for this will be charged to the Tenant.

2. Construction/Demolition deliveries **are not** considered average, and neither are moves into or out of the Building.

3a. All construction/demolition and furniture deliveries must begin at 6:00 a.m. or earlier to assure they will be completed by 8:00 a.m. deliveries that exceed the 8:00 a.m. time frame will be asked to redeliver the next day.

3b. The deliveries mentioned above (construction/demolition/furniture, moves into or out of the Building) also require Building personnel to manually operate the hydraulic car because of the damage these types of moves can cause to the elevator. This is the reason for a double freight charge.

4. Contact the management office for any questions about deliveries.

5. The "Single Load" capacity (placing a skid of bricks on the elevator at one time) vs. Rated capacity (Placing bricks on the elevator, one at a time) must be considered before delivering anything to this Building.

If a reservation is made but not canceled within 24 hours of the reservation then the Tenant will be charged for a minimum of 4 hours per elevator. If an Elevator Mechanic is required for standby or a hatch opening, the cost shall be borne entirely by the Tenant.

ooooooooooooooooooooooooooooooooooooooooooooooooooooooooooo

- Any costs, including the assignment of personnel, resulting from the violation of any guidelines documented on these pages shall be borne in total by the Tenant.

- The Occupational Safety and Health Act (OSHA) will be adhered to so that all jobs will be free from hazards.

- Nothing contained in these regulations is to be construed as all inclusive.

# *What is expected of Construction Workers at 40 Wall Street*

-NO Smoking in this Building

-You may NOT Use the Passenger Elevators. Use ONLY the Freight Car

- Keep music at a low volume

- Anything creating a loud noise or a strong odor must be performed on overtime.

- Please keep the bathrooms clean after you use them.   (Especially floors SHARED with other Tenants.)

**Exhibit J**
**Duane Reade Waiver as to Tenant's Permitted Use**
*Copy of Waiver to Be Attached*

Meat Department featuring prime cuts / organic / charcuterie
Produce Department including packaged cut fruits and vegetables
Prepared foods
Fresh soups (hot and cold)
Salads (service and pre-packed)
Sandwiches (service and pre-packed)
Sushi
Mezza Bar (self-service Mediterranean foods)
Hot foods
BBQ Chickens
Bakery Department
Service coffee
Service cheese
Café
Gourmet candy (sweets and snacks)
Floral
Seafood Department
Small Dairy Department
Small Frozen Food Department
Upscale grocery offering (no household other than high-end housewares, no paper, no pet food)
Cold drinks / wine and beer for on-premises consumption



**DUANE**reade

July 16, 2015

40 Wall Street
725 5th Avenue
New York, NY 10022
Attn: Donald J. Trump

        Re:    Lease dated July 1, 2010 (as amended from time to time, the "Lease") between
                  40 Wall Street LLC ("Landlord") and Duane Reade ("Tenant")

Dear Mr. Trump:

Reference is hereby made to Section 40.06 of the Lease which restricts, among other things, the operation of a supermarket/grocery store within the Building (other than the Demised Premises) or any property owned or leased by Landlord or any affiliate of Landlord within a one (1) block radius of the Building.

Landlord desires to enter into a lease with Dean & DeLuca, Inc. ("Dean & DeLuca") in the Building for use as a full service gourmet food market with a mix of food, food products and merchandise and for any other lawful purpose (other than for the sale of prescription drugs and health and beauty aids) including, without limitation, for the on-site cooking, preparation and sale (both wholesale and retail) of food and beverages (including corporate and private catering and private dining services and alcoholic beverages) for on and off-premises consumption (the "Permitted Use") as provided in the draft lease provided to Tenant as same may be amended from time to time not inconsistent with the terms of this letter ("Dean & DeLuca Lease").

Tenant hereby agrees to waive its supermarket/grocery store restriction for Dean & DeLuca and its successors, assigns and/or subtenants as tenant under the Dean & DeLuca Lease and consents to any of the foregoing entities operating a Permitted Use under the Dean & DeLuca Lease. Capitalized terms used herein but not defined herein shall have the meaning ascribed to such term in the Lease. The undersigned represents he is authorized to bind Tenant.

                                Very truly yours,
                                Duane Read

                              By:  Duane Reade, Inc.,
                                  Its general partner

                              By:
                              Name: Thomas J. Connolly
                              Title: Vice President

91230169 1

**Exhibit K**
**Load Letter**

**Exhibit L**
**New Freight Lift Location and Specifications**



40 Wall Street - Pine Street Entrance.

Proposed New Freight Lift Location

- PINE STREET -
- LEVEL

Loading Dock & Entrance

exist ramp

STORE LEVEL



PINE STREET

Loading Dock Area

Proposed New Freight
Lift Location

WILLIAM STREET

LANDLORD AREA
UNIT 1
BUILDING'S
GARBAGE RM.

2  PLAN BASEMENT LEVEL

1  PLAN 1ST FLOOR LEVEL

1ST FLOOR

CUSHMAN &
WAKEFIELD.

THE TRUMP BUILDING
40 WALL STREET

GHWA
Gensler, Hill & West Architects, LLP

## Exhibit M
## Memorandum Confirming Term

Memorandum Confirming Term

THIS MEMORANDUM ("Memorandum") is made as of _____, 2015 between **40 WALL STREET LLC**("Landlord") and **DEAN & DELUCA, INC.** ("Tenant"), pursuant to that certain Lease Agreement between Landlord and Tenant dated as of June ___, 2015 (the "Lease") for the Premises located at 40 Wall Street, zed terms used in this Memorandum have the meanings ascribed to them in the Lease.

    1)    Landlord and Tenant hereby confirm that:

          a)    The Commencement Date of the Lease Term is _____, 2015;

          b)    The expiration date of the Lease Term is _____ 3_, 20__; and

          (c)    Pursuant to the terms of the Lease, the date Fixed Rent commences under the Lease is the first day of the _____.

    2)    Tenant hereby confirms that:

          (a)    All commitments, arrangements or understandings made to induce Tenant to enter into the Lease have been satisfied except as follows:_____;

          (b)    All space and improvements have been completed and furnished in accordance with the provisions of the Lease except for the following:_____; and

          (c)    Tenant has accepted and is in full and complete possession of the Premises.

    3)    This Memorandum shall be binding upon and inure to the benefit of the parties and their permitted successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.


**LANDLORD:**               **TENANT:**
**40 WALL STREET LLC**        **DEAN & DELUCA, INC.**


By: _____        By: _____

Name/Title: Donald J. Trump, President    Name/Title:

**Exhibit N**
**Estoppel**
TENANT ESTOPPEL CERTIFICATE AND AGREEMENT

_____

**New York, New York**

_____, _____

[Name and Address]

RE: _____
Premises: 40 Wall Street
New York, New York

Gentlemen:

The undersigned, as tenant, has entered into a lease agreement dated _____, with _____, as landlord ("Landlord"), which expires on _____ (the "**Lease**"), pursuant to which the undersigned has leased a portion of the Premises (the "**Leased Premises**"). You have requested the undersigned to deliver this Estoppel Certificate for the purpose of setting forth pertinent information regarding the Lease and the Leased Premises. The undersigned acknowledges that [you and Landlord] [is/are] relying upon the certifications and agreements made by the undersigned herein.

The undersigned hereby certifies to [you and Landlord] the following:

(a)    The Lease constitutes the entire agreement between Landlord and the undersigned with respect to the Leased Premises and same is in full force and effect and has not been modified or amended, other than _____;

(b)    The undersigned is not in default of any of its obligations under the Lease;

(c)    To the actual knowledge of the undersigned, the Landlord is not in default under any of its obligations under the Lease;

(d)    The fixed monthly rent due under the Lease as of the date hereof is $_____ and such rent has been paid through _____, 201_. The commencement date of the Lease occurred on _____ and the Lease will expire on _____. The additional rents, (including, without limitation, all escalations and tenant reimbursements to Landlord such as taxes and insurance, and percentage rent, if any), payable under the Lease for the month this Estoppel Certificate is executed is as follows: [Specify each of such additional rent charges] _____;

(e)     The undersigned has no (i) present right of offset or defense against any rent, additional rent, or other sums payable to Landlord under the Lease which are due or to become due under the Lease or (ii) actions, claims, proceedings or suits pending or threatened against the Landlord or relating to the Premises;

(f)     The Lease was duly authorized and entered into by the undersigned and constitutes the valid and binding obligation of the undersigned enforceable in accordance with its terms;

(g)     The undersigned has not prepaid any sums payable to Landlord under the Lease beyond the current month and will not pay any sums payable to Landlord more than one month in advance.

(h)     The undersigned has entered into and accepted possession of the Leased Premises and such Leased Premises are in compliance with the terms of the Lease. All improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant in all respects;

(i)     There is currently on deposit or held under the Lease a security deposit of $_____ in the form of [cash][a letter of credit];

(j)     The undersigned is not entitled to any rent concessions or abatements other than

_____

_____

_____ ;

(k)     The undersigned has not given notice to exercise any rights to cancel, surrender or terminate the Lease and will not so cancel, surrender or terminate the Lease without giving the Bank at least thirty (30) days prior written notice (at the address set forth above) of the undersigned's intention to do same;

(l)     Attached hereto is a true and complete copy of the Lease and the undersigned is the sole holder of the Tenant's interest in the Lease;

(m)     The undersigned has not used, stored, buried or otherwise involved itself with toxic substances or hazardous materials on or in connection with the Leased Premises;

(n)     The undersigned has not received any written notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease or of the rents secured therein, with the exception of _____ ;

(o)     The undersigned, as tenant of the Leased Premises, has, except to the extent Landlord has expressly agreed in the Lease to ensure such compliance, complied with, and will, except to the extent Landlord has expressly agreed in the Lease to ensure such compliance,

102

continue to comply with, all local, state and federal laws and regulations affecting the Leased Premises, including, but not limited to, the Americans with Disabilities Act, Public Law 101-336; (p)    The Lease has not been assigned, modified, supplemented or amended in any way, except as follows: _____.

(t)    Tenant has no right of first refusal, option or other right to purchase the Premises or any part thereof.    Tenant has no right or option to renew the Lease except as follows:

_____

(u)    There are no actions, whether voluntary or otherwise, pending or threatened against Tenant before or by any court or administrative agency.

The undersigned hereby certifies that the information contained in the foregoing Estoppel Certificate is true and correct and that [_____] and any of [its/their] respective successors and assigns may rely upon such information.

Very truly yours,

_____


By:_____
    Name:_____
    Title: _____